RECEIVED BY MAIL
SEP 30 2019
Clerk, U.S. District Court
Fergus Falls, Minnesota

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

TONY DEJUAN JACKSON,
Plaintiff,
& As Jail House Lawyer,

Other Similarly Situated Prisoners At Stillwater Correctional Facility & Other Similarly Situated Prisoners At Rush City Correctional Facility & All other Minnesota Correctional Facilities & Contracted Half Way Housing, & Minnesota Association Of Community Corrections Act Counties County Jails,

v.
Tim Walz, Governor et al, State of Minnesota,
Defendants.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

19cv 2612 JNE /BRT

(To be assigned by Clerk of District Court)

DEMAND FOR JURY TRIAL

YES __[X]__ NO____

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 PRISONER & PRISON CONDITIONS**

I. PREVIOUS LAWSUITS

A. Have you begun other lawsuits in states or federal court dealing with the same facts Involved in this action or otherwise relating to your imprisonment in the last three years?

**[X] Yes**

[] No

B. if you answer to (a) is "yes", describe each lawsuit in the space below.

1. Parties to the previous lawsuit:

Plaintiffs:



SCANNED
SEP 30 2019
U.S. DISTRICT COURT FF

**Tony Dejuan Jackson, Plaintiff & All Similarly Situated Prisoners at Rush City Correctional Facility.**

Defendants:

**Mark Dayton, Governor et al, In their official capacities,**

2. Court (if federal court, name the district. If state court, name the state and country.):

**United States District Court District of Minnesota**

3. Case Number:

**Case No. 15 –CV-4429 (WMW/TNL)**
**Case No. 17-cv-00880(WMW/TNL)**

4. Name of judge assigned to the case:

**Tony N. Leung :United States Magistrate Judge**

**Wilhelmina M. Wright: United States District Judge**

5. Cause of action (Cite the statute under which you filed and write a brief statement of the case): **42 U.S.C. 1983 Violation of Civil Rights Regarding Overcrowding & Double Bunking Prison Conditions that Jeopardize the Health & Safety of the Plaintiff & All Similarly Situated Prisoners at Rush City Correctional Facility & Stillwater Correctional Facility & All Minnesota Correctional Facilities State Wide**

6. Disposition or final determination of the case (for example, dismissed or appealed).

**Dismissed Without Prejudice**
**Dismissed With Prejudice**

7. Approximate date of filing the lawsuit:

**December 16th 2015**

8. Approximate date of disposition or final determination of the lawsuit:

**Order Dated February 7th 2017**
**Order Dated August 3rd 2018**

***Attach a copy of the disposition or final determination of the lawsuit if it was filed in a court other than the U.S. District Court for the District of Minnesota.*** **If there was more than one lawsuit, describe the additional lawsuits on a separate sheet of paper answering the same questions in the same order as above in Question 1(b). Label this information as Question 1(b).**

**Check here if additional sheets of paper are attached. []**

II. PRESENT PLACE OF CONFINEMENT
**MCF STILLWATER CORRECTIONAL FACILITY**

A. Is there a prisoner grievance procedure in the institution?

**[x] Yes**

[] NO

B. Did you present the facts relating to your complaint in the prisoner grievance procedure?

**[x] Yes**

[] No

C. If you answered "yes" to question II.B.:

1. What steps did you take:

**(a) STILLWATER CORRECTIONAL FACILITY:**
**First I tried to raise the issues by way of the Offender Kite System addressed to Victor Wanchena, Associate Warden Administration, Steve Hammer, Former Warden, John Quist, Program Director, Lisa Stinseth, Program Director, Cell Block A/East Lieutenant Andreachi, and both Offender Kite Verbal Conversation with Steve Mccarty, Former Supervisor for Office Of Special Investigations for Stillwater Correctional Facility. I also filed a Formal Complaint with the Department of Corrections Commissioner Tom Roy, Alleging Violations of the Code of Personal Conduct Policy by Administrative Staff. I talked with the Warden Eddie Miles on July 9th 2017 the warden instructed the Plaintiff write him an Offender Kite regarding the Issue and that he would assist the Plaintiff with the Issue.**

**(b) RUSH CITY CORRECTIONAL FACILITY:**
**First I tried to raise the issues as part of the Offender Representative Meetings with no results so I raised the issues using the Offender Kite System, to Jim Benson, Warden of Rush City Correction Facility, former Warden Steve Hammer of Rush City Correctional Facility, (OSI) Office of Special Investigations at Rush City Correctional Facility and Psychology Services Department and Eddie Miles, Former Assistant Commissioner of Department of Corrections for the State of Minnesota. I also again regarding these Amended issues raised them as part of the Offender Representative Meetings and submitted several Memorandums regarding the Amended issues to the Warden Jim Benson & Joe Winiecki, MINNCOR Industry Director & (PIECP) Coordinator & Tom Roy Commissioner of Department**

**of Corrections with only one partial Response on behalf of Tom Roy Commissioner of Minnesota Department of Corrections from Chris Dodge Chief financial officer for the Minnesota Department of Corrections.**

2. What was the result?

**(a) STILLWATER CORRECTIONAL FACILITY:**

**I had both verbal communications & written response from Program Director John Quist who stated to me that he was speaking on behalf of the Commissioner Tom Roy. Program Director Quist Informed me that things would change but as of to Date nothing has changed instead the situations has gotten progressively worse which prompted me to write a Offender Kite to the Newly Appointed Warden Eddie Miles and also file a Formal Criminal Complaint & Memorandum for continued Violations of my Civil Rights for Discriminatory & intimidating Conduct, & Hate Crimes regarding Stillwater Correctional Facility Security Staff & Administrators which I sent To the Federal Bureau of Criminal Division(District of Minnesota),Minnesota Bureau of Criminal Apprehension, and Bayport Police Department. I have been experiencing situations where both my legal mail & regular mail has been tampered with and confiscated prior to being delivered to me by Stillwater Correctional Facility Mail Room Staff. <u>The Plaintiff sent the Warden Eddie Miles an Offender Kite as he instructed him to do regarding the Broad restriction placed upon the prisoners regarding the Internet. The Warden Never responded to the Offender Kite.</u>**

**(b) RUSH CITY CORRECTIONAL FACILITY:**

**Jim Benson, Warden of Rush City Correctional Facility conducted an investigation into the Plaintiffs allegation, the warden Jim Benson explained to the plaintiff in an Office Memorandum after meeting with the Plaintiff with OSI present (Office of Special Investigations) that the Warden had completed his investigation and that he could not disclose any information to the plaintiff regarding the results of the investigation. Therefore the Plaintiff appealed to the Former Assistant Commissioner of Department of Corrections Eddie Miles who later informed Warden Jim Benson to take a second look at the plaintiffs allegations. The Warden and OSI (Office of Special Investigations) meet with the Plaintiff a Second Time for two hours This was in August of 2015. The Warden Jim Benson stated to the Plaintiff that he or The Assistant Commissioner Eddie Miles would be giving the Plaintiff a Reply. The plaintiff however still to this day has not received any information from the Commissioner of the Department of Corrections office regarding the Plaintiffs allegations. Regarding the Amended issues The Plaintiff was instructed at the March 2nd 2016 Offender Representative Meeting by the Warden Jim Benson to Meet with Both Joe Winiecki, MINNCOR Industry Director & (Private Sector/Prison Industry Enhancement Project (PIECP)) for the Rush City Correctional Facility Site & Finance Director M. Henderson, to discuss the issues regarding the Amended Complaint. Both Joe Winieciki , and M. Henderson refused to meet with the Plaintiff as instructed by the warden Jim Benson.**

***Attach a copy of the decision or disposition received from the prisoner grievance procedure.***

D. If you answered "no" to question II.B., explain why you did not present the facts relating to your complaint in a prisoner grievance procedure.

TABLE OF CONTENTS

PAGES

I. NATURE OF THE CASE------------------------------------------------------------ 8 - 20
II. JURISDICTION------------------------------------------------------------------- 20
III. VENUE-------------------------------------------------------------------------- 21
IV. PARTIES: STATEMENT OF PLAINTIFF------------------------------------------ 21
A. Conditions of Confinement……………………………………………………26
B. Health Care……………………………………………………………………………31
C. Minnesota Medicaid Program………………………………………………..32
D. Retaliation and Harassment…………………………………………………33 - 36
E. Rush City Correctional Facility ……………………………………………35 - 44
F. Information Found on Wiki Pedia On Jodi Huisontruit………………44 - 47
G. Rehabilitation Programming ………………………………………………47 - 57
H. Sex offender Treatment Programs…………………………………………51 - 57
V. FACTUAL ALLEGATIONS: Against Individual DEFENDANTS ---------------57 – 176
TIM WALZ, GOVERNOR: STATE OF MINNESOTA----------------------------57 -
MARK DAYTON, Former GOVERNOR, STATE OF MINNESOTA----------- 57 - 62
AMY KLOBUCHAR, UNITED STATES SENATOR------------------------------62 - 64
LORI SWANSON, FORMER STATE ATTORNEY
GENERAL--------------------------------------------------------------------------64 - 66
KEITH ELLISON, STATE ATTORNEY GENERAL ---------------------------------66 - 67
TINA SMITH, UNITED STATES SENATOR-------------------------- ------------67-69
DEBRA HILSTROM, STATE OF MINNESOTA HOUSE
REPRESENTATIVE------------------------------------------------------------- --69 - 71
MINNESOTA SENTENCING GUIDELINES COMMISSION---------------------71 - 74
LORIE SKJERVEN GILDIEA, CHIEF JUDGE
MINNESOTA STATE SUPREME COURT-----------------------------------------74 - 77
MINNESOTA ASSOCIATION OF COMMUNITY CORRECTIONS
ACT COUNTIES--------------------------------------------------------------- --77 - 79
MINNESOTA DEPARTMENT OF HUMAN SERVICES---------------------------79 - 82
MINNESOTA DEPARTMENT OF ADMINISTRATION----------------------------82 - 86
OVERVIEW OF THE MNDOC SYSTEM AND
MNDOC DEFENDANTS----------------------------------------------------------86 - 87
RON SOLHEID Former DEPUTY COMMISSIONER
MNDOC CENTERAL REGION---------------------------------------------------87 - 92
MARY DOMBROVSKI, GRANTS AND SUBSIDIES SUPERVISOR
MNDOC COMMUNITY SERVICE DIVISION------------------------------------ 92 - 93
CRAIG FRUEN, EXECUTIVE DIRECTOR/CEO, DAMASCUS WAY
REENTRY CENTER, INC-------------------------------------------------------93 -
DENNIS CUMMINGS, EXECUTIVE DIRECTOR, THE

DULUTH DETHEL------------------------------------------------------------------------93 - 94
DAN CAIN, PRESIDENT, RS EDEN------------------------------------------------ ---94 - 95
DAN PFARR, CHIEF EXECUTIVE OFFICER,
180 DEGREES, INC----------------------------------------------------------------- ---95 -
KARY GERLICHER, Former MNDOC SPECIAL INVESTIGATIONS
DIRECTOR-------------------------------------------------------------------------------96 -
SARA J. FITGERALD, MNDOC COMMUNICATIONS
PERSONAL-------------------------------------------------------------------------------96 -
LYDIA NEWLIN, MNDOC DIRECTOR OF VICTIM SERVICES--------------------96 -
SHEILA PACKWOOD, CORRECTIONS PROGRAM DIRECTOR-------------- ----96 -
CHRONIC OVERCROWDING AT MNDOC FACILITIES ---------------------------96 -
BRUCE REISER, Former DEPUTY COMMISSIONER FACILITIES
DIVISION----------------------------------------------------------------------------------96 - 99
BILL PAL-FREEMAN, MNDOC CHIEF BUSINESS TECHNOLOGY
OFFICER-----------------------------------------------------------------------------------100 - 102
TRACY HOSKING, MNDOC CAPACITY MANAGEMENT FACILITIES
DIVISION----------------------------------------------------------------------------------102 - 106
CHRIS DOGE, CHIEF FINANCIAL OFFICER MNDOC------------------------- ------106 – 109
Paul Schnell, COMMISSIONER OF DEPARTMENT OF
CORRECTIONS----------------------------------------------------------------------------109 -
TOM ROY, Former COMMISSIONER OF DEPARTMENT OF
CORRECTIONS, MINNCOR BOARD MEMBER------------------------------ ------109 – 116
MICHELLE SMITH AS DEPUTY COMMISSIONER
FACILITES DIVISION----------------------------------------------------------------------116 - 117
DEFENDANT MINNCOR INDUSTRIES----------------------------------------- -------117 - 124
DAVID MILTON, MINNCOR INDUSTRIES CHIEF EXECUTIVE
OFFICER-----------------------------------------------------------------------------------117 - 123
JEFF LONSKI, MINNCOR INDUSTRIES VICE PRESIDENT
OF OPERATIONS-------------------------------------------------------------------------123 - 124
WALMART CORPORATION-------------------------------------------------------------124 - 125
3M CORPORATION -----------------------------------------------------------------------125 -
PLASTECH CORPORATION -------------------------------------------------------------125 - 126
DEPARTMENT OF LABOR-----------------------------------------------------------------126
A'VIANS FOOD SERVICE-------------------------------------------------------------------126 - 127
CWF SOLUTIONS LLC----------------------------------------------------------------------127 - 128
ANAGRAM INTERNATIONAL--------------------------------------------------------------128 - 129
MINNESOTA DEPARTMENT OF NATURAL RESOURCES---------------------------129 - 130
MINNESOTA DEPARTMENT OF TRANSPORTATION--------------------------------131 -
ANDERSON WINDOWSCORPORATION--------------------------------------- -------132 -
CENTURY COLLEGE------------------------------------------------------------------------132 - 133
JPAY, INC------------------------------------------------------------------------------------133 – 134
GUY BOSCH, WARDEN STILLWATER CORRECTIONAL FACILITY-------------------134 -

STEVE HAMMER FORMER WARDEN, STILLWATER
CORRECTIONAL FACILITY----------------------------------------------------------------135 -
EDDIE MILES, WARDEN STILLWATER CORRECTIONAL FACILITY----------------135 - 142
VICTOR WANCHENA, ASSOCIATE WARDEN ADMINISTRATION
STILLWATER CORRECTIONAL FACILITY----------------------------------------------143 - 149
DOUG GREENE, PHYSICAL PLANT DIRECTOR
STILLWATER CORRECTIONAL FACILITY----------------------------------------------149 - 150
LATHAN SCOTT, CORRECTIONS PROGRAM DIRECTOR---------------------------150 - 153
CHRIS PAWELK, FORMER ASSOCIATE WARDEN OPERATIONS
STILLWATER CORRECTIONAL FACILITY----------------------------------------------153 - 155
LISA STENSETH, Associate Warden Operations----------------------- ------------155 - 159
ANDREW REED, CORRECTIONS PROGRAM DIRECTOR---------------------------159 - 160
DEFENDANTS AFSCME COUNSEL #5 CORRECTIONS
GUARD UNIT REPRESENTITIVES ----------------------------------------------------160 - 164
AFSCME UNION LOCAL 600--------------------------------------------------------161 - 163
AFSCME UNION LOCAL 1539------------------------------------------------------164 -
BYRON MATTHEWS, SECURITY CAPTIAN-------------------------------------------165 -
STEPHEN HARDING, SECURITY CAPTIAN-------------------------------------------165 -
RICK RAVEN, SECURITY LIEUTENANT------------------------------------------------166 - 167
JEFF TITUS, WARDEN OF RUSH CITY
CORRECTIONAL FACILITY---------------------------------------------------------- --167 - 171
GREGG SMITH, ASSOCIATE WARDEN OPERATIONS
RUSH CITY CORRECTIONAL ------------------------------------------------------------171 - 174
SANDY O'HARA, ASSOCIATE WARDEN ADMINISTRATION
RUSH CITY CORRECTIONAL-------------------------------------------------------------- --174 -
JOE WINIECKI, MINNCOR INDUSTRY DIRECTOR--------------------------------------175 – 177
(i) <u>Summary of Facts Regarding Death Of Correctional</u>
<u>Officer Joseph Gohm By Prisoner John D-------------------------------------------176 - 178</u>
<u>(ii) Minnesota Department of Corrections</u>
<u>Facility Funding Structure and Definitions:----------------------------------------178 - 182</u>
<u>(iii) PURPOSE OF MINNCOR:-------------------------------------------------------------182 - 186</u>
<u>VI. CLASS ACTION ALLEGATIONS--------------------------------------------------------195 - 199</u>
<u>VII. *Appointment Of Counsel*-------------------------------------------------------------*199 - 200*</u>
<u>REQUEST FOR RELIEF:-----------------------------------------------------------------------200 - 204</u>

III. PARTIES

List your name, prisoner number, address and telephone number. Do the same for any additional plaintiffs. Attach an additional sheet of paper, if necessary.

A. **Tony Dejuan Jackson**
**Jail House Lawyer**
**Prisoner #197562**
**MCF STILLWATER CORRECTIONAL FACILITY**
**970 PICKETT STREET NORTH**
**Bayport MN 55003**

Additional Plaintiffs:
**Other similarly Situated Prisoner's**
**At Stillwater Correctional Facility**
**970 Pickett Street North**
**Bayport MN 55003 &**

**Other similarly Situated Prisoner's**
**At Rush City Correctional Facility**
**MCF RUSH CITY CORRECTIONAL FACILITY**
**7600 525TH Street**
**Rush City MN 55069**

IV. STATEMENT OF THE CLAIM

Describe in the space provided below the basis facts of your claim. Describe how each individual defendant is personally involved, including dates, places and specific wrongful acts or omissions by each defendant. Each factual allegation should be provided in separately lettered paragraphs, beginning with letter A. Do not make any legal arguments or cite any cases or statutes.

**I. NATURE OF THE CASE**

1. Minnesota State Prisons are In a State of Chaos that endangers the health, Safety, and Lives of Prisoners and staff alike on a daily basis. For over twenty years, Minnesota State Prisons have been overcrowded under-resourced, and understaffed and crumbling under clear neglect due to the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding . The Minnesota Department of Corrections Conspired with officials from other State Government Agencies,

Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff.

2. The result is a dangerous system in perpetual crisis, prisoners are consistently deprived of adequate mental health care, including medical, dental, and mental health care, and denied accommodations for their disabilities. Minnesota State prisoners, including male juveniles, dental, and Mental Health Care, and denied accommodations for their disabilities Minnesota State prisoners, including Juveniles, suffer in conditions of extreme isolation, sometimes for years. In addition, the over use of Isolation, inadequate Mental Health Care, and the failure to provide Rehabilitation Programs, and inadequate pre-release and reentry planning programs and resources, have led to dangers not only to prisoners and staff, but to the public safety. These failures are the precipitating cause of several aggravated Crimes of prisoner who killed people and police officers within days of their release, after serving many years in isolation without rehabilitation Programming. This Treatment of Minnesota Male Prisoners violates their rights under the Eighth Amendment to the United States Constitution and under federal statutes protecting persons with disabilities.

3. Prisoners who are blind, deaf, or hard of hearing are denied access to adequate health care and other programs and services due to the Defendants failure to provide accommodations, including Auxiliary aids and services. Prisoners with mobility disabilities are denied accommodations and support, leaving them to rely on other prisoners for help, which puts them at risk of injury and exploitation and excludes them from programs and services provided in inaccessible locations.

4. These Conditions have contributed to frequent violence at Minnesota at all Minnesota male Prisons In the past twelve years alone, riots have left multiple prisoners and prison Staff injured. Since January of October of 2017, several prisoners and staff have been assaulted and injured with metal Prison shanks and more recently on July 18th 2018, a Correctional Officer was murdered in the Stillwater

Level Four Correctional Facility MINNCOR INDUSTRY Building #20 by a prisoner Due to Prisoner overcrowding . Correctional officials have repeatedly cited a National Institute of Corrections document stating the need for 150 additional staff in Minnesota's state system. When asked for a copy of the document a Minnesota Doc spokes women said it was not public for security reasons. A document produced by House bipartisan fiscal research staff detailed request dating back to 2013 showed former Governor Mark Dayton made a request for 25 officers in 2016, a fraction was funded. That year, the former Governor asked for about 175 new D.O.C. Staff – including 16 more guards – for changes in mental health services. After Negotiations with the Legislature only 12 additional information Technology employees and eighth more guards for a severely understaffed juvenile facility were funded that year.

5. A Research staff member noted that because of the D.O.C.'s massive size – with a 2019 budget of $588 Million – a lot of the funding increases it ask for go toward accommodating Contract wage and benefit increase for existing employees. Thus, adding staff can be a hard sell. In 2017, for example, $47 million went toward wage and benefit increases of existing employees alone – before any staff could be added. The department currently has roughly 4,300 full – time employees.

6. Tom Roy former Commissioner for the Minnesota Department of Corrections spoke with media for the Department of Corrections budget which has increased steadily in recent years, going from 999 million in 2014 – 2015 to $1.2 Billion in the most recent budget approved by law makers. The former Governor and the Department of Corrections said it requested funds to hire 187 additional officers in the last seven years. However the Legislature has only approved 15. Senate Republicans pushed back 5 Eyewitness News, saying that the department's budget has increased in recent years and suggested the department's spending be examined.

7. In 1980, when the pioneering Minnesota Sentencing Guidelines were enacted, there were roughly 1,800 adult prison inmates in Minnesota. Today there are nearly 10,200 – more than a 500

percent increase. The state's population did not go up by anywhere near that percentage, and the crime rate, while fluctuating, has remained pretty much stable. So how and why the steep increase? The original legislation required the Sentencing Guidelines Commission to rank sentences proportionate to crime severity and an offender's criminal history. It also required the commission to take into "substantial consideration' the resources available for incarceration.

8. Commission membership was staggered so as to avoid political influence, and changes to the guidelines themselves, whether modifications or the ranking of newly created crimes, were to automatically go into effect in August of the year following the change, absent legislative action to the contrary. What that meant was that the Legislature did not need to approve commission actions; instead, it needed to take action to disapprove them. Political winds change over time. Everyone needs a platform to run on; high-profile crimes stir emotions providing that platform, and no one wants to run against someone who can remotely paint them as soft on crime. So following a period during which the guidelines remained free of political influences for about four years, the exponential growth of Minnesota Prison System began.

9. Two key structural changes were made by a Legislature that felt sentences were not severe enough. First, all reference to taking into consideration the capacity of prisons was removed from language. Second, appointments of commission members were changed so that their terms were concurrent with the governor, removing the staggered terms and fostering a total turnover in the commission every time a new chief executive took office. Another change was a tendency to appoint prosecutors, judges or commissioners of corrections as commission chairs. Previously, commission chairs were typically chosen from the public rather than from those whose position in the system created a vested interest.

10. Prison growth accelerated in the late 1980s in response to the "crack" epidemic and several murders in Minneapolis parking ramps. In 1989, the Legislature remodified all drug crimes, setting up an

artificial assumption that passion or sales of certain amounts of a controlled substance identified an offender as being higher up in the drug hierarchy. The prison population of African –Americans went through the roof, and ultimately the distinction between "crack" and powder was found to be unconstitutional. But the decision was not made retroactive for those already in prison. And the ability of law enforcement to aggregate to a targeted threshold remained.

11. High-profile sex crimes are like red meat to policymakers. Sentences for criminal sexual conduct for all levels of the crime were increased as a result of legislative action following a number of cases, most notably the assault and murder of Dru Sjodin. A secondary consequence of the response to that particular crime, while not specifically prison –related, was that those committed to a life of incarceration in the costly Minnesota Sex Offender Program in a given year increased by 300 percent almost immediately, However the former Governor Mark Dayton continued to disregard a Federal Judge order Issued by the Honorable Donovan W. Frank, United States District Court Judge District of Minnesota requiring the release of Sex Offenders which also applies to Sex Offenders being held In the Minnesota Department of Corrections Facilities that were deprived of both Criminal and Civil procedures so as to afford individuals their constitutional Rights.

12. Then we have the fastest recent growth segment of the prison population. Those convicted and sentenced for felony-level aggravated DWI. Previously, drunken driving had been classified as a misdemeanor or gross misdemeanor, neither resulting in a prison sentence, but instead subject to a year in a county workhouse or jail.

13. Last, we have the disproportionate population of release violators. Someone released from prison typically has 13 conditions of release, with those identified as high risk having as many as 80. These are people who are returning to prison without committing, or being convicted of, a new crime. They account for approximately 3,000 prison commitments per year, usually for moderate violations, requiring approximately 1,200 prison beds. We have multiple rules against missing, or being late to,

appointments with your supervisor agent, having a positive alcohol or drug test, being identified through your electronic bracelet as being outside the area in which you are authorized, or failing a treatment program, all of which can lead to a return to prison. These technical violations are not only enacted on those who are released from prison but also on those who never go to prison as part of their sentence but instead receive probation.

14. Even as the U.S. system of mass incarceration is increasingly under fire, prison industry stakeholders remain vocal, resisting efforts to close prisons, reform sentences, and increase opportunities for early release. Stakeholders in both sectors have the interest of businesses, community groups, legislatures, other government workers, and their own financial interests. For Example, the Correctional officer's union in Illinois was particularly vocal in opposing Governor Quinn's order to close Tamms Supermax. This maximum –security prison in Southern Illinois was notorious for its brutal treatment of prisoners with mental illness, which included isolating them for years, often indefinitely, in solitary confinement. The American Federation of State, County, and Municipal Employees (AFSCME union worked to stall the closure order through the courts, taking the position that conditions at Tamms were necessary to maintain prison safety and security as well as to keep jobs in Southern Illinois.

15. AFSCME Corrections officers Union here in Minnesota have also allied themselves with businesses that risk losing cheap labor if prisons are closed. Business In Bayport Minnesota and St Croix Wisconsin, MINNCOR Industries, Anagram International, Walmart, 3M, Computers For Schools, Anderson Windows, Plastech Corporation, Department of Natural Resources, Department of Transportation, Parks and Recreations and Many others are just examples of Businesses that profit from cheap Prisoner Labor At Stillwater Correctional Facility, Rush City Correctional Facility and All other Similarly Situated Minnesota Correctional Facilities State Wide. Correctional officers rely on the continued strength of the prison industry for their job security. Officers in many states are members of unions that are sometimes part of a larger public employee union. Because these unions act on behalf of

officers, and officers generally assert their interests through these unions, unions representing correctional officers historically have preferred more punitive criminal laws and longer sentences which the Plaintiff has been subjected to.

16. They have justified these preferences as necessary to punish "the bad guys." The preference for more punitive criminal laws also relies on a few basic assumptions. First, when the number of prisoners increases ( and/or the length of prisoners' sentences is extended), more prisons will be built. Second, an increase in the number of prisons in Minnesota will result in more jobs for correctional officers. Even if new prisons are not built, an increase in prisoners has required Current Minnesota Correctional Facilities to house more prisoners, which has required the hiring of more officers, resulting in a net gain of officer jobs. Ultimately, prison expansion would likely mean even more job Security ( and perhaps promotion opportunities) for officers, whereas prison contraction in Minnesota would likely mean that officers will be laid off. Because the Corrections Guard Unit Representatives for AFSCME Local 600 & Local 1539, job is to advance the interest of its members, and because job security is of paramount importance to correctional officers, the union is invested in expanding the reach of criminal law and the length of prison sentences.

17. Unions historically have also opposed the privatization of prisons, and they have lobbied against political candidates that favor privatizing prisons. "One union representative describing privatization as "our biggest challenge" alongside "the challenge of getting a pay raise." Private prisons hire outside the union and pay lower wages, so every contract that goes to the private sector is a lost opportunity or more public-sector union jobs. Furthermore, if the private sector is successful in saving money while offering comparable services, then questions inevitable will arise about the viability of public-sector officers jobs and about whether their self-image as uniquely capable of dealing with a difficult population is justified. Officers pride themselves on being "tough." They describe controlling prisons as "the toughest beat," as walking the toughest blocks," and as "patrolling the toughest precincts." The

notion that officers jobs are especially demanding, and that officers are uniquely qualified to work in such a challenging environment, figures prominently in their collective self-image as depicted on union websites. Related to the 'toughness" trope that permeates officers' self-image is the pervasive "us versus them rhetoric used to separate themselves from Prisoners under their watch and are quick to reject proposed reforms aimed at improving inmate conditions.

18. Anything that could be construed as indulging inmates disturbs correctional officers, many of whom believe that prison should be a state of deprivation where there is no pleasure. Officers often come from the same neighborhoods as the Prisoners so separating themselves using the rhetoric of "us versus them" may fill a psychological need. Indeed, officers and inmates are often linked "by common interests, cultural and social values and experiences and by common deprivations. The narrow gap between officers and prisoners has motivated officers at Stillwater Correctional Facility, Rush City Correctional Facility and all other Minnesota Correctional Facilities State wide to distance themselves from the prisoners under their watch, occasionally asserting their superiority even to the point of abuse and Murder.

19. The United States Supreme Court had this to say regarding prisoner labor unions: "State correctional officials uniformly testified that the concept of a prisoners labor union was itself fraught with potential -dangers, whether or not such a union intended, illegally, to press for collective-bargaining recognition. Appellant Ralph Edwards, the Commissioner of the Department of Correction, stated in his affidavit: "The creation of an inmate union will naturally result in increasing the existing -friction between inmates and prison personnel. It can also create friction between union inmates and non-union inmates." Appellant David Jones, the Secretary of the Department of Correction, stated: "The existence of a union of inmates can create a divisive element within the inmate population. In a time when the units are already seriously over-crowded, such an element could aggravate already tense conditions. The purpose of the union may well be worthwhile projects. But it is evident that the inmate

organizers could, if recognized as spokesman for all inmates, make themselves to be power figures among the inmates. If the union is successful, these inmates would be in a position to misuse their influence.

20. After the inmate union has become established, there would probably be nothing this Department could do to terminate its existence, even if its activities became overtly subversive to the functioning of the Department. Work stoppages and mutinies are easily foreseeable. Riots and chaos would almost inevitably result. Thus, even if the purposes of the union are as stated in the Plaintiffs complaint, the potential for a dangerous situation exists, a situation which could not be brought under control." Therefore because the realities of running a penal institution are complex and difficult, the United Stated Supreme Court has recognized the wide-ranging deference to be accorded the decisions of prison administrators.

21. Therefore because the Circumstances cited by the United States Supreme Court are similar to the conditions created by AFSCME UNION Corrections Guard Unit within the Minnesota Department of Corrections facilities State wide the existence of the State Employee Correctional Unions Should be held to be in Violation of the Eighth Amendment in regards to the Toxic Prison Conditions and harm to the prisoners under their supervision These Correctional Guard Unit Unions have Caused for Profit. Such as the murders and Excessive Force of Prisoners housed in Minnesota Correctional Facilities State Wide by Security Staff who have never been charged or prosecuted for Excessive Force or Murder of a Prisoner or Death due to Medical Neglect, Because of the Prison Unions Representatives Strong Political influence.

22. It also must be noted that sometime in the year 2016 it was found out by the Minnesota State Legislature Conducting an Audit that the Minnesota Department of Corrections was not Properly reporting incidents that happen within each Correctional Facility properly for many years Classifying serious incidents as Confidential to keep them from being Audited by the Legislature and out of the

public eye. The Washington County Attorney Publicly cited after the first murder of an on Duty Minnesota Correctional officer on July 18th 2018, that his office has handled more than 125 staff assault cases between both Stillwater Correctional Facility and Oak Park Heights Maximum Security Prison since the year 2016. Despite These Events, repeated warnings from outside Consultants and recommendations and Funding from the Minnesota State Legislature, The Defendants have failed to take effective action to address these long standing and well known deficiencies. They have instead acted with deliberate indifference to the unconstitutional and discriminatory Conditions and treatment of Minnesota Male Prisoners, resulting in unnecessary and avoidable pain, suffering, permanent injuries, and death.

23. The Newly Appointed Minnesota Department of Corrections Commissioner Paul Schnell in charge of Minnesota's vast and expensive prison system says state officials must soon decide whether to build new prisons or start locking up fewer prisoners . Paul Schnell told Minnesota Sentencing Guidelines Commission in July 2019 but facing a new mandate from state lawmakers to study child-porn crimes, Sentencing Guidelines Commissioners said that they would be unlikely to wade into the probation and prison sentencing issues until next year 2020. The State's prison population is also a concern, Schnell said. Minnesota has more than 9,500 prisoners – a decrease from 10,100 inmates in 2017 but up from 5,700 in 2000, according to agency data. Only Lawmakers can make changes to policies such as Minnesota's requirement that inmates serve at least 67 percent of their sentences before being released.

24. The prison population could be smaller if Minnesota reduced the time-served requirement, Schnell said. In A letter to the Editor of the Minnesota Correctional Facility Stillwater Prison Mirror Published July 29th 2019, Representative Jack Considine, (House Corrections Division Chair) Minnesota House of Representatives, District 19B, Considine States the Following: **"Dear Residents of the DOC, This Legislative session, I have the honor to serve as chair of the House Corrections Division, a brand**

new committee to the Minnesota House tasked with improving safety, programming, and ultimately, the outcomes for people incarcerated in Minnesota's Correctional facilities. We've had several organized tours and visits of the facilities and in February – in an unprecedented step – held an official legislative in a state prison. Since January, I've also heard from many of you directly with a variety of concerns you've either witnessed or experienced. Please know that while I take each of these seriously, I'm unable to respond to all of them individually.

25. I will note this year, the Legislature approved my bill to reestablish the position of Ombudsperson for the Dept. of Corrections. Eliminated in 2003 due to budget cuts, this potion will be responsible for investigation complaints within the DOC and providing recommendations. I truly feel this will improve the safety and wellbeing of everyone within the walls of our jails and prisons, and I am hopeful people will take advantage of the office's services. Still, I recognize there is more to do. In many cases, programming opportunities remain inadequate, and treatment available within the system for substance abuse and mental illness doesn't meet the need. Our states probation system is also long overdue for reform to ensure all Minnesotans are able to succeed in our communities.

26. For too long, the Legislature has treated state correctional facilities as out of sight and out of mind. This approach hasn't served anyone well, neither the residents who deserve to live safely and with dignity, nor the public as a whole, which deserves positive outcomes from taxpayer investments. All of us should share the goal that everyone – whether working or incarcerated thoughtfully working to enact the policy solutions ensuring this can be a reality."

27. However as of July 29, 2019 no Ombudsperson has been hired for the Minnesota Department of Corrections and the $900,000 Dollar Appropriated Funding for the Ombudsperson Which the New Minnesota Department of Corrections Commissioner Paul Schnell Stated would be implemented using the Departments Budget which is now in question has not been implemented. Where did the Money go

for the Ombudsperson position? Or where is the Ombudsperson? Or where are both the $900,000 Dollars and the Ombudsperson?

28. The States massive Department of Human Services, continues as of September 2019 to be thrown into disarray when its top two deputy commissioners abruptly resigned, signaling serious conflicts within. In quick succession, Commissioner Tony Lourey stepped down, followed by his chief of staff, Stacie Weeks, the two deputies then opted to stay on. With the appointment of Pam Wheelock, a well-respected veteran player in state Government, as acting commissioner, Governor Walz wants a top-to-bottom analysis of an agency that many have long suspected has become too large and complex to also be efficient and accountable. The structure is too big, too unruly, too unfocused," Republican Sen. Michelle Benson who leads the health and human services budget division, has said DHS is too big and in need of restructuring. Benson is not the first to make that critique.

29. In 2015, then – Democratic House Minority Leader Paul Thissen, now a Minnesota Supreme Court Justice, proposed a bill that would have broken DHS into five agencies, each with a district mission, using existing staff and resources. The idea failed to gain traction at the time, but it deserves a second, serious look. The Minnesota Department of Human Services Mission is so sprawling, it's hard to see how so many disparate responsibilities were gathered under one umbrella. DHS is responsible for nursing homes, assisted living, care of the disabled, mental health services, addiction programs, foster care, adoption assistance, the state's controversial Sex Offender Program,food stamps, welfare services, MNsure, Minnesota Care, Medicaid and more. it's very size and complexity mean that only a select few in state government have a real working knowledge of how all the pieces come together.

30. That makes it difficult for a part-time legislator to effectively challenge agency practices or conduct strong oversight. Challenges exist even for someone as skilled as Legislative Auditor Jim Nobles, who earlier this year found "pervasive fraud" among operators in the state child care program. "We audit DHS constantly," Nobles told an editorial writer." "it's that big, that complicated. But I've got three

or four auditors, not an army." He's found problems over the years and recommended changes – some followed, some not.

31. Plaintiff As Jail House Lawyer Request both Individual Compensatory Damages and Injunction and Declaratory Relief & Class Action Certification Regarding Both Injunction and Declaratory relief and Class Punitive Damages to Compel Defendants, Current Governor Tim Walz, Paul Schnell Current Minnesota Department of Corrections Commissioner, Minnesota Sentencing Guidelines Commission and Minnesota State Supreme Court, to immediately remedy the overcrowded, discriminatory, and unconstitutional conditions of Minnesota Prisons. Plaintiff seeks injunctive relief to compel Defendants to provide prisoners with constitutionally adequate health Care, including medical, dental, and mental health care, and cease the unlawful and excessive use of insolation.

32. Plaintiff further seeks injunctive relief to compel Defendants to provide Reasonable Safe accommodations for All Prisoners including Transsexual and Transgender Prisoners, Disabled Inmates, Auxiliary aids and Services, and to cease discriminating against, prisoners with disabilities, Mental Illness and Sex offenders, Transsexual & Transgender Prisoners. Finally, Plaintiff seeks injunctive Relief to abate the extreme overcrowding in Minnesota Prisons, which is a Primary Cause of the Constitutional and Statutory Violations described in this Complaint.

## II. JURISDICTION:

33. Unconstitutional Toxic & Violent overcrowding & Double Bunking Prison Condition that Jeopardize the Health & Safety of The Plaintiff. & Retaliation Against Plaintiff For Bringing Forward Claim.

34. This Action arises under United States Constitution and Violation 42 U.S.C. § 1983. Jurisdiction is proper in this Court pursuant to 28 U.S.C §§ 1331 and 1343(a)(1)(2)(3)(4).

35. This Court has jurisdiction over Plaintiffs' claims arising under Title II of the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehabilitation Act") and the regulations promulgated thereunder, pursuant to 28 U.S.C. §§ 131 and 1343.

36. This Court has jurisdiction over Plaintiffs'' claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ to 28 U.S.C. §§ 2201 and 2202. This Court also has authority under the ADA (42 U.S.C. § 12205), Section 504 Of the Rehabilitation Act (29 U.S.C. § 794a(b) and 42 U.S.C. § 1988 to award Plaintiff reasonable fees, litigation expenses, and costs.

## III. VENUE

37. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants reside in the District of Minnesota; Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Minnesota.

## IV. PARTIES

**STATEMENT OF CLAIMS OF PLAINTIFF:**

38. Plaintiff TONY DEJUAN JACKSON is a 45-year old African American Male Jail House Lawyer Prisoner Incarcerated in the Minnesota Department of Corrections Stillwater Level Four Correctional Facility. He was detained beginning in May of 1997. Jackson hereby states that he continues to be in imminent danger of serious Physical Injury Due to Violent Overcrowding and Double Bunking Conditions of Confinement and Extreme Staff Shortages which has caused Escalating Violence, The July 18th 2018, Murder of Security Officer Joseph Gomm, Inadequate Security, Drug Abuse is rampant in the Prison, Escalating Gang Violence and Riots, and The Physical facilities are dilapidated and poorly maintained. Institutional programs do not exist or are inadequate: when in operation they can be arbitrarily suspended for lack of materials or space, or because teachers, Inmates or Guards are unavailable. Program Schedules are conflictive and inmates may have to drop out of one to participate in another. Educational courses are above or below the educational levels of inmates.

39. Work sources are few and the available work is not meaningful. Recreational facilities are either entirely lacking, underutilized or not used at all because of the unavailability of equipment, Security Staff or other personnel. Inmates are not assessed or diagnosed for work or vocational training but made to fit the available slots: another inmate or a Security Staff is frequently a better source of employment opportunities than MINNCOR , which is officially responsible for job assignments. These Situations have placed the mass of the population in custody in degrading idleness, shut up in overcrowded filthy Cellblocks and old outdated small open front Cells without privacy during most of the day, day in, day out, for years on end. The Administration's failure to maintain order and secure the personal safety of all persons in its custody is one of the most important factors in the deteration of facilities, unstructured programs, the break-down of schedules Mentally Disabled Prisoners and Elderly Prisoners and Sex Offenders being Assaulted by two or more very Hostile Inmates in their Cells Frequently where these hostile Inmates are frequently placed in what is supposed to be Positive Programming CellBlocks for Prisoners with Work Assignments and Good Behavior, straight out of segregation or are unemployed and unnecessarily increasing the risk of inmate-on- inmate violence.

40. The Resources are available but are wasted by daily acts of Misappropriations Funds, Fraud, Negligence, the abdication of responsibility and the failure to supervise on the part of individual Administration Officers or Program Directors and employees at all levels. All Caused by the Defendants Through ongoing pattern of illegal activity that is Organized Criminal Activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO, Which involved Fraud, Collusion, Employee Organization Representation Certification Fraud and Misappropriations of vast Sums of Legislative Appropriated funding, Federal Funding and other funds appropriated for the welfare of Minnesota Prisoners housed in Correctional Facilities State Wide, Community Corrections Subsidy Act Counties Funding and Halfway housing Funding, Prison Rape Elimination Act Funding and Minnesota Department of Corrections Facility Funding Structure.

41. Where The Minnesota Department of Corrections Colluded or Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies, to commit Fraud for Profit regarding the request the Appropriation of Both State Legislative Funding and Federal Grants or Funds received for a specific Activity or purpose, Such as Rehabilitative Programming Contracts, Health Services Contracts, Mental Health Contracts, Adult Basic Education Contracts, Vocational Training Contracts, FOOD Service Contracts , Inmate Phone Contracts, Inmate Kiosk Contractor Provider, Community Corrections Subsidy Act Contracts, And Physical Plant Maintenance contract.

42. In the Process Abusing Jackson and Violating his Civil Rights by subjecting Jackson to unconstitutional Living & working Conditions that are toxic such as refusing to provide Jackson with the Proper Protective Work Clothing/Protective gear and Protective Work Boots needed and required for Jacksons work Assignments as a Construction Worker/Outside year round Work Crew worker and the continued exposure for 22years to Asbestos, Perfluorochemicals or PFCs and other Toxic – Dangerous and Environmentally unsafe Prison Conditions that can cause cancer, Extortion and Confiscation of Jackson Wages Earned through MINNCOR Industries, contracted Food Service Contractors, And Inside/Outside Construction through Building & Maintenances , Fraudulent Registering Jackson as an Independent Contractor with the IRS (Internal Revenue Service) to avoid Paying Employee benefits and Taxes, the Mental abuse and Retaliation by Administrative Staff and Security Staff.

43. Minnesota Department Of Corrections Policy Number: 104.252 Title: Code of Conduct for Employees with Auditing, Purchasing, Financial Reporting, or Tax Filing Duties Effective Date: 4/2/19 PURPOSE: To identify the expectations for all department employees with accounting, purchasing, auditing, financial reporting, or tax filing duties to conduct themselves within a values-based ethical

framework that: A. Ensures accountability; B. Provides governance processes; C. Ensures the timely detection of significant internal control deficiencies; and D. Ensures the accuracy and reliability of the state's comprehensive annual financial report and other state and federal reports. APPLICABILITY: All department employees with accounting, purchasing, auditing, financial reporting, or tax filing duties.

44. DEFINITIONS: None PROCEDURES: A. Employees are expected to act honestly and ethically in carrying out their duties, and to conduct themselves in a manner that upholds the public trust and demonstrates honesty and integrity in their day-to-day decisions and actions. Common sense, good judgment, consistency, and the department's mission are the guiding principles for the expected employee standard of conduct. B. Employees must prepare or facilitate the preparation of full, fair, accurate, timely, and understandable financial reports, tax filings, or related disclosures. C. Employees must comply with applicable policies, law, rules, and regulations. D. Employees must cooperate fully with internal, legislative, and external auditors who are acting in their capacity to examine official accounting records, purchasing records, financial reports, or tax filings. E. Employees are expected to put aside their personal beliefs, motivations, biases, differences, or desires so that agency management staff are informed of financial reporting problems and quality improvements in internal controls and financial information can be made.

45. Employees must report evidence of the following actions through appropriate communication channels to their supervisor or to other proper authorities within the agency. 1. Evidence of theft, embezzlement, or unlawful use of public funds or property. 2. Misuse of the state's long-distance telephone services. 3. Substantial violations of the code of ethics for employees in the executive branch. 4. Significant deficiencies in internal controls. F. Employees must cooperate and provide full disclosure in any department investigations involving any code of conduct violations. G. An employees who makes a good faith report of evidence of a violation of this code of conduct policy, a significant internal control deficiency, or other unlawful employee action(s) is covered by the state's whistleblower statutes. H.

Employees who fail to carry out the duties established under this policy, or who make false statements or disclosures are subject to disciplinary action, up to and including dismissal from state employment. I. Employees are required to annually affirm their knowledge, understanding, and compliance with their respective responsibilities. The certification process must be recorded in the agency-approved electronic training management system.

46. INTERNAL CONTROLS: A. The annual certification process is recorded in the agency-approved electronic training management system. ACA STANDARDS: None REFERENCES: Policy 103.220, "Personal Code of Conduct of Employees" Minn. Stat. §§ 43A.38; 16A.50; 16C.04; and 43A.39 Minn. Stat. §§ 181.932 to 181.935 (Minnesota whistleblower statutes) Minnesota Management and Budget Operating Policy 103.01 Code of Conduct REPLACES: Policy 104.252, "Code Of Conduct for Employees with Auditing, Financial Reporting, or Tax Filing Duties," 6/19/18. All facility policies, memos, or other communications whether verbal, written, or transmitted by electronic means regarding this topic.

47. Jackson States that as a Person born or naturalized in the United States and Subjected to the Jurisdiction thereof and who is clearly a citizen of the United States and the State of Minnesota, has been subjected to Laws and Minnesota Department of Corrections Policies which has abridged the Privileges or immunities of Jackson as a Citizen of the United States who is Currently being Housed At Stillwater Correctional Facility for Care, Custody and Rehabilitation pursuant to state law. Jackson is being subjected to Slavery and Involuntary servitude under the Jurisdiction of the Minnesota Department of Corrections without proper Notice pursuant to an Indictment, Presentment, or Criminal Complaint Detailing all the Additional Punishments not named in the Criminal Statutes that Jackson was Charged Pursuant to a Criminal Complaint and was Convicted of the Charged Criminal offense, but did not specifically detail all the Civil Rights or Privileges and Immunities that Jackson stood to lose if Convicted of a Crime. Jackson States that he continues to be Deprived of Life, Liberty, and property without Due Process of Law for profit.

**(A) CONDITION OF CONFINMENT:**

48. Jackson States that *Recent prison unrest throughout the Minnesota Correctional System has shed new light on the Prisoners concerns, for safety after the July 18th 2018 beating death of corrections officer Joseph Gomm at Minnesota Correctional Facility – Stillwater. All The State's Prisons were placed on lock down status and as of too date the Jackson and All similarly situated Prisoners housed at Stillwater Correctional Facility Continue to experience some form of LockDown Status and the Cancelling of Education Programming, Recreational Programming, Cancellation of Law Library, Work Assignments Being Eliminated, Dangerous Increases in the Level of Unemployed Prisoners, Increased Idleness and More Staff Assaults, Serious Prisoner Assaults and Group Click Gang Assaults.* During the Lockdown Jackson was denied Showers for 20 days, Stripped Searched in his Cell by Security Staff then taken to the Stillwater Prison Recreation area in handcuffs behind his back and escorted by Canines and Security Staff with automatic weapons while other security staff back in the cellblock searched the Jackson Cell leaving the cell in disarray.

49. Jackson's Work Assignment has been taken away from him and the Jackson has been denied Recreation and Yard since July 18th 2018. In addition Jackson is currently receiving only 4hrs of flag time inconsistently and had not been to the Prisoner Dinning Hall due to the Continued Lock Down. Jackson had been receiving his meals in the Cellblocks sometimes in 6"X 5" card board trays with Three 4oz portion servings or sometimes peanut Butter packs with four pieces of bread or cold bologna sandwich. Now the Stillwater Correctional Facility doesn't serve the Plaintiff Breakfast in the Dining Hall instead the Appellant is served a Plastic Bag Breakfast in the Cellblock.

50. Jackson States that Mental illness issues are very serious and make-up a very high percentage of current Prisoners reasons for imprisonment. An estimate that 80% of Stillwater's prisoners suffer from some form of mental illness, and that illness is not being treated Due to Lack of Mental Health Workers. A Shortage of trained Security Staff, Chaplain Services, Social Workers, Recreational Staff, Education

Opportunities, and rehabilitation and occupational Services staff adds to the growing unrest within Minnesota's State Correctional Facilities.

51. Jackson States that The Minnesota State Legislature found that Stillwater Correctional Facility and other Minnesota Correctional Facilities was experiencing severe under staffing of both custodial and clinical staff. Vacancies in allocated positions are very high and turnover is also high. Vacancies in mental health, including a critically low number of psychologists, the turnover rate across all MDOC positions is over 24%, and the turnover rate in protective service staff positions is 31% or more which creates instability and management issues. Typically, corrections officers work 12-hour shifts. Mandatory overtime, where MDOC staff is required to work additional hours before or after their 9 -hour shifts to cover a vacancy, is common. In addition, correctional staff is often assigned duties outside their job classifications because of staff shortages. These dangerous practices put staff and prisoners in danger because staff are overextended and asked to perform duties they may not be trained to perform.

52. New employees are often being trained by other new staff, who are not yet sufficiently qualified to train others. And employees have frequently referred to staffing difficulties. One employee commented that the job is definitely "sink or swim situation," other Staff have consider the ratio of [prisoners] to staff out of balance, Inadequate resources for programming and insufficient staffing leads both Staff and Prisoners to believe that the MNDOC is simply warehousing prisoners. Staff does not know what they're doing and without resources, good luck rehabilitating anyone.

*53. Jackson States That The MNDOC Defendants have all too frequently offered the appearance of compliance as a substitute for obedience, the laws of the State of Minnesota, The United Nations Standard Regarding Minimum Rules for the Treatment of Prisoners Known as the "Nelson Mandela Rules," the Adopted United States Supreme Court Standard Regarding Prison Conditions; "Evolving Standard of Decency of a Maturing Society" and The United States Constitution, have been ignored by administrators(at all levels) who disobey in silence, and vast sums of Legislative appropriated Fund,*

*Federal Funds, and other funds appropriated for the welfare of the Minnesota Prisoners housed in Correctional Facilities State wide, vast sums of money, have been wasted without bringing about any substantial and enduring change in the reality of daily life in Minnesota's Prison System.*

54. Although Jackson was transferred to Stillwater Correctional Facility from Rush City Correctional Facility in May of 2016, the conditions that Jackson complains of transcend both Stillwater Correctional Facility & Rush City Correctional Facility and occur throughout the Minnesota detention system. Stillwater Correctional Facility was constructed in 1914 and is now 104 years old.
Jackson States that there are other aspects of prison life which in and of themselves do not rise to constitutional dignity but which aggravate the more serious prison defects and deficiencies.

55. Jackson States that during his time incarcerated at the Minnesota Correctional Facility at Stillwater (MCF-Stillwater) & Minnesota Correctional Facility Rush City (MCF-Rush City), he and other prisoners were subjected to unconstitutional conditions of confinement arising from having been subjected to Racial Injustices and Discrimination for profit due to the Jacksons Criminal status and also due to their Race and Gender as Heterosexual Males and Transgender Prisoners where Jackson is an African American Male.

56. Jackson States that the Minnesota Department of Corrections ("MDOC") and MINNCOR Industries and its Private Business Contractors and Other State Agency Contractors (("MINNCOR")---a division of the MDOC that assigns jobs to Minnesota prisoners during their term of incarceration) Minnesota Department of Administration/Real Estate and Construction Services & AFSCME UNION #5 Contractors, pays prisoners too little for their labor and improperly deducts the bulk of those wages as reimbursements for the cost of confinement. Jackson States that he seeks declaratory, injunctive, and monetary relief on behalf of himself and similarly situated MCF-Stillwater Inmates & MCF Rush City Inmates. From the Defendants in their Individual & Official capacities as officers and Employees of the

State of Minnesota, Private Contractors, and None State Employees Acting on the Behalf of State Law Enforcement Agencies.

57. Jackson alleges that this double-Bunking policy and overcrowded conditions puts MCF Stillwater prisoners at increased risk of physical danger. The number of prisoners now detained at MCF-Stillwater strains the ability of the MDOC officials to maintain adequate health services, Mental Health Programing which has been eliminated, and sanitary conditions, Adequate Sanitary Food Service Conditions and Proper Food Portions, Prisoner Work Assignments have been eliminated, Recreation Programming has been eliminated, Visiting Privileges are improperly restricted by Prison Officials In addition The Visiting Room Space is inadequate and doesn't provide the opportunity for Jackson to receive visits during his period of incarceration in an effort to maintain ties to family and friends; to enhance Jacksons transition from prison to the community; and doesn't enable Jackson to continue to foster relationships with significant individuals.

58. Education Programming are inadequate, Volunteer Services Registration for the welfare of prisoners is inadequate and Discriminatory, Religious programing and Cogitative Thinking Programing are also inadequate at this facility. Further the double bunking policy and overcrowded conditions has increased the risk that prisoners will be assaulted by other prisoners, Sexually Assaulted by other prisoners, Increase Theft of Prisoners property & Canteen Items & Suicides Attempts by prisoners and Fatal Suicide Attempts and Drug Abuse is rampant in the prison system.

59. Jackson further claims that this double bunking policy was implemented in response to a former Minnesota governor's mandate that several divisions within the MDOC, including MINNCOR ---- which is charged with "providing adequate, regular and suitable employment, educational training, and [aiding] the inmates of state correctional facilities," Minn. Stat. 241.27--- become financially self- sufficient. Under the Plaintiff's Theory, by increasing prisoner populations, the MDOC (through MINNCOR) could supply a greater quantity of prison labor to private entities than previously. Those entities In some cases

would pay the Federal Minimum wages to the prisoners, but only a fraction of that fee would be retained by the prisoner. Instead, the bulk of the wages --- "80% or more," would be deducted as contributions to the MDOC for the costs of confinement while some Private Companies did not pay neither Federal or State Minimum Wages nor Prevailing Wages for similar work performed by the Minnesota Department of Corrections Prisoners.

60. Jackson states that Along with providing labor to private entities, Prisoners At Stillwater Correctional Facility also are Assigned tasks through Contracted Services & Building & Maintenance Construction Contractors, around the facility, such as kitchen Assignments , Inside & Outside Construction, MINNCOR Canteen, Electrician, Pluming, Painter, Yard Crew, Welding, Carpentry, & Masonry, for examples. The Plaintiff alleges that MINNCOR, Food Service, Education, Transition Department and Building & Maintenance Construction Contractors pays less than the Federal minimum wage to prisoners for these contracted jobs however Certain Class Of Prisoners are Paid Prevailing Federal or State wages for contracted work Assignments creating wage Discrimination. Stillwater Correctional Facility was constructed in 1914 and is now 102 years old.

61. Jackson state that From November of 2017 until present the Corrections Kitchen Cooks under the control of the AFSCME UNION LOCAL 600 Corrections Guards Unit who runs both the State of Minnesota's Kitchens and Canteen Deliveries were depriving the plaintiff and all similarly situated Prisoners at Stillwater Correctional Facility adequate Food portions under cooked food and Delayed Canteen Purchase and Deliveries for the purposes of provoking violence amongst the Prisoners at Stillwater Correctional Facility to Aid the AFSCME UNION Local #5 Corrections Guards Unit regarding Fraudulently seeking more funding from the Minnesota State Legislature for more Correctional Guards and Pension Benefits leaving Jackson and other Prisoners hungry and frustrated.

62. Jackson also states that state Law that requires the inhumane Portions of food to be provided to Minnesota State Prisoners Amounts to Cruel & Unusual Punishment pursuant to Minn. Stat. 243.557,

INMAT MEALS; **"Where inmates in a state correctional facility are not routinely absent from the facility for work or other purposes, the commissioner must make three meals available Monday through Friday, excluding holidays, and at least two meals available on Saturday, Sundays and holidays."** Just as the Plaintiff may starve if not fed, The Plaintiff may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society. If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation.

**(B) HEALTH CARE:**

63. Jackson also state that Psychiatric care provided at Stillwater & Rush City Correctional Facilities are even far more deficient than the Medical Care delivery Systems. Psychiatric Care at Stillwater & Rush City is almost none existent The Minnesota Department of Corrections Contracts at least Two Psychologist, it is unknown if they are Full or Part time at Both Stillwater Correctional Facility & Rush City.

64. The attitude of the MNDOC with regard to psychiatric care can best be described as deliberately indifferent. The approach for diagnosing drug dependencies, alcohol problems, or other substance abuse related problems is haphazard. Apparently the chosen course of action is to prescribe psychotropic medication in lieu of psychiatric counseling. The prescription and attendant use of psychotropic medication has more that quintupled when considering the number of prisoners actually taking psychotropic medication.

65. The Psychiatric Cellblock of Stillwater Correctional Facility D-Hall does not currently meet the National Institute of Corrections, American Correctional Associations and Minnesota Health and Welfare Standard regarding: (a) physical standard on room size; (b) number of available beds; (c) psychiatric services; (d) number of therapy technicians; (e)occupational therapy services; and (6) number of fully

equipped observation rooms. (3) The Medical staff at Stillwater Correctional Facility consists of medical services manager; a licensed physician's assistant and a registered nurse and licensed nurse practitioner.

66. Jackson also states that Medical services are provided in large part by these three individuals. These three Examine patients, refer patients to physicians, diagnose illnesses, suture cuts, and the medical staff is only available six hours per day, Five days per week. Accordingly Emergency Medical Care is unavailable more than one-third of the time. The Medical delivery system at Stillwater Correctional Facility and Rush City Correctional Facility is very minimal and meager at best, There was evidence that after some time delay, serious medical problems were taken to Reginal Hospitals in Minnesota and upon arrival the Prisoner then received adequate medical attention. There is also evidence that follow-up medical attention, medical prescription, and dietary prescribed needs in numerous instances received deliberate indifference.

67. Jackson states that at both Stillwater Correctional Facility & Rush City Correctional Facility, Prison Officials have not attempted to reduce the violence in these Close Custody Facilities by single-celling inmates but has reduced the openness of the tiers, Because of the high level of violence at both Stillwater Correctional Facility and Rush City Correctional Facility, and because the prison officials themselves have acknowledged the problems inherent in double-celling of Close Custody inmates.

**(C) Minnesota's Medicaid Program:**

**68.** For the Last several years, Minnesota's Department of Corrections has fraudulently been working on enrolling Inmates in prisons in Minnesota's Medicaid program. An agreement between the Minnesota Department of Corrections and the Minnesota Department of Human Services allows the Department of Corrections to submit applications to countries up to 45 days before release. Even prior to Medicaid expansion, most inmates qualified for medical assistance programs based on low income. The Department of Corrections claims to have specialized release planning staff. After the passage of the

Affordable Care Act, the department claims to have trained approximately 20 staff members to be healthcare navigators.

69. Supposedly these navigators assist inmates with higher needs, including those with mental illness, with enrollment. Who are these Navigators? Where are they Located? How do Inmates access them? Supposedly this effort is part of a broader Transition from Prison to Community initiative, with all staff focused on reentry from intake. The Minnesota Department of Corrections faces challenges with technology. Most Applications for MNSURE are completed in real-time over the Internet, but inmates do not have access to that system. Filing paper applications is more time – consuming. The Minnesota Department of Corrections claims that the department has also had to work diligently to coordinate among all of Minnesota's 87 counties.

**(D) RETALIATION & HARRASMENT:**

70. Jackson states that On Sunday April 2nd 2017 between 8:00am & 8:30am one of the Three Canine Units employed at Stillwater Correctional Facility which was under the handling and direct supervision of K9 Officer Richard Jennings, Attempted to assault the Plaintiff as the Plaintiff passed by the Canine unit coming from the Prisoner Dinning Hall during mass movement. The Plaintiff immediately informed the Staff in his Cellblock about the incident and followed up with writing an Offender Kite to the Stillwater Facility Captain in Charge of the Canine Units Programming (Byron Matthews). The Captain never responded to the Plaintiff Kite regarding the Incident so the plaintiff continued to write Kites up the Chain of Command regarding the matter yet the Plaintiff did not receive any response from any of the Administrators including the Warden Eddie Miles the Plaintiff also did not receive any of his Offender Kites back from any of the Administrators regarding the incident. During this time the Plaintiff also talked with his Cellblock A-East Lieutenant Andreachi regarding the matter on several occasions and how the Canine Units are violating Policy.

71. Jackson states that Almost Two months after the Plaintiffs incident, a Prisoner in Cellblock B-West was attacked by another Canine unit while the Prisoner was on the ground. The Prisoner was bitten twice once in his private parts and on his leg. These are just two examples of excessive force regarding the Canine Units that has resulted in sever injury of prisoners at Stillwater Correctional facility for many years.

72. Jackson has been experiencing continuous none Disciplinary Administrative moves from one Prison to another prison where the Plaintiff was Residing since August of the Year 1998 two months after the plaintiff was sentenced to the Minnesota Department of Corrections and it was discovered by the Plaintiff that Now Retired Stillwater Correctional Facility Program Director Regina Stepnay was involved with each Administrative Transfer which has never been one of her official job titles or duties.

73. Jackson states that on May 27th 2016, the Plaintiff was administratively moved from Rush City Correctional Facility back to Stillwater Correctional Facility. The Plaintiff was placed in a double bunk cell and placed on T.U none worker status once he arrived at Stillwater Prison although the plaintiff was Performing PIECP Work under the Employment of MINNCOR Industries, the Plaintiff was not Terminated from his Job Position with MINNCOR but was placed in a NONE PIECP related work assignment which negatively affected the Plaintiffs pay without Due Process as required by MNDOC Policy in relevant part.

74. Jackson immediately started to be harassed by Program Director Regina Stepney , Program Director Lisa Stenseth & Food Service Supervisor Daniel Kiser. The Plaintiff filed a Harassment Complaint with the Wardens Office which former warden Steve Hammer replied back to the Plaintiff that he would be meeting with the Plaintiff soon regarding the matter. The Former Warden Steve Hammer never meet with the Plaintiff. Because the Harassment started to escalate more and more the Plaintiff decided to file a formal Harassment complaint with the Minnesota Department of Corrections Commissioner Tom Roy.

75. Jackson states that In the early morning during breakfast at about 6:30AM while the Plaintiff was in the prisoner dining hall, the Plaintiff was pulled from the dining hall and escorted to the Operations Area where the Plaintiff meet with Program Director John Quist & Associate Warden Victor Wanchena. At the start of the meeting Program Director John Quist did most of the talking he informed the Plaintiff that both he and AWA Victor Wanchena where speaking on behalf of the Commissioner Tom Roy. During the Meeting the Plaintiff was assured that he would not be having any more problems and that if the Plaintiff needed any assistance with anything that he Program Director Quist would try to help as best as he could. The Plaintiff later that morning found out that Former Warden Steve Hammer was suspended pending an investigation. The Plaintiff continues to experience harassment.

76. Jackson On November 20th 2016 the Plaintiff sent an Offender Kite to warden Eddie Miles regarding the harassment the plaintiff was being subjected to by his Administrative Staff, the Plaintiff referred to warden Miles information that he shared with his administrative staff at the November 8th 2016 meeting held in the Cellblock A-East Casemanagment Office regarding the October 27th 2016 assignment restriction committee-decision to ban the plaintiff from the Dining Hall and from receiving employment in the Kitchen. The Plaintiff, Program Director Lisa Stenseth, Program Director John Quist, and Plaintiff Casemanger Abbie Domogaski were all present.

77. The Plaintiff informed the Parties present at the meeting that he the Plaintiff had received information from his supervisor Travis Green at his Building & Maintenance work site who stated to the Plaintiff that Food Service Director Daniel Kiser told him to keep the plaintiff close by because the plaintiff attempted to Rape A Staff Member in the Kitchen this is why the Plaintiff was sent to Rush City Correctional Facility and this is why both Food Service Director Daniel Kiser & Program Director Regina Stepnay are banning the Plaintiff from the Kitchen & Dinning Hall Areas. Yet Jackson Had no Disciplinary segregation sanctions when he was sent to Rush City Correctional Facility from his Job Site in the Kitchen

at Stillwater Correctional Facility in May of 2014. Which was also reflected in Jackson's annual Reviews with his Casemanager since May of 2014.

**(E) RUSH CITY CORRECTIONAL FACILITY:**

78. On May 27th 2014, the day after the Memorial day holiday, the Plaintiff was transferred from the MCF Stillwater Level Four Correctional Facility and sent to MCF Rush City Level Four Correctional Facility for what the plaintiff was told by his Prison Casemanager was an none disciplinary transfer, no further information about why the plaintiff was suddenly transferred to what seemed like an disciplinary Prison was not disclosed to the plaintiff, While during the plaintiffs stay a Rush City Correctional Facility he managed to get voted in as Prisoner Representative for complex 3-south where the plaintiff is being housed within two months after his arrival at Rush City Correctional Facility (see Exhibits PB51 –PB53), from the time the plaintiff arrived at Rush City Correctional Facility he was experiencing some aggressively disrespectful behavior that was being directed towards him personally by prison officers and prison staff whenever the Plaintiff approached them with a question or concern. This behavior by Prison Staff was happening so much and very frequently that the plaintiff wrote the former Warden Steve Hammer, OSI (Office of Special Investigations) and the Psychology department about his concerns for his safety because of the unpleasant and unprofessional treatment the plaintiff was receiving by the Rush City staff (see PA6 – PA48).

79. Former Warden Steve Hammer was not in the office at the time the plaintiff wrote to him regarding the incidents so AWO (Associate Warden Operations) Gregg Smith responded to the plaintiffs kite. After being at Rush City Correctional Facility for a little while, the plaintiff started to notice how other inmates at this Correctional facility that had Sex Offenses were being treated by both staff and prisoners. After witnessing the disrespectful and unprofessional behavior by prison officers aimed at Sex offenders and the purposefully targeted assaults, extortion, Sexual Assaults and disrespectful behavior by other prisoners targeting Sex offenders and other vulnerable adults. Jackson immediately

concluded that because he is an High profile prisoner and a convicted sex offender this is why the plaintiff was being treated so disrespectfully by the staff at Rush City Correctional Facility. The harsh and assaultive treatment of both Sex Offenders and other vulnerable adult prisoners seems to be a systemic problem at Rush City Correctional Facility and the harsh treatment of this Class of prisoners has also been over looked by the Administration at Rush City Correctional Facility for a long period of time as well as the effects that both overcrowding and double bunking of prisoners at Rush City Correctional Facility which has frequently created the opportunity for vulnerable prisoners to be sexual assaulted, Extorted, and Physically and Psychologically Assaulted by other prisoners and gang affiliated prisoners (see Exhibits PB54 –PB57)&(Exhibits PB85 –PB89).

80. The Plaintiff States that these conditions that have caused harm to both the safety and health of the prisoners at Rush City Correctional Facility, has never been disclosed to the Commissioners of the Department of Corrections both past and present for many years. (see appendices PA1 –PA3)(see Exhibits PB91 – PB110, Jackson States that Rush City Correctional Facility is an Level Four Correctional Facility and was originally designed and built to occupy 543 total prisoners in single cells but that number increased when the Correctional Facility opened in year as a double bunked facility 1998 or 1999 since then the population at Rush City Correctional Facility has grown to over 1,000 prisoners forced to double bunk with other prisoners yet there has been no changes to both the prison infrastructure or programming space to accommodate the increase of prisoners (see Exhibits PB83 – PB84).

81. The Plaintiff States that the Department of Corrections deliberately caused the overcrowding conditions by increasing the number of parole violations and the Introduction of ISR (Intensive Supervised release) in response to former Governor Elect Jesse Ventura's (1998 – 2002)Mandate requiring that all Minnesota Correctional Facilities must Operate Self Sufficiently by the Year 2004 or 2005. in order for each Correctional Facility to Operate Self Sufficiently the facilities needed to increase

canteen purchases, Phone time Purchases and other revenue making systems which required more prisoners as consumers. Rush City Correctional Facility routinely sold the Plaintiff and other similarly situated prisoner's poor quality electronics and also routinely confiscated canteen from prisoner's just so that the items can be repurchased again and again also no kind of log was kept by Rush City Correctional Facility property control indicating what was done with confiscated property (see Exhibits PB76 –PB80).

62. Also the Plaintiff and other similarly situated prisoners were also required to pay for used state issued clothing. There was not an tremendous spike in crime from the years 1997 to 2014 that would have caused such an rapid increase of Minnesota's Male Prisoners Prison population in such an short period of time, it also must be noted that Minnesota's only Female Prison Shakapee was not effected in anyway regarding prisoner population rapid increases. Rush City Correctional Facility is also home to a Sex Offender Treatment Program which also houses mentally ill prisoners and other prisoners in the same cell block or complex they are all placed in double bunked cells in the sex offender treatment program exposing them to sexual assault and physical and psychological harm every minute of the day and night. Rush City Correctional Facility is also the dumping ground for all of the Minnesota Department of Corrections problematic prisoners, Gang leaders and parole violators that were released from both low and high custody level Correctional Facilities across the state of Minnesota and out of state prisoners as well. Rush City Correctional Facility is also a Level Four Correctional Facility and therefore houses Prisoners that have been convicted of very serious and dangerous Crimes such as Murder, Aggravated Assaults, Rape, and other Serious Crimes against persons.

83. The Plaintiff and all other similar situated prisoners at Rush City Correctional Facility regardless of their crimes of mental or physical disabilities are forced to double Bunk with one another. because of this type of mixture of prisoners it is highly likely that both physical and sexual assaults will occur at a much higher rate where the Plaintiff and both Sex Offenders and mentally ill prisoners and physically

disabled prisoners will likely be targeted because there is no type of isolation or separation for both the problematic prisoners and gang affiliated prisoners that are known to pray upon vulnerable prisoners, sex offenders, and mentally ill prisoners and physically disabled prisoners at Rush City Correctional Facility because of the forced double bunking. Rush City prison is a 98% double bunked Correctional Facility, this makes prison conditions at Rush City very unsafe and makes it very difficult for prison staff to detect or manage predatory behavior that may threaten the security and safety of both staff and prisoners at Rush City Correctional Facility due to overcrowding, double bunking and shortness of staff in the prison complexes. The Plaintiff has personally witnessed several continued premeditated and severe aggravated assaults and extortion of sex offenders and physically disabled prisoners here at Rush City Correctional Facility (see Exhibits PB54 –PB57)&(Exhibits PB58 –PB60).

84. Jackson states that was happening on a regular bases in complex 3-south of Rush City Correctional Facility were the Jackson was being housed and also is where Jackson was an Prisoner Representative. As you will see the Jackson tried as prisoner representative to bring these issues to the attention of the administration on more than one occasion. At the June 3rd 2015 prisoner representative meeting the plaintiff began to realize that the Severe assaults of Sex Offenders and other prisoners was being covered-up by staff because at the meeting the plaintiff made some very spontaneous, direct and passionate statements to AWO Gregg Smith, regarding the assaults and extortion of Sex Offenders in Complex -3-south. Jackson's comments came after another prisoner representative was telling AWO Gregg Smith and lieutenant Darling, about what was going on in Complex- 4-south regarding the disrespectful nature of staff when dealing with the prisoners in that complex. AWO Gregg Smith was defending both Lieutenant Darling and his staff's behavior which prompted the plaintiff to spontaneously join in on the last minute conversation. AWO seemed very upset that the plaintiff brought both the issue regarding the Assaults of Sex Offender's and Staff telling other prisoners that the assaulted sex offender was snitching on them AWO Gregg Smith even down played the fact that there

was or is a major problem. Newly appointed Warden Jim Benson was present at this Prisoner Representative meeting on June 3rd 2015, and he seemed concerned and surprised about what the plaintiff had brought up about the assaults.

85. Jackson states that Some days after the prisoner representative meeting jackson was approach by a certain lieutenant at Rush City Correctional Facility while the plaintiff was at his prison job cite and was warned that AWO Gregg Smith is very upset with me and that AWO Gregg Smith has ordered prison staff to "reel me in." the plaintiff took this as a direct threat to his personal safety especially since the staff at Rush City Correctional Facility has already been treating the plaintiff with such disrespect since he arrived at the Correctional Facility in May of 2014. (see appendices PA1 –PA3)&(see appendices PA6 –PA48)&(see Exhibits PB61 –PB65). Jackson States that Rush City Correctional Facility was at the time Nineteen years young, during those Nineteen years Rush City Correctional Facility has now had six Warden changes and very little if any at all lower level administrators changes such as Associate Warden Operations & Associate Warden Administration & Complex Directors. Because of the constant changes in wardens the staff and prisoners at Rush City Correctional Facility have come to realize and except the fact that AWO Gregg Smith is the unofficial warden of Rush City since his promotion to Associate Warden Operations.

86. Since Former AWO Gregg Smith had been in charge at Rush City Correctional Facility for well over five years at the time, violence has then and now continued to rise extremely high because of Double Bunking and over-crowded conditions there is nowhere to put prisoners with special needs or mentally ill inmates who are all placed in double bunked cells with other violent prisoners where sexual assaults will occur as well as aggravated assaults and extortion. Jackson States that Continued Rotation of Wardens At Rush City Correctional Facility & Lack of Positive Programming Options, Lack of Programing space, Lack of Positive Communication Between Staff and prisoners , lack of Minorities as regular prisoner staff & as prison Education Staff or prison Administration Staff combined with

overcrowded conditions and Double Bunking are the main highly contributors to the extremely excessive violence and frequent sexual assaults of prisoners that continue to plague Rush City Correctional Facility and continues to place the Plaintiff and other similarly situated prisoners at Rush City Correctional Facility in immediate danger at all times (see Exhibits PB66 –PB68)&(see Exhibits PB69 –PB72)&(see Exhibits PB73 –PB75)&(see Exhibits PB76 –PB80).

87. While Jackson was still being housed at Rush City Correctional Facility, Jackson received a visit from the Iowa Department of Criminal Investigations (D.C.I) Investigator Jim Theile ((641)-494-9677) to interview the Plaintiff regarding the Disappearance of Mason City News Anchor women Jodi Huisentruit which occurred in the year 1995. During the interview process the Plaintiff was told that Jeffrey Baillon called them and told them to come talk to Jackson, Jackson then asked the Investigator Jim Theile if he or the F.B.I received the letters from Stillwater Correctional Facility that the Plaintiff gave to the Stillwater Correctional Facility Office of Special Investigation that were sent to the Plaintiff by someone from a P.O. BOX address in the state of Arkansas. The Investigator Jim Theile informed Jackson that he did not receive any letters from the Stillwater Correctional Facility.

88. Jackson then went on to explain the weird and bazar story behind the letters which was as follows: **Sometime between the months of August or September 2013, I Tony Dejuan Jackson, Complaint tent started to receive some correspondence letters from someone form a P.O. Box in Arkansas named Jennifer Bleind (check for Correct last name spelling). In a span of a total of three days of one weeks time I, Tony Dejuan Jackson received five Correspondence letters and money from Jenneifer Bleind. The letters were very weird starting out which prompted me to notify my then Stillwater Correctional Facility Cell Block (D/Hall) Lieutenant Hartman (now retired but comes back to Stillwater Correctional facility to facilitate Building Character program).**

**89. I, Tony Dejuan Jackson gave Lieutenant Hartman the letters while in his office in Cell Block D/Hall after he informed me in his office that OSI wanted him to confiscate the letters from me. After**

I Tony Dejuan Jackson Gave the letters to Lieutenant Hartman I also informed him that I wanted an incident report done regarding the matter and that I was also going to write my then Casemanager (Lyodd Gracheck, currently still at Stillwater Prison) a Kite requesting a telephone call to speak with the Iowa Department of Investigations (D.C.I.) regarding the letters and the letters content. Some days later I received movement pass from my then case manager to come see him in his office which was located at the time in the education department.

90. Casemanager Lyodd Gracheck then placed a call to someone named Linda at the (D.C.I) for me yet for me the entire situation regarding the phone call was very weird (I will explain this weirdness in person if needed). The next week I received another card type letter which I again proceeded to give to Lieutenant Hartman. This time Lieutenant Hartman did not take this card type letter from me instead he told me that O.S.I told him to tell me that I was covered regarding the letters and Mr. Hartman also stated to me the following; "is this person sending you money then you should just take the money."

91. Sometime later I Tony Dejuan Jackson tried to call Jenneifer Bleind by calling the phone number that she left in one the many card type letters that she sent me. I was unable to clearly talk with Jenneifer Bleind because each time I called her it seemed like I was talking through some type of device. On more the one occasion I requested that jenneifer Bleind send me a photo of herself so that I could see who I was talking with but no photo never came.

92. Jenneifer Bleind also stated in several of her card letters that she would be coming to visit me soon which never happened. So I stopped all communications with Jenneifer Bleind. Sometime in February 2014, I Tony Dejuan Jackson, received a card letter form Jenneifer Bleind asking if would please start writing her again, I did not respond. I then received another card letter from her this time there was a picture of me playing basketball in junior Collage included with the card letter. I did not

respond yet again. This time Jenneifer Bleind sent me a card letter which now included a photo shopped picture of Jodie Houssientrut siting on a couch.

93. After I received this picture I then called Jenneifer Bleind at which time I told her that I was going to put her in touch with some people that she could play games with. I Tony Dejuan Jackson, then called the F.B.I. in Ceder Rapids Iowa. I talked with someone that gathered information from me because the F.B.I. Agent that came to visit me back in the year 1999, had retired. I gave the F.B.I Agent or information staff person all the information regarding Jennefier Bleind, I then asked the Agent if his office received the letters that I gave to the Stillwater Prison Administration Office of Investigations. The Agent told me that no information was sent to them regarding the matter I also asked the agent about one of their Agents named Linda (last name is documented with the D.C.I. & F.B.I. in Iowa) that work for the D.C.I (Department of Criminal Investigations in Iowa) which Casemanager Lyodd Grachek set the phone call up with many months ago.

94. I Tony Dejuan Jackson was told by the F.B.I Agent In Cedar Rapides that no such person by that name works for them. I then asked the agent what he wanted me to do with the rest of the letters that I have the agent then instructed me to hold on to them because they were on their way to get the letters. The next morning at about 6:00am Casemanager Lyodd Gracheck came to my cell #101 in D/Hall at the time and asked me to come to his new office now located in D/Hall. I Tony Dejaun Jackson went to the office as instructed where Casemanager Lyodd Gracheck then asked me if had written the F.B.I. I told him "no" that I talked with them yesterday.

95. Casemanager Lyodd Gracheck then told me that the F.B.I. Called and that they told O.S.I (Office of Special Investigations for Stillwater Prison) that I had some letters that I wanted them to have and that I could give them to him (Casemanger Lyodd Gracheck) or I can give them to O.S.I. I told Casemanger Lyodd Gracheck that I would prefer to give the letters to O.S.I. myself I then left the office. About 10 seconds after I went back to my cell one of the security officers called me to the desk

**to and told me that O.S.I. wanted to see me in the discipline office, I proceeded to the Discipline office area without a movement pass. When I Tony Dejaun Jackson arrived at the discipline office area I was meet by Steve Mccarty Office of Special Investigations Supervisor.**

**96. Steve MCCarty stated to me that the F.B.I. (Federal Bureau of Investigation) had called regarding some letters that I have he then told me that the letters where my property and that I did not have to give them to him. I Tony Dejuan Jackson then asked Steve MCCarty about the other five letters that his office confiscated from me and the those letters were also my property. Steve Mccarty at that time then informed me that the letters had gotten lost and that he had sent a phone massage regarding the lost letters to another O.S.I agent named Mike McMahon regarding. I gave Steve Mccarty the Letters that I had to give them to the F.B.I and at which time he gave them back sometime later."**

97. In May of 2014 some two months after the above incident occurred, Jackson was then Administratively removed from Stillwater Correctional Facility and sent to Rush City Correctional Facility for what was told to Tony Dejuan Jackson, was a none disciplinary Transfer which was also reflected in his base file. On May 27th 2016, the Plaintiff was then Administratively moved from Rush City Correctional Facility back to Stillwater Correctional Facility. According to official statements Made to Jackson by Iowa Department of Criminal Investigator Jim Theil; "Neither Jeffrey Baillon, Jay Alberio & Caroline Lowe are not currently or in the past ever worked on behalf of or as Agents for any Law Enforcement Agency in Iowa or the Federal Bureau of Investigation regarding the disappearance of Mason City Iowa Anchor women Jodi Huisentruit. The Plaintiff was Cleared by the Mason City Police Department of Any involvement with the Disappearance of Jodi Huisentruit in through a Press Release in the Year 1999.

**(F) INFORMATION FOUND ON WIKIPEDIA ON JODI HUISENTRUIT:**

98. Jodi Sue Huisentruit ( born June, 1968declared legally dead may 2001) was a television anchor for KIMT, based in Mason City Iowa, in the United States. She was declared missing in the early morning hours of June 27, 1995, soon after telling a colleague that she was on her way to work. As there were signs of a struggle outside her apartment, she is believed to have been abducted but extensive investigations have failed to uncover any clues to her disappearance.

Early Life:

99. Huisentruit was born in and grew up in Long Praire, Minnesota, The youngest daughter of Maurice Nicholas Huisentruit (1920 – 1982) and Imogene L. "Jane" Huisentruit (Ne Anderson, 1923 – 2014). In High School she was considered to be very good at golf. Her team won the state Class A Tournament in 1985 and 1986. After high School, she went on th St. Cloud State University, Where she studied Mass Communications and speech Communication and graduated with a Bachelor's degree in 1990. Her first Job after graduation was with Northwest Airlines. She entered broadcasting by getting a job at KGAN in Cedar Rapids, Iowa, as the Station's Iowa City Bureau Chief, then returned to Minnesota for a Job at KSAX in Alexandria before returning to Iowa for her KIMT Position.

Disappearance:

100. On the day before she disappeared, Huisentruit participated in a golf tournament and, according to Mason City resident John Vansice, she went to his home to view a video tape of the birthday party that he had arranged for her earlier in the month. At about 4:00am on June 27th 1995, KIMT producer Amy KUNS noted that Huisentruit had failed to report to work as scheduled, so she called Huisentruit's apartment. Huisentruit answered the telephone, explained that she had overslept, and said she was preparing to leave for the station. By 6:00am, however, she had still not arrived and Kuns filled in for her on the morning show Day Break, at about 7:00am, KIMT Staff Called the Mason City Police. When Police arrived at Huisentruits Apartment they found her red Mazda Miata in the parking lot, as well as evidence

suggesting there had been a struggle Near that Car. Among other evidence, Huisentruit's personal items, including a bent Car key, were found strewn about the area and police reported recovering an unidentified palm print form her car.

Investigation:

101. The ensuing Investigation revealed at least three Neighbors in her apartment Complex who said they heard screams at about the time Huisentruit would have likely been leaving for week in addition, a Neighbor who lived nearby reported seeing a white Van with its running lights on parked in Huisentruit's Parking lot at about the Same Time. This Van was never positively identified. In September 1995, the Huisentruit family hired private investigators from Mc Carthy and Associates, Investigative Services, INC (MAIS) In Minneapolis, Minnesota, who in turn enlisted the assistance of Omaha, Nebraska private Investigator Doug Jasa. Mc Carthy and Jasa appeared on several National television shows, including America's Most Wanted and Unsolved Mysteries In November 1995, they and members of Jodie's family traveled to Los Angeles to meet with three prominent psychics. This meeting was televised and served as the pilot for the Psychics. This meeting was televised and served as the Pilot for the Psychic Detectives Television Show.

102. Although each show generated a large volume of leads, none resulted in concrete evidence or the identification of a Suspect. In May 1996, about 100 Volunteers searched an area of Cerro Gordo County and Left flags to mark anything that appeared suspicious. Each of these sites was then re-examined by law enforcement, but no promising evidence was located. Since HUisentruit's disappearance in 1995, police and private investigators have conducted more than 1000 interviews relating to her disappearance. None have resulted in conclusive evidence pointing towards a suspect. Huisentruit was declared legally dead in May 2001. There have been periodic resurgences in the Story. When new cases arise that appear to bear similarities to Huisentruit's or remains are found in the area, speculation quickly leads to a connection with the missing reporter.

So far, however, no Suspect has been tied to Huisentruit's disappearance and all remains have proven to be from other sources. In 2005, many Media outlets, including 20/20, again focused on the story as the 10th anniversary of the disappearance approached. IN early June 2008, Photo Copies of the 84 pages of Huisentruits Personal Journal were anonymously mailed to a local Newspaper. The Mason City Globe Gazette received the material in a large envelope with no return address and a June 4 postmark from Waterloo, Iowa. The original journal has been in the possession of law enforcement since the investigation of Huisentruit's disappearance began.

103. Within days, Mason City Police reported that the Sender had Come forward and then identified her as the wife of the former Mason City Police Chief. Although noting that the former chief had taken a copy of the journal home when he left office, The police gave no motive for his wife sending the copy to the Newspaper. The FBI, The Mason City Police Department, The Iowa Division of Criminal Investigations, and MAIS"S Investigators are all still actively working on Huisentruit's disappearance, and the television show Nancy Grace: America's Missing Spotlighted her case on February 23rd, 2011, and again on December 6th 2013.

**(G). REHABILTATION PROGRAMMING:**

104. Jackson States that the Legislature recognized the important Place of Training and Rehabilitation in the Minnesota Correctional System and Directed the Department of Corrections through Legislative Statues specifically for the purpose of Rehabilitation needs of prisoners, to create and design such programs to meet those needs of prisoners, however nothing or very little has been Done at Stillwater Correctional Facility. A large portion, perhaps a majority of the prisoners at the Stillwater Facility are ignorant and unskilled. Many are illiterate. The Contribution of ignorance and lack of skills and specialization to crime today is well known a man who is ignorant and unskilled when he goes into prison can come out with some education and some usable skill, he has an improved chance of staying out of prison in the future.

105. Jackson States that if a man comes out of prison as ignorant and unskilled as he goes in, recidivism on his part is almost inevitable. The Absence of such a program conditions and practices exist which actually militate against reform and rehabilitation. That is the situation that exists in Minnesota Today, Completely at Stillwater Correctional Facility and to a similar degree at Rush City Correctional Facility. It can be said safely that except in a very, very few and unusual cases confinement in Minnesota Correctional System today is the opposite of beneficial. As a generality it can be stated that few individuals come of it better me for their experience most come out as bad as they came in or worse.

106. Jackson states that while at Stillwater Correctional Facility The First annual Stand-up Positive Support Group came to an end on April 11th 2017 with a graduation ceremony. The group's mission is to change prison culture by rejecting peer pressure and by helping men build productive perceptions and self-worth. The group was a Six month twenty four session program that the Plaintiff completed although for some reason the Plaintiffs Picture and Name was excluded from the First Stand-up Group Article and Group photo published in the June 2017 Prison Mirror Issue.

107. As the Article Points out the Staff Facilitators & Prisoner Facilitators were "volunteers" and therefore was not paid a wage for facilitating the Program so where did the money go that was supposes to be used for the program? The materials for the program were paid for by the Prisoners as well, so where did the money go for the Program? Also the Stand-up Program has been fraudulently presented by the MNDOC Defendants as being an Evidenced based – program that has been researched and proven to be effective at reducing recidivism. Where is that evidence? And who tracked the Program? Where is the money going? This also is true for the following programs that the plaintiff also participated in and graduated from between June of 2016 until April of 2017; Restorative Justice 101, Building Character, Hope Group, Grief Group, Long Term Offender Group.

108. All of these Programs are being facilitated by Prisoner volunteer Facilitators and Paid Security Staff Facilitators and Paid Regular Staff Facilitator, no wages are being paid to any of the Prisoner

facilitators, nor was material for the programs being purchased with funding for the Program, so where is the money going for the programs especially where it was reported that the Staff were volunteers? (2) This is also true regarding the **"Thinking for a Change"** Program that receives federal Grants yet the program is facilitated by Security Staff Lieutenant Darling who volunteers to facilitate the Program here at Stillwater Correctional Facility and at Rush City Correctional Facility yet was being paid a salary.

109. Jackson states that **Victim Offender Dialogue:** Victim Offender Dialogue (VOD) is a process in which the victim of a crime, or the surviving family members, and the Prisoner who committed the offense meet face-to face in a safe and structured setting with trained facilitators present. There is extensive preparation for all parties involved before meeting face-to-face. A victim maybe interested in meeting with the person who harmed him or her. Often, victims have questions only the Prisoner can answer – questions such as "what actually happened?" why did you choose me?" "What were my loved one's last words?" victims may want to tell the Prisoners how their lives have been affected by the offender's Criminal behavior and how they feel about the Crime.

110. Prisoners may want to apologize to the victim and express remorse for their actions. Answering questions is one way the offender can attempt to make amends to the victims. Dialogues are considered only at the request of the victim. And Prisoner Cannot Initiate or request a dialogue. (4) **Restorative Justice:** Restorative justice is a process to involve, to the extent possible, those who have a strike in an offense and to collectively identify and address harms, needs and obligations, in order to heal and put things right as possible."

111. Restorative Justice recognizes that Crime hurts everyone – victims, offenders and community. It Creates an obligation to make things right. The foundation of restorative justice is genuine, accountability based on 3R's: respect, responsibility and relationships. 3 key Restorative Justice Concepts: 1. Crime is a violation of people and relationships, 2. Crime creates harms, needs and obligations, 3. Individuals most affected should be meaningfully included. Lydia Newlin is the Director of

Victim Services for the Minnesota Department of Corrections, and oversees Restorative Justice. At an Restorative Justice Speaking event at Stillwater Correctional Facility in 2017 Lydia Newlin stated to the Group of Staff and Prisoners that when she first started doing this work she was not a believer in Restorative Justice, but now she is a believer in the program.

112. Jackson states that This explains why the Restorative Justice Programs within the Minnesota Department Of Corrections Male Facilities under Lydia Newlin's Supervision has not been operating as it intended purpose Especially the Victim Offender Dialogue Programs completely depriving the Plaintiff and All other Similarly situated Male Prisoners housed in Minnesota Correctional Facilities Effective Rehabilitative Needs due to Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male.

113. Also the Victim Service Unit started a Domestic Violence Program at Stillwater Correctional Facility in November of 2016 however Victim Services has been receiving Federal & State Appropriations Funding or Grants for Domestic Violence Programs that have been none existent for many years within all Male Minnesota Correctional Facilities so where was the money going? Also in 2017 there was 7,111.89 dollars raised through the sale of chicken and pies which was alleged to have been donated to Victim services in the community throughout the State of Minnesota.

114. Jackson states that The Restorative Justice Council at Stillwater Correctional Facility used an list compiled by Victim Services to decide what programs to donate the money to however this process which has been done for many years by Vitim Services is in violation of MNDOC Policy 104.100 Attachment (C) **(Special Purpose –Restorative Justice).** Some of These Programs are also lead by Prisoner who are Primary Group Facilitators even though the Minnesota Department of Corrections policy No. 202.055 in relevant part states the following; Offenders' right to protection: **"2. No offender or group of offenders will be allowed to have control or authority over other offenders."**

**115.** Also none of the Facilitators have wide and successful administrative experience in correctional programs embodying rehabilitative concepts. The Resource Staff Person former Casemanager Julie Ryan was responsible for organizing & holding together all of the Cogitative Programs offered at Stillwater Correctional Facility now that former Casemanager Julie Ryan's employment with the Minnesota Department of Corrections has been terminated, all programing at Stillwater has been put to a standstill while the Stillwater Correctional Facility Administration is trying to figure out how to proceed with the Cogitative Programs due to staff shortages and were the programs were already being held together with a Band-Aid.

116. Jackson states that The Minnesota Department of Corrections has looked at what works with Minnesota Prisoners by conducting more than 20 research studies and programs evaluations, most of which have been published in peer-review Academic Journals. Because of these studies the Defendants knows what works in corrections when it comes to lowering recidivism and making Minnesota Safer, which is through Employment, Education and the job site, helps the prisoners land after release, can reduce recidivism yet the MNDOC Defendants are Deliberately Indifferent to the needs of the Plaintiff regarding misappropriating of both Federal & State Funds Fraudulently requested by the Governor and Appropriated by the State Legislature for the Welfare of the Plaintiff.

117. Jackson states that In a story broad cast on Minnesota Public News (MPR News) on August 24th 2016, Charlene Briner who is Minnesota's Deputy Education Commissioner, talked about her experience with prisons as the mother of a son serving time. During the interview, she offered criticism of the state's Correctional System: **"If we don't want to house offenders indefinitely at a cost of millions, if not billions, of dollars to the state, we need to think about what happens when they leave, and how do we help them be productive citizens," Charlene Briner said." And I'm not necessarily convinced that Nick has gotten that kind of preparations."**

**(H). SEX OFFENDER TREATMENT PROGRAMS:**

118. Jackson states that Sex offender Treatment Programs that provide appropriate or effective or reasonable treatment of the illness or disability that triggered the Plaintiffs involuntary confinement are currently and in the past none existent at Stillwater Correctional Facility and All Similarly Situated Minnesota Correctional Facilities State Wide and there are no Sex offender treatment Programs available within the Minnesota Department of Corrections facilities that would satisfy any meaningful relationship between the Program and an end to indefinite detention.

119. Jackson states that the United States Supreme Court has recognized a substantive due process right to reasonably safe custodial conditions, [it has not recognized] a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement." Under an as-applied due process challenge the plaintiff would have no problem with the burden of showing that the state actors or Defendants actions were conscience-shocking and violate a fundamental liberty interest.

120. The Plaintiff has a Fundamental Right to Liberty, therefore strict scrutiny is the proper standard of scrutiny to apply to the plaintiffs' facial and as-applied due process claim regarding Lack of Sex Offender Treatment Programs at Stillwater Correctional Facility or any other Minnesota Department of Corrections Facility regarding a broader due process right to "appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement" that would fulfil the Mandatory Patterned Sex Offender Sentencing Enhancement Statutory mandates in relevant part: "the court finds that the offender needs long-term treatment or supervision beyond the presumptive term of imprisonment and supervised release."

121. The United States Constitution guarantees that "[n]o State shall...deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Supreme Court has not expressly identified the proper level of scrutiny to apply when reviewing constitutional challenges to civil commitment statutes." However we are talking about Criminal Sentencing Statutes that Act as Civil

Commitment Statutes requiring "Long-term treatment or supervision beyond the presumptive term of imprisonment and supervised release." In this context the strict scrutiny standard is reserved for claims of infringements on "fundamental" Liberty interests upon which the government may not infringe "unless the infringement is narrowly tailored to serve a compelling state interest."

122. Jackson states that According to the Supreme Court, "fundamental rights and liberties" are those "deeply rooted in this Nation's history and traditions and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." The excessive sentencing of the Plaintiff who is not a recidivist sex offender pursuant to Criminal Sentencing Enhancement Statutes that are reserved for Repeat Sex Offenders for which the Plaintiff is not and where these statutes also act as Civil Commitment Statutes but yet the Sex Offender Treatment Programs are none existent within the Stillwater Correctional Facility or any other Minnesota Department of Corrections Facilities and the Minnesota Department of Corrections does not provide a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement."

123. Jackson states that there is no meaningful relationship between the long term intensive sex offender treatment program that are none existent or unavailable within the Minnesota Department of Corrections and an end to indefinite detention. And even more importantly the United States Supreme Court has recognized a substantive due process right to reasonable safe custodial conditions, however the Supreme Court has not recognized a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the Plaintiffs involuntary confinement.

124. The Plaintiff has a State Create Due Process Right Pursuant to the Fourteenth Amendment of the United States Constitution to Rehabilitation Especially as a convicted Sex offenders Pursuant to Minn. Stat. 609.1352 Patterned Sex offender Sentencing Enhancement Provision (repealed 1998) therefore although the United States Supreme Court has not recognized a broader due process right to

appropriate or effective or reasonable treatment of illness or disability that triggered the plaintiffs involuntary confinement This honorable United States District Court for the District of Minnesota must decide if the Fourteenth Amendment of the United States Constitution required this broader Due Process Right Regarding Sex Offender Treatment programs within the Minnesota Department of Correction Facilities Shall exist.

125. Jackson asks that If so? required by the Constitution did depriving the Plaintiff of this broader due process right pursuant to the Fourteenth Amendment of the United States Constitution deprive the Plaintiff of his Liberty & Property resulted in the infliction of unnecessary and wanton pain, and is grossly disproportionate to the severity of crimes warranting the Plaintiffs imprisonment in violate of the Eighth Amendment of the United States Constitution?

126. Jackson states that Therefore because the Plaintiffs Liberty interest are attached to Rehabilitation and the Sex Offender Treatment that the Plaintiff is mandatorily PURSUANT TO State Law required to receive as conditions of his confinement beyond the Plaintiffs Presumptive term of imprisonment which is governed by the State of Minnesota Criminal Sentencing Enhancement statutes for Sex offenders; Patterned Sex Offender Sentencing Enhancement Statute Minn. Stat . 609.1352(repealed & Replaced as Minn. Stat. 609.108.(1998) Minn. Stat. 609.346 subd.2a (a)(1)(2)(i) (1996) Repealed and Recodify and Clarify as Minn. Stat. 609.109 subd.3.(1998).

127. which operate as Civil Commitment Statutes but side steps the requirements of the Minnesota Civil Commitment and Treatment Act: Sexually Dangerous Persons and Sexual Psychopathic Personalities (MCTA) now codified at Minnesota Statute §253D, the depravation of appropriate or effective or reasonable treatment of the illness or disability that triggered the Plaintiffs involuntary confinement by the MNDOC Defendant's deprives the Plaintiff of his Liberty Interests where the Plaintiff remains incarcerated after the legal authority to hold him has expired. The Eighth Amendment proscribes the unnecessary and wanton infliction of pain, which includes those sanctions that are totally

without penological justification that it results in the gratuitous infliction of suffering. This includes not only physical torture, but any punishment incompatible with the evolving standards of decency that mark the progress of a maturing society. The United States Supreme Court has recognized a substantive due process right to reasonable safe custodial conditions.

128. Jackson states that The MNDOC Defendants behavior suggests that they are Deliberately Indifferent to insuring that the Plaintiff is getting or receiving Sex Offender treatment that is a mandatory condition of the Plaintiffs Incarceration and Statutorily required beyond the Plaintiffs presumptive Sentences. The Minnesota State Supreme Court has associated A Prisoners Liberty Interests and Recidivism and a prisoners opportunity to reform while being incarcerated with the impression that the Minnesota Department of Corrections is providing the effective Treatment opportunities Needed by the Plaintiff such as Sex Offender Treatment Programs.

129. The Plaintiff is also challenging the Constitutionality of the statutes governing the plaintiffs unlawful continued Detention beyond his presumptive term of imprisonment under unsafe custodial conditions. The Fourteenth Amendment of United States Constitution Due Process Clause is violated where a prisoner remains incarcerated after the legal authority to hold him has expired. And the Plaintiffs due process rights extend to State Supreme Court Review of Aggravated Sentencing Enhancement Factors imposed by the District Court where the State Supreme Court has provided Mandatory Right to Such Review.

130. Jackson states that According to the Supreme Court, "fundamental rights and liberties" are those "deeply rooted in this Nation's history and traditions and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed therefore the excessive sentencing of the Plaintiff who is not a recidivist sex offender pursuant to Criminal Sentencing Enhancement Statutes that are reserved for Repeat Sex Offenders for which the Plaintiff is not and where these statutes also act as Civil Commitment Statutes but yet the Sex Offender Treatment

Programs are none existent within the Stillwater Correctional Facility or any other Minnesota Department of Corrections Facilities and the Minnesota Department of Corrections does not provide a broader due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement.

131. Jackson states that there is no meaningful relationship between the long term intensive sex offender treatment programs that are none existent or unavailable within the Minnesota Department of Corrections and an end to indefinite detention. And even more importantly the United States Supreme Court has recognized a substantive due process right to reasonable safe custodial conditions. Therefore because the Plaintiffs Liberty interest are attached to Rehabilitation and the Sex Offender Treatment that the Plaintiff is mandatorily required to receive as conditions of his confinement beyond the Plaintiffs Presumptive term of imprisonment which is governed by the State of Minnesota Criminal Sentencing Enhancement statutes for Sex offenders; **Patterned Sex Offender Sentencing Enhancement Statute Minn. Stat . 609.1352(repealed & Replaced as Minn. Stat. 609.108.(1998) Minn. Stat. 609.346 subd.2a (a)(1)(2)(i) (1996) Repealed and Recodify and Clarify as Minn. Stat. 609.109 subd.3.(1998)** which operate as Civil Commitment Statutes but side steps the requirements of the Minnesota Civil Commitment and Treatment Act: Sexually Dangerous Persons and Sexual Psychopathic Personalities (MCTA).

132. Now codified at Minnesota Statute §253D, the depravation of appropriate or effective or reasonable treatment of the illness or disability that triggered the Plaintiffs involuntary confinement by the MNDOC Defendant's deprives the Plaintiff of his Liberty Interests where Jackson remains incarcerated after the legal authority to hold him has expired. The Eighth Amendment proscribes the unnecessary and wanton infliction of pain, which includes those sanctions that are totally without penological justification that it results in the gratuitous infliction of suffering. This includes not only physical torture, but any punishment incompatible with the evolving standards of decency that mark the

progress of a maturing society. The United States Supreme Court has recognized a substantive due process right to reasonable safe custodial conditions.

## V. FACTUAL ALLEGATIONS

Provide each defendant's full name, official position, and place of employment. Attach additional sheets of paper, if necessary.

**NOTE: IF THERE ARE ADDITIONAL PLAINTIFFS OR DEFENDANTS, PLEASE PROVIDE THEIR NAMES ON A SEPARATE SHEET OF PAPER.**
**Check here if additional sheets of paper as II.A. for Plaintiffs and II.B. for Defendants.**

**ALLEGATIONS AGAINST INDIVIDUAL DEFENDANT'S:**

**133. Defendant Tim Walz, Individual & Official Capacity as Current Governor of the State Of Minnesota,** The Primary duties of the governor are to oversee all operations of state government and to take the lead in shaping public policy through legislative proposals and agency initiatives. The Operation of government is carried out through more than 23 major departments whose heads are appointed by the governor. These Department heads which includes the Commissioner of the BUREAU OF MEDIATION SERVICES make up the Governor's Office. The Plaintiff Hereby states that he continues to be under imminent danger of serious physical injury Due to the Toxic Violent Mass Incarceration and Toxic overcrowding Conditions that has been inherited by Governor Tim Walz from the Previous Administration under Former Governor Mark Dayton.

**134. Defendant Mark Dayton, Individual & in his Former official capacity as Governor of the State of Minnesota,** The Plaintiff hereby states that he is under imminent danger of serious Physical Injury Due to Overcrowding and Double Bunking Conditions of Confinement which has caused Escalating Violence, The July 18th 2018, Murder of Security Officer Joseph Gomm, Inadequate Security, Drug Abuse is rampant in the Prison, Escalating Gang Violence and Riots, and The Physical facilities are dilapidated

and poorly maintained. Partly Caused through a pattern of collusion and Fraud committed by both State Agencies and Department Heads appointed by the former Governor Dayton, regarding what has amounted to Human Rights Violations and Hate Crimes regarding the Human Trafficking of the Plaintiff and Similarly situated Minnesota Prisoners through the Minnesota Criminal Justice System Through ongoing pattern of illegal activity that is Organized Criminal Activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO, Which involved Fraud, Collusion, Employee Organization Representation Certification Fraud and Misappropriations of vast Sums of Legislative Appropriated funding, Federal Funding and other funds appropriated for the welfare of Minnesota Prisoners housed in Correctional Facilities State Wide, Community Corrections Subsidy Act Counties Funding and Halfway housing Funding, Prison Rape Elimination Act Funding and Minnesota Department of Corrections Facility Funding Structure.

135. Dayton Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

136. Dayton , Continues to Jeopardize the Plaintiffs Health & Safety and show Deliberate Indifference by failing to implement or mandate State wide Prison Population limits necessary to remedy the violations of the Plaintiff's Constitutional Rights and to remedy the none action by the Minnesota State

Legislature to reduce its prison population which is toxic. Dayton Also has failed to enforce a Federal Mandate Issued by United States District Judge Donovan W. Frank, regarding the Release of Sex Offenders where Civil Commitment might improperly be used to indefinitely extend the prison terms of individuals who have been criminally convicted of a crime and who have finished serving their defined terms of imprisonment.

137. **(Dayton)** The overcrowded and double bunked conditions over time has had an extremely toxic impact on all Treatment Programs such as the use of untrained prisoners to provide facilitation of both Treatment Programs and Cognitive Thinking Programs and Mental Health Programing & Educational programming and services at Stillwater Correctional Facility due to Programming Staff Shortages & Casemanagment Shortages and also has resulted in Crisis management with respect to the ongoing Prison Gang Riots including sexual assaults, staff assaults, increased assaults, suicides by both staff and Prisoners, idleness, frustration, stress, discomfort, edginess, and fear.

138. **(Dayton)** This, of course, does not require much imagination to realize that these toxic overcrowding conditions is one of the principle causes of the effect of violence, fights, stabbings, and of course, extreme management problems. The Minnesota Department of Correction Facilities are some of the biggest suppliers of Neuroleptic Medications to its Prisoner populations especially the Mentally Ill. Stillwater Correctional Facility, Rush City Correctional Facility & all similarly situated Minnesota Correctional Facilities State Wide have been for the past Twenty years been experiencing rapidly increasing Drug Abuse & Addictions regarding the misuse of Neuroleptic Medications by Prisoners who mix these Neuroleptic Medications with other Neuroleptic Medications to create a Cocaine like substance that is then snorted through the nose. Most often the Neuroleptic Medications are being sold to other Prisoners by Mentally Ill Prisoners because they have no money or family to help support them or the Neuroleptic Medications are being extorted from Prisoners by other Prison Gangs.

139. **(Dayton)** Also much needed emergency maintenance of the Facilities quickly deteriorating Infrastructure, major Maggots Infestation in the Prisoner Kitchen dock area & Unsanitary Prisoner Dinning Hall & Kitchen Conditions & Unsafe Prisoner Kitchen Infrastructure, Cellblock Pluming issues regarding prisoner cells, Brown water issues in the Cellblocks effecting each prisoner cell room running water & Major Gas Leaks due to old outdated underground Pipes which has caused Stillwater Correctional Facility to Lock down the Facility several times and evacuate the Correctional Facilities Staff from the Facility and securing the Prisoners in their Cells several Times between the months of January thru May of this year 2017 not counting the year 2016 and another major Gas Leak as of January 2nd, 2018 at 8:00am.

140. **(Dayton)** Stillwater is currently a Ticking Time Bomb although Stillwater Correctional Facility alone has received a conservative estimate of approximately $768 Million Dollars over a Twenty Year period of time not including federal Funding or Funds generated from MINNCOR and it is not even verified if the Maintenance Staff Employed By the Minnesota Department of Corrections for Stillwater Correctional Facility to construct the Gas Piping for the Stillwater Correctional Facility are Certified to do so especially since two separate types of certifications are needed one Certification for 2" Gas Pipes or more and one Certification for 2"Gase pipes or less. These Unconstitutional toxic conditions of confinement was caused by a combination of extreme Sentencing Reforms Implemented by the Minnesota Sentencing Guidelines Commission Targeting Sex Offenders, Drug Offenses, and Domestic Violence.

141. **(Dayton)** The toxic overcrowding Conditions are also Caused due to more than 3,400 of Minnesota's 10,111 prisoners are being incarcerated right now for technical parole violations and the Legislature is not given sufficient information regarding the cost associated with the Care and Custody of the Plaintiff And all Similarly Situated Prisoners at Stillwater Correctional Facility Rush City Correctional Facility and All other Minnesota Correctional Facilities and County Jails State Wide. Instead the

Minnesota Department of Corrections as an Agency chooses to report artificial cost figures derived from a calculation based on a flawed methodology, without accurate and reliable incarceration cost data to policy makers the Public, Policy makers cannot began to address long-term solutions to the problems of Minnesota's Prison overcrowding because funding is virtually guaranteed.

142. **(Dayton)** nor has the Governor held the Commissioner Tom Roy accountable for not promoting offender change through proven strategies during safe and secure incarceration and effective community supervision and failing to provide the Plaintiff with Evidenced based – programs that have been researched and are proven to be effective at reducing recidivism And the Lack of Sex Offender Treatment Programs at Stillwater Correctional Facility or any other Minnesota Department of Corrections Facility that would fulfil the Mandatory Patterned Sex Offender Sentencing Enhancement Statutory mandates that Govern the Plaintiff's Mandatory Conditions of Incarceration in relevant part:**"the court finds that the offender needs long-term treatment or supervision beyond the presumptive term of imprisonment and supervised release"** Depriving The Plaintiff of his liberty and Property without due process of law because there are no Sex offender treatment Programs available within the Minnesota Department of Corrections that would satisfy any meaningful relationship between the Program and an end to the Plaintiff's indefinite detention within and beyond the Plaintiffs presumptive term of imprisonment.

143. **(Dayton)** Governor Mark Dayton has Authority over the Minnesota Sentencing Guidelines Commission who has in the past and presently continuing to subject the Plaintiff and all Similarly Situated Minnesota Prisoners to Racial Injustices and Discrimination Due to the Plaintiffs Criminal Status as a Sex Offender and The Plaintiffs Race and Sex where the Plaintiff is an African American Male to what has Amounted to Human Rights Violations and Hate Crimes regarding the human trafficking of the Plaintiff through the Minnesota Criminal Justice System.

144. **(Dayton)** based upon Fraudulent implementation and passing of Legislative Sentencing Enhancement Statutes and Sentencing Guidelines Aggravating Departure Sentencing schemes that doubled or more than doubled the Plaintiffs Presumptive Sentences pursuant to the Minnesota Sentencing Guidelines Grid Boxes regarding Sex Offender Legislation that has allowed the continued Detention of the Plaintiff beyond his Presumptive Sentence without Due Process depriving the Plaintiff of his liberty and property without a Clear Narrowly Tailored Significant Government interest other than to create Mass Incarceration for profit and to use the Plaintiffs Labor and Criminal Status as a Sex Offender for profit while under the illegal Custody of the Minnesota Department of Corrections where slavery on is only permissible under the circumstances mandate pursuant to Amendment XIII [1865] section 1. **"Neither Slavery nor Involuntary servitude, except as a punishment for crime where of the party shall have been duly convicted, shall exist within the United States, or any place subjected to their jurisdiction."** And not for profit.

145. **Amy Klobuchar, In her official Capacity as United States Senator And Individual & Former Official Capacity as Hennepin County Prosecutor,** Senator Klobuchar has failed to Provide oversight regarding the Federal Funding Issued to the Minnesota Department of Corrections for the Welfare of the Inmates and rehabilitation Programs. Senator Klobuchar Was formally Responsible for Salaries and expenses related to the Operation of the Office of the Prosecutors in Hennepin County. This Included Administering Pretrial Diversion Programs as part of Funds Obtained Due to Voluntary Participation In the Minnesota Association of Community Corrections Act Counties & Subsidy Funds received by From the Minnesota Department of Corrections and is a public entity duly organized and existing under the laws of the state of Minnesota. Amy Klobuchar has received state and federal funding for the operations associated with the Community Corrections Act Funding such funds continued at all times relevant to this complaint.

146. The Plaintiff hereby states that he is under imminent danger of serious Physical Injury Due to Overcrowding and Double Bunking Conditions of Confinement which has caused Escalating Violence, The July 18th 2018, Murder of Security Officer Joseph Gomm, Inadequate Security, Drug Abuse is rampant in the Prison, Escalating Gang Violence and Riots, and The Physical facilities are dilapidated and poorly maintained. Partly Caused through a pattern of collusion and Fraud committed by Amy Kolbuchar, regarding what has amounted to Human Rights Violations and Hate Crimes regarding the Human Trafficking of the Plaintiff and Similarly situated Minnesota Prisoners through the Minnesota Criminal Justice System Located in In Hennepin County Where Amy Klobuchar was Quoted in a 1999 News Release regarding the Plaintiff **"We want to make Absolutely sure that Tony Jackson ( The Plaintiff Then age 24) will never again be loose on the streets",**

147. Through ongoing pattern of illegal activity that is Organized Criminal Activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO, Which involved Fraud, Collusion, Employee Organization Representation Certification Fraud and Misappropriations of vast Sums of Legislative Appropriated funding, Federal Funding and other funds appropriated for the welfare of Minnesota Prisoners housed in Correctional Facilities State Wide, Community Corrections Subsidy Act Counties Funding and Halfway housing Funding, Prison Rape Elimination Act Funding and Minnesota Department of Corrections Facility Funding Structure.

148. Where The Minnesota Department of Corrections Colluded and Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies, to commit Fraud for Profit regarding the request the Appropriation of Both State Legislative Funding and Federal Grants or Funds received for a specific Activity or purpose, Such as Rehabilitative Programming, Adult Basic Education, Vocational Training, And Physical Plant

Maintenance. Payment of Subsidy only occurs upon compliance by a county or group of counties with the prerequisites for participation in the subsidy prescribed by section 401.01 to 401.16.

149. "Pretrial diversion" means the decision of a prosecutor to refer an offender to a diversion program on conditions That the criminal charges against the offender will be dismissed after a specified period of time, or the case will not be charged, if the offender successfully completed the program. BY July 1st,1994, every County Attorney of a county participating in the Community Corrections Act shall establish a pretrial diversion program for adult offenders. If the County attorney's county participates in the Community Corrections Act as Part of a Group of Counties under section 401.02, the county attorney may establish a pretrial diversion program in conjunction with other county attorneys in that group of counties. Two of the Key components of the program must be operated to further goals of **(1) to reduce the costs and case load burdens on district courts and the criminal justice system and (2) to minimize recidivism among diverted offenders.**

**150.** During Amy KLobachar's Tenure as County Attorney or Head Prosecutor For Hennepin County Minnesota the Adult Inmate Commitment Rate was well over 32% and Hennepin County continues to be Number#1 of the top Five County of Commitments. Amy Klobachar has Fraudulently Stated that She has been fighting to pass Criminal Justice Reform. Each biennially, each County attorney shall report to the state court administrator and the legislator on the operation of a pretrial diversion program. The report shall include a description of the program, the number of offenders participating in the program, the number and characteristics of the offenders who successfully complete the program, the number and characteristics of the offenders who fail to complete the program, and an evaluation of the program's effect on the operation of the criminal justice system in the county. However no such Reports were ever filed to the Legislature by Amy Klobachar from the years 1997 -2006.

**151. LORI SWANSON, Individual & Official Capacity, as Former Minnesota State Attorney General,** The Attorney General is an officer in the executive department, The attorney general is the chief legal

officer for the state. The attorney general's duties arise from the Minnesota Constitution, state statutes, and common law. Every board, commission, and agency of the state receives its legal counsel and representation from the attorney general. The attorney general is also permitted to act in a parens patriae capacity on behalf of the people. ("Parens patriae" means "parent of the country" a doctrine that grants the inherent power and authority of the state to protect persons who are legally unable to act on their own behalf.)

152. The attorney general has authority to initiate legal action for the enforcement of civil laws of the state, the preservation of order, and protection of public rights. The attorney general provides assistance to county attorneys in criminal justice area. As a statewide elected official, the attorney general advocates for a wide range of policy initiatives and legal reforms to protect Minnesotans and enhance their quality of life. Lori Swanson failed to protect the Civil Rights of the Plaintiff and All Similarly Situated Minnesota State Prisoner and Is deliberately a Party to collusion, Fraud and a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves

153. The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living and working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

154. Despite the long history of Abuse, Negligence and Murder of Prisoners by MNDOC Staff that Minnesota Prisoners were subjected to for Profit by the Minnesota Department of Corrections, Lori

Swanson Failed to Seek the Abolishment of Prison Slavery authorized Pursuant to the Thirteenth Amendment of both the State Constitution and United States Constitution and failed to Seek Criminal Prosecution of the MNDOC State Actors. However Lori Swanson has used the Office of the State Attorney General for Personal Gains such as using Office Staff to work on Her Political Campaigns regarding Reelections to the State Attorney's Office.

155. **Keith Ellison Individual and Official Capacity as Current Minnesota State Attorney General,** Has failed to protect the Plaintiff and all similarly situated Minnesota Prisoners by failing to take measures to protect the Civil Rights of the Plaintiff by seeking the abolishment of the State's constitutional Amendment and United State Constitutional Amendment which allows all forms of Prison Slavery and Involuntary servitude(Thirteenth Amendment) and has inherited the wrongs or bad Acts of the Previous State Attorney General Lori Swanson. The attorney general is permitted to act in a parens patriae capacity on behalf of the people. ("Parens patriae" means "parent of the country" a doctrine that grants the inherent power and authority of the state to protect persons who are legally unable to act on their own behalf.) The attorney general has authority to initiate legal action for the enforcement of civil laws of the state, the preservation of order, and protection of public rights.

156. The Plaintiff continues to be placed in imminent danger of serious Physical Injury Due to Overcrowding and Double Bunking Conditions of Confinement which has caused Escalating Violence, The July 18th 2018, Murder of Security Officer Joseph Gomm, Inadequate Security, Drug Abuse is rampant in the Prison, Escalating Gang Violence and Riots, and The Physical facilities are dilapidated and poorly maintained. Due to what has amounted to Human Rights Violations and Hate Crimes regarding the Human Trafficking of the Plaintiff and Similarly situated Minnesota Prisoners through the Minnesota Criminal Justice System All Caused by the Defendants Through ongoing pattern of illegal activity that is Organized Criminal Activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO, Which involved Fraud, Collusion, Employee Organization Representation Certification Fraud and

Misappropriations of vast Sums of Legislative Appropriated funding, Federal Funding and other funds appropriated for the welfare of Minnesota Prisoners housed in Correctional Facilities State Wide, Community Corrections Subsidy Act Counties Funding and Halfway housing Funding, Prison Rape Elimination Act Funding and Minnesota Department of Corrections Facility Funding Structure.

157. Where The Minnesota Department of Corrections Colluded and Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies, to commit Fraud for Profit regarding the request the Appropriation of Both State Legislative Funding and Federal Grants or Funds received for a specific Activity or purpose, Such as Rehabilitative Programming, Adult Basic Education, Vocational Training, And Physical Plant Maintenance. In the Process Abusing Jackson and Violating his Civil Rights by subjecting Jackson to unconstitutional Living & working Conditions that are toxic such as the continued exposure for 22years to Asbestos, Perfluorochemicals or PFCs and other Toxic – Dangerous and Environmentally unsafe Prison Conditions that can cause cancer, Extortion and Confiscation of The Prisoners Wages Earned through MINNCOR Industries, Private Food Service Contractors, And Inside/Outside Construction, Fraudulent Registering Prisoners as an Independent Contractor with the IRS (Internal Revenue Service) to avoid Paying Employee benefits and Taxes to the Prisoners, the Mental abuse and Retaliation by Administrative Staff and Security Staff.

158. **Tina Smith in her Individual & Official Capacity as United States Senator & Former Capacity as Lieutenant Governor State of Minnesota,** Senator Smith has failed to provide oversight regarding Federal Funding and Resources requested by the State of Minnesota for the welfare of Inmates regarding Reasonable Safe Prison Conditions, Education, Mental Health, Fair Prisoner Labor Wages, Physical Plant Operations and Natural Resources or Recycling, Jeopardizing the Plaintiffs Health & Safety

and show deliberate Indifference regarding failing to develop or propose major policies and budget decisions For Criminal Justice Reform regarding reducing the toxic violent overcrowding and double bunking conditions in all Minnesota Correctional Facilities Such as The First Step Act Enacted by Congresss, as a requirement before any Federal Funding would be issued to the Minnesota Department Of Corrections Facilities which currently place the Plaintiff and All Similarly Situated Prisoners housed at Stillwater Correctional Facility & Rush City Correctional Facility & All Similarly Situated Minnesota Correctional Facility Health & Safety in Serious Jeopardy Due to: (1) Increased Aggravated Assaults & Aggravated Assaults with weapons, increased Attempted Murders, Increased Suicides by Prisoners & Staff, Increased number of calls by Stillwater Health Services for ambulances has risen regarding the need for emergency room visits to the Hospital due to the frequency of the seriousness of the violence by prisoners.

159. Increased Violence by Mentally Ill Prisoners Due lack of Care and Failure by the Department of Human Services to Admit them to State-operated treatment facilities but instead being placed in regular Population Cell blocks that houses up to three hundred (300) Prisoners with only four or five security staff overseeing the Cellblocks with no programming staff available in the Cellblocks for much needed support (3) the cellblocks are not structured and lack mentors to help the mentally Ill prisoners or prisoners in general within these regular Population Cellblocks (4) Increased Gang Violence, Increased Riot Activity, Increased Extortion, & Increased Sexual Assaults involving Prisoners being housed in double bunks, Extreme Isolation of Prisoners in Solitary Confinement without Programing.

160. Senator Smith has also allowed The Commissioner of Employment and Economic Development to Continue to violate the Federal Rehabilitation Act of 1973 by not ensuring that the Plaintiff and all other prisoners housed at Stillwater Correctional Facility and all other Minnesota Correctional Facilities that the Act is Applicable to are in fact receiving the extended employment programs or the Granted Funds to the extended employment programs. (2)Insuring that the Plaintiff is receiving free choices of

vender for any medical, dental, prosthetic, or orthotic services, (3) Expending funds and provide technical assistance for the establishment, improvement, maintenance, or extension of Stillwater Correctional Facility and Rush City Correctional Facility and (4) Independent Living Space.

161. Senator Smith has failed to seek Senate Investigative hearings into the Minnesota Department of Corrections and the Minnesota Sentencing Guidelines Commission regarding its sentencing and release practices that have caused extreme Disparities and Racial Injustices and Human Rights Violations regarding the Extremely Excessive Aggravating Sentencing Departure that have traditionally Targeted Minority Racial Groups and Specific Crimes without Due Process and has continued to cause the overcrowding Conditions within Stillwater Correctional Facility, Rush City Correctional Facility and all Minnesota Correctional Facilities State Wide for profit were the Minnesota Sentencing Guidelines Commission may except funds from any person, corporation, or the United States Government which has influenced the Sentencing Commission to make decision that have increased the sentencing of specific Racial Groups and Gender and Specific Crimes Such as Sex Offenses or Drug Offenses

162. depriving the Plaintiff of his liberty and property without Due Process, Causing wide spread Prison Overcrowding & Violence within each Correctional Facility Jeopardizing the health and Safety of the Plaintiff without a Clear Narrowly Tailored Significant Government interest other than to create Mass Incarceration for profit and to use the Plaintiffs Labor and Criminal Status as a Sex Offender for profit while under the illegal Custody of the Minnesota Department of Corrections where the Commissioner of the Minnesota Department of Corrections has provided Adequate office space and Administrative Services for the Commission.

163. **Debra Hilstrom, Individual & Official Capacity as State of Minnesota House Representative, ,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff where Hilstrom and The Minnesota Department of Corrections Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work

Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

164. Presently and in the Past Caused the Plaintiff Continued harm and Jeopardy to his Health and Safety and has continued to show deliberate indifference by Committing Ethics violations regarding the intentional Fraudulent use of the Toxic Minnesota State Prisons overcrowding Conditions State Wide to Chief Author Correctional Worker Funding for the Benefit of AFSCME UNION Local Corrections Guard Unit Representatives for Profit and Political Gains where the AFSCME Union Local Corrections Guards Unit purposefully Fraudulently Testified to the Minnesota State Legislature regarding Security Staff Shortages At Both Stillwater Correctional Facility & Rush City Correctional Facility on several occasions on behalf of the Chief Authored Bills By Debra Hilstrom which allowed for the appropriation of money for additional Security Staff & Corrections Cooks that were also designated to be Part of The Corrections Guard Unit under the Control of AFSCME Union Local Corrections Guard Units which is also in violation of state Law.

165. Debra Hilstrom was aided in the presentation of these Bills and Other Bills that were based upon Fraudulent intentions with Financial and Political Support as the Motive for Debra Hilstrom and Expansion of the AFSCME Corrections Guards Unit BY AFSCME UNION Local 1539 and Local 600, Corrections Guards Unit Representatives , That have Negatively affected Prisoner Programming and Food Service and Canteen Deliveries at Stillwater Correctional Facility and Rush City Correctional Facility, The existence of the AFSCME Union has created a divisive element within the inmate population Also not to mention the tension between both Staff and Prisoners which has Now resulted in several

Stabbings regarding Staff and Prisoners with Metal Prison Shanks, and the Low morale of both the Prisoners & Staff.

166. Debra Hilstrom has subjected the plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility and Rush City Correctional City and All other Minnesota Correctional Facilities State Wide to Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations and Hate Crimes regarding the Human Trafficking of the Plaintiff through the Minnesota Criminal Justice System based upon fraudulent implementation and passing of Civil Commitment Statutes that are disguised as Criminal Sentencing Enhancement Statutes that apply only to Sex Offenders which has permitted the state to detain the Plaintiff beyond his presumptive sentences.

**167. Minnesota Sentencing Guidelines Commission Official Capacity as Commission,** Has as Sentencing Guidelines Commission both Presently and in the Past Caused the Plaintiff Continued harm and Jeopardy to his Health and Safety and has continued to show deliberate indifference in regards to the Plaintiffs Health and Safety by totally disregarding the Commissions Purpose and Principles to establish rational and consistent Sentencing Standards which reduce sentencing disparities and ensures that sanctions following conviction of a felony are proportional to the severity of the offense of conviction and the extent of the offender's Criminal history but instead has Caused Toxic Mass incarceration and overcrowded conditions within the Minnesota Correctional System and County Jails State Wide for Profit.

168. **(Minnesota Sentencing Guidelines Commission)** The overcrowded and double bunked conditions over time has had an extremely toxic impact on all Treatment Programs such as the use of untrained prisoners to provide facilitation of both Treatment Programs and Cognitive Thinking Programs and Mental Health Programing & Educational programming and services at Stillwater Correctional

Facility due to Programming Staff Shortages & Casemanagment Shortages, Special Education Teachers, Religious Programming, and also has resulted in Crisis management with respect to the ongoing Prison Gang Riots including sexual assaults, staff assaults, increased assaults, suicides by both staff and Prisoners, idleness, frustration, stress, discomfort, edginess, and fear. This, of course, does not require much imagination to realize that these toxic overcrowding conditions is one of the principle causes of the effect of violence, fights, stabbings, and of course, extreme management problems.

169. **(Minnesota Sentencing Guidelines Commission)** The Minnesota Sentencing Guidelines Commission has subjected the plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility and Rush City Correctional City and All other Minnesota Correctional Facilities State Wide to Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Sex where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations and Hate Crimes regarding the Human Trafficking of the Plaintiff through the Minnesota Criminal Justice System.

170. **(Minnesota Sentencing Guidelines Commission)** based upon fraudulent implementation and passing of Civil Commitment Statutes that are disguised as Criminal Sentencing Enhancement Statutes that apply only to Sex Offenders which has permitted the state to detain the Plaintiff beyond his presumptive sentences **(Sentencing Structure received for his Criminal convictions for First Degree Criminal Sexual Conduct that occurred in May of 1997, in Washington County (186 months consecutive to 48 months ), Ramsey County (Life Sentence & Consecutive to 98 months), & Dakota County (30 year sentence & Consecutive 48 month Sentence) all run consecutively where the Plaintiffs Presumptive Sentences should have been (Washington County 81months & 48 month run Concurrently)(Ramsey County 110months & 48 months run Concurrently)and (Dakota County 139months & 48 Months run Concurrently) sentences to be run Concurrently, which means the Plaintiff should have been released from prison Nine Years ago)** without Due process and therefore

depriving the Plaintiff of his Liberty or Individual Freedom based upon a Civil Commitment Process that was disguised as an Criminal procedure and was not narrowly Tailored so that detention is absolutely limited to a Period of time necessary to achieve any narrow Government Objectives.

171. **(Minnesota Sentencing Guidelines Commission)** The year 1985 for the first time Sex offenders outnumbered all categories of prisoners in the state of Minnesota Correctional System representing 18.5 percent or 430 adult inmates. Since then that number continued to increase rapidly due to the for profit incentives the Sentencing Guidelines Commission has received from any person, corporation, the United States Government, or any other entity to offer funds to carry out its purpose and duties and also after the Dru Sjodin tragedy, state law was amended to increase the conditional release options available to a state court when sentencing sex offenders also The Appointment by Former Governor Tim Pawlenty a Commission to focus on best practices relating to sentencing, supervision, commitment, healthcare services, and registration of sex offenders.

172. **(Minnesota Sentencing Guidelines Commission)** The Government may only involuntary detain an individual outside of the criminal commitment process which permits the state to detain individuals who are suffering from acute symptoms of severe Mental Illness and who are truly dangerous to the public as a result of their psychiatric condition. The Plaintiff was sentence pursuant to the Minnesota Patterned Sex Offender Criminal Sentencing Enhancement Statutes and provisions that require the court to sentence the plaintiff beyond his presumptive Guidelines Sentence if **"the court finds that the offender needs long-term Treatment or Supervision beyond the presumptive term of imprisonment and supervised release."**

173. **(Minnesota Sentencing Guidelines Commission)** The Sentencing Guidelines Commission has therefore side stepped the Minnesota Civil Commitment and Treatment Act (MCTA) Process by implementing and subjecting the Plaintiff to preventive Detention Through Aggravating Sentencing Departure Provisions within the Sex Offender Criminal Sentencing Enhancement Statues which are in

reality Civil Commitment Provisions, depriving the Plaintiff of his liberty without Due Process and Jeopardizing the Plaintiffs Health and Safety Due to the Toxic overcrowding conditions that has currently over taken the Minnesota Department of Corrections Facilities and County Jails State Wide. Where the Sentencing Guidelines Commissions ill rational Sentencing Standards has partly caused for profit.

**174. Lorie Skjerven Gildiea, In Her Individual & Official Capacity as Chief Judge Minnesota State Supreme Court, and Sentencing Guidelines Commission Member,** Is the administrative head of the judicial branch, supervises the work of all courts which includes all Counties that Voluntarily participate in The Minnesota Association of Community Corrections Act Counties (MACCAC) which have chosen to deliver all correctional services through Minnesota Statute 401, and chairs the Minnesota Judicial Council, which is the single administrative policy-making body for the Judicial branch, Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

**175.** State Supreme Court has continued to cause the Plaintiff harm and Jeopardy to his Health and Safety and has continued to show deliberate indifference in regards to depriving the Plaintiff of his liberty and Property without Due Process Due to the Toxic overcrowding conditions that has currently over taken the Minnesota Department of Corrections Facilities and County Jails State Wide. Where the Sentencing Guidelines Commissions ill rational Sentencing Standards in combination with the Minnesota

Association of Community Corrections Act Counties and the Minnesota Department of Corrections excessive Technical Parole Violations caused these toxic conditions along with the Supreme Court's Refusal to Grant Mandatory Review of hundreds of Unlawful Sentencing Departure imposed by the District Courts State Wide for profit.

176. On February 8th, 1985 The Minnesota Supreme Court in order to ensure future compliance regarding the Minnesota State District Courts regarding Criminal Sentencing Procedures with the Sentencing Guidelines requirements the Supreme Court Prospectively adopted, the following rules in relevant part: "If reasons supporting the departure are stated, the supreme court will examine the record to determine if the reasons justify the departure." Departures from the presumptive sentence are only justified when substantial and compelling circumstances are present in the record. When reviewing a district court's decision to depart from the presumptive guidelines sentence, the Supreme Court reviews for abuse of discretion.

177. However the State Supreme Court has deprived the Plaintiff of mandatory review of his Aggravated Sentencing Departures**(Sentencing Structure received for his Criminal convictions for First Degree Criminal Sexual Conduct that occurred in May of 1997, in Washington County (186 months consecutive to 48 months ), Ramsey County (Life Sentence & Consecutive to 98 months), & Dakota County (30 year sentence & Consecutive 48 month Sentence) all run consecutively where the Plaintiffs Presumptive Sentences should have been (Washington County 81months & 48 month run Concurrently)(Ramsey County 110months & 48 months run Concurrently)and (Dakota County 139months & 48 Months run Concurrently) sentences to be run Concurrently).**

178. The State Supreme Court's Chief Judge and Associate Judges also Serves as Members of the Minnesota Sentencing Guidelines Commission through appointment by the Governor and therefore has violated the stated "Statement of Purpose and Principles" in relevant Part "Because the Capacities of

state and local correctional facilities are finite, use of incarcerate sanctions should be limited to those convicted of more serious offenses or those who have longer criminal histories.

179. To ensure such usages of finite resources, sanctions used in sentencing convicted felons should be the least restrictive necessary to achieve the purposes of the sentence." However the Supreme Court has done just the opposite by adopting as matter of State Law the Teague Rule regarding Retroactivity without determining whether adopting the Rule was narrow tailored to achieve a compelling government purpose and that if it failed to meet this narrow tailoring both facially and as applied. (1). state courts, when reviewing state criminal convictions, are not bound by *Teague* and may choose the standard for deciding whether new rules of federal constitutional criminal procedure are retroactive. (2) had to be narrow tailored to achieve a compelling government purpose and that if it failed to meet this narrow tailoring both facially and as applied.

180. Criminal Defendants have a Fundamental Right to Liberty unless: **"When the prosecutor provides reasonable notice under subdivision 4, the district court shall allow the state to prove beyond a reasonable doubt to a jury of 12 members the factors in support of the state's request for an aggravated departure from the Sentencing Guidelines or the state's request for an aggravated sentence under any sentencing enhancement statute or the state's request for a mandatory minimum under section 609.11 as provided in paragraph (b) or (c)."). And in relevant part Pursuant to Minn. R. Crim. P. Rule 27.03 Subd.4(A): " Subd. 4. *Sentencing.* "When pronouncing sentence the court must: (A) State precisely the terms of the sentence."**

181. Therefore the Minnesota State Supreme Court's Retroactive Application of the Teague Rule denying the Plaintiff and all Similarly Situated Prisoners at Stillwater Correctional Facility, Rush City Correctional Facility and all other Minnesota Correctional and Local Correctional Facilities State Wide Mandatory Review of the District Courts Departures from the presumptive Guidelines Sentences Substantial demonstrates the infliction of unnecessary and wanton pain, and is grossly disproportionate

to the severity of crimes warranting the Plaintiffs imprisonment. The State Supreme Courts actions are Deliberate the Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility and Rush City Correctional City and All other Minnesota Correctional Facilities State Wide have been subjected to Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations and Hate Crimes that have been well Known to the Supreme Court based of the findings by the Minnesota Supreme Court Task Force On Racial Bias in the Judicial System presented in May of 1993 for profit.

182. **Minnesota Association of Community Corrections Act Counties,(Aitkin County, Anoka County, Arrowhead Regional, Blue Earth County, Crow Wing County, Dakota County, Dodge-Fillmore and Olmstead Counties, Hennepin County, Kandiyohi County, Morrison County, Ramsey County, Region 6W –Chippewa-Lac qui Parle, Swift and Yellow Medicine Counties, Rice County, Rock/Nobles County, Scott County, Sherburne County, Stearns County, Steele County, Todd/Wadena, Tri County-Polk, Norman and Red Lake Counties, Washington County),** is sued herein in There Individual & official capacity. At all times relevant hereto, They are acting under color of state law. The Association of Community Corrections Act Counties (MACCAC) is a voluntary membership association of counties, which have chosen to deliver all correctional services through Minnesota Statute 401 (Community Corrections Act. As of 2017, all 21 CCA Jurisdictions representing 34 counties belong to MACCAC.

183. Counties that voluntarily participate in the CCA subsidy program are required to submit for department approval, a comprehensive plan (including budget) every other year for the provision of community-based correctional services. These services may include such examples as preventive or diversionary programs, probation, parole/supervised release and community corrections centers, and facilities for the detention or confinement and/or care and treatment of persons convicted or adjudicated of a crime. However the MACCAC, Is deliberately a Party to a continued Conspiracy to

interfere with the Civil Rights of the Plaintiff and All other Similarly Situated Prisoners housed in Minnesota Correctional Facilities, County Jails and Halfway house which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

184. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Due to Fraud and inappropriate spending regarding the Community Corrections Grants not being used for its intended Purpose of more effectively protecting society and to promote efficiency and economy in the delivery of correctional services, such as implementation, and operation of community-based corrections programs including preventive or diversionary correctional programs, conditional release programs, community corrections centers, and facilities for the detention or confinement, care and treatment of persons convicted of crime or adjudicated delinquent. Every County Attorney of a county participating in the Community Corrections Act shall establish a pretrial diversion program for Adult Offenders.

185. If the county attorney's county participates in the Community Corrections Act as Part of a Group of Counties under State of Minnesota Law. The county attorney may establish a pretrial diversion program in conjunction with other county attorneys in that group of counties. The Programs must according to State Law be designed and operated to further the following goals: (1) to provide eligible offenders with an alternative to confinement and criminal conviction; (2) to reduce the cost and caseload burdens on district courts and the criminal justice system; (3) to minimize recidivism among diverted offenders; (4) to promote the collection of restitution to the victim of the offender's crime; and (5) to develop responsible alternatives to the criminal justice system for eligible offenders. However the Minnesota Department of Corrections has an 80% Recidivism rate regarding Parole Violators even

regardless of the fact that In 1973 Minnesota Legislatures decided to reserve prison bed space for offenders who pose a threat to community safety, the Community Corrections Act allows for low level offenders to serve their sentences in county jails or on public service programs in their communities, Department of Corrections resources are reserved for those with previous criminal histories and/or serious crimes against persons.

186. A diversion program established Pursuant to the Community Corrections Act must provide screening services to the court and the prosecuting authorities to help identify likely candidates for pretrial diversion establish goals for diverted offenders and monitor performance of these goals and perform chemical dependency assessment of diverted offenders where indicated, make appropriate referrals for treatment, and monitor treatment and aftercare.

187. **MINNESOTA DEPARTMENT OF HUMAN SERVICES AS AN STATE WIDE AGENECY,** is a public entity duly organized and existing under the laws of the state of Minnesota. Employs Contracted Professional Employees Represented By the MAPE UNION and is ultimately responsible for, and retains ultimate authority over, the operations of array of treatment and residential services to Minnesota State Prisoners housed in Correctional Facilities and to people with mental illness, chemical dependency, developmental disabilities or acquired brain injury, some of whom may pose a risk to society including the housing of The Minnesota Sex Offender Program In Moose Lake and St. Peter. MNDHS receives state and federal funding for its operations In All Minnesota State Correctional Facilities and has received such funds at all times relevant to this complaint and is sued here individual & official capacity. At all times relevant hereto, is acting under color of state law.

**188.** The Department administers programs for citizens whose personal or family resources are not adequate to meet their basic needs. The commissioner administers and supervises public funded health care programs, economic self-sufficiency programs, children's services and community-based services to persons with disabilities. It also administers state-operated services for persons with chemical

dependency, developmental disabilities, and mental illness and operates one center generic patients.

**189.** **DHS** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff, The Minnesota Department of Human Services Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Misappropriate Both State Legislative Appropriated Funds and Federal Grants Appropriated for A sex offender treatment system that has not been established under the administration of the commissioner of corrections to provide and finance a range of sex offender treatment programs for eligible adults and juveniles and Mental Health Services and Programs for Offenders who are eligible to receive treatment, within limits of available funding but are none existent within the Minnesota Correctional Facilities and do not adherence to risk and need principles and other evidence-based practices.

190. Constitutionally adequate treatment is not that which must be provided to the general prison population, but that which must be provided to those committed for mental incapacity. At the Least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed. Lack of funds, staff or facilities cannot justify the State's failure to provide Plaintiff with treatment necessary for rehabilitation which includes being house under safe custodial conditions. The Minnesota Department of Correction Facilities are some of the biggest suppliers of Neuroleptic Medications to its Prisoner populations especially the Mentally Ill. Stillwater Correctional Facility, Rush City Correctional Facility & all similarly situated Minnesota Correctional Facilities State Wide have been for the past Twenty years been experiencing rapidly increasing Drug Abuse & Addictions regarding the misuse of Neuroleptic Medications by Prisoners who mix these Neuroleptic Medications with other Neuroleptic Medications to create a Cocaine like substance that is then snorted through the nose.

191. Most often the Neuroleptic Medications are being sold to other Prisoners by Mentally Ill Prisoners because they have no money or family to help support them or the Neuroleptic Medications

are being extorted from Prisoners by other Prison Gangs. Neuroleptic Medications are psychoactive medications that literally suppresses the human mind particularly the prefrontal Cortex Dopamine is a neurotransmitter –i.e. chemical compound that is produced in the brain and released to the regions of the brain responsible for causing emotional states. When dopamine enters receptors it produces a mild sense of euphoria energy, etc – It helps us stay alert, our thoughts fluid, thinking and cognition sharp and clear. Lack of dopamine leads to catatonia, flat affect, apathy, depression, etc... Drugs like cocaine and meth synthesize dopamine by entering the receptors that cause dopamine to flood the brain and holds it there, cocaine holds dopamine there for fifteen minutes or so, meth –twelve to eighteen hours, Europhoria, energy, etc, eventually burn out and regress sleep until brain can create more dopamine.

192. There is currently no studies being done regarding the Misuse of Neuroleptic Drugs by prisoners and Violent behavior in prisoners the drugs has produced or Damage that mixing Neuroleptic Medications with other Neuroleptic medications to create a cocaine like substance may have caused dopamine in what way to damage or effect negatively the brain what kind of prisoners are being produced? And for how long? And how many of these types of prisoners have been produced by the Minnesota Department of Corrections? And what impact has the overcrowded & double bunking conditions and Lack of Funding had regarding this issue due to the lack of oversight or supervision regarding monitoring & safely housing the Mentally Ill due to Misappropriations of Legislative funding for this specific purpose.

193. Stillwater Correctional Facility currently does not have the resources to deal with this enormous ongoing Prison Drug use epidemic caused by misuses of Neuroleptics Medications by none prescribed prisoners which has contributed to the escalated violence and it is very unclear if the current Drug Treatment Program (ATLANTIS) here at Stillwater Correctional Facility is effective or an Certified Mandated Treatment Program as required pursuant to Minn. Stat. 241.021 Subdivision 4a. Rush City Correctional Facility does not have an Chemical Dependency Treatment Program.

194. The Minnesota Department of Human Services does not help Prisoners Housed in Minnesota Correctional Facilities meet their basic needs so they can live in dignity and achieve their highest potential. The Psychologist and treatment therapists at Stillwater Correctional Facility and all other similarly situated Correctional Facilities such as Rush City Correctional Facility are under staff and there are no regional treatment centers or Unit Complexes available on cite at Stillwater Correctional Facility that offers reasonable and safe accommodations and treatment for the most severely physically and mentally disabled or sex offender treatment.

**195. Minnesota Department of Administration as an Agency, Individually and Official Capacity as Department of Administration, ,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff, Through a Series of Fraud, Misappropriation of Both Federal & State Legislative Appropriated Funds and Purchasing violations – failure to follow State of Minnesota purchasing rules (including Minn. Stat. Chapters 16A and 16C; see Policy 104.305, "Purchasing Violations"). Procurement Requirements require A formal Public notice of solicitation for all purchases for goods, services contracts and Utilities, for amounts at or more than $50,000.

196. The Minnesota Department of Administration Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through Building & Maintenance, and mental abuse by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

197. Venders Such As IndianHead Food Distributor Located in Eau Claire Wisconsin Area, Waupan Dairy Contractor Located in Waupun Wisconsin Area, MINNCOR Centralized Canteen, Minnesota Department of Corrections As Contracted Food Service Provider, Mental Health Contractor, Health service Contractor, Adult Education Contractor, and others all exceed the five year contract limit however these contractors continue to provide services to the Minnesota Department of Corrections without a formal Solicitation Process being used by the MNDOAM where for goods, general services, and Building construction terms of contract must not exceed five years without specific, written approval by the commissioner according to established policy, procedures, and standards.

198. – under Minn. Stat. § 16B.04, the Commissioner of Administration is granted authority to supervise, control, and approve all state contracts and purchasing. The Department of Administration grants purchasing authority to other state agency personnel upon completion and certification of purchasing training. Authority is granted by individual for up to $10,000, $25,000 or $50,000 total cost based on agency-level approval and training completed. However due to Fraud the Plaintiffs Health and Safety has continued to be jeopardize for profit and Deliberate indifference Due to consistent poor performance on the part of the Venders Contracted to provide the Plaintiff and other Similarly Situated Minnesota Prisoners with services for their welfare and

199. continued exposure to hazardous materials that cause cancer due to the Misappropriation of Funds, and Purchasing Violations on the part of the Stillwater Correctional Facility Buyer regarding deteriorating infrastructures at Stillwater Correctional facility, Purchasing Violations Regarding the Purchasing of Personal Special made Furniture for Stillwater Security Captains and former and Present Security Staff Lieutenants, Purchases of Vehicles by Industry Security staff and other wasteful purchases at a time when the Minnesota Department of Corrections should be using funds for Prisoners Rehabilitation Programming, Treatment Programs, Prisoner Jobs and Wages and Reducing Recidivism.

200. because of the failure of the MNDOA to properly Supervise, Control, and Approve all State Contracts and purchasing regarding both Emergency Purchases and Emergency Construction and Construction projects for both Stillwater Correctional Facility and Rush City Correctional Facility. The State of Minnesota owns a total of 29 Million Square feet in more than 5,000 buildings, this Real Estate is managed by 20 Custodial Agencies, the Minnesota Department of Corrections Manages 283 Buildings with more than 5,592,818 Square feet.

201. Although Funding was appropriated years ago to remedy the much needed Maintenance of Stillwater Correctional Facilities Infrastructure requested needs, Stillwater is currently in need of emergency maintenance of the Facilities quickly deteriorating Infrastructure, major Maggots infestation in the Prisons Kitchen Dock area Due to Incompetent and wasteful spending of State Funds regarding the purchasing of defective food recycling equipment and Dumpsters, Unsafe Kitchen Celling and Dining hall Celling Structures, Asbestos infested Prisoner Kitchen and Prisoner Dining Hall Windows Structures also located in the Cellblock and old outdated Industry Buildings, Unsafe Kitchen Floor Structure that is being held up with Construction Scaffolding, Cellblock Pluming Issues regarding Brown water coming out of Prisoners Cell faucets, and old out dated showers that have black mold issues, Open Front Cells which causes safety issues regarding prisoners throwing bodily fluids or other Bio hazardous liquids on other Prisoners through the open front cells, no Air Conditioning in the Cellblocks the Plaintiff and All other Prisoners at Stillwater Correctional Facility must purchase fans from MINNCOR Industries for a small amount of comfort during the extremely hot Summer Months.

202. Also not to mention the major gas leaks Due to old outdated underground pipes which has caused Stillwater Correctional Facility to lockdown the Facility several times and evacuate the Correctional Facilities Staff from the facility and securing prisoners in their Cells Several Times between the months of January thru May of this year 2017 not Counting the year 2016 and another major Gas

leake as of January and 2018 at 8:00 am. Stillwater is Currently a ticking time bomb and not to mention the water-pollution the Plaintiff has been exposed to regarding the release of Perfluorochemicals or PFCs through the MINNCOR Industries Plaints Operations at Stillwater Correctional Facility which is effecting the Drinking Water the Plaintiff must consume which can cause cancer, birth defects and Thyroid problems in laboratory animals. Construction Projects or repair/Replacement-related request require Stillwater Correctional Facility Buyer Consultation prior to initiation however the Plaintiff who works side by side with Physical Plant contractors has had to do what can be called warranty construction work and Masonry work regarding construction work that an outside Construction Company was paid to do after consultation with the Stillwater Buyer but had done the Job very poorly.

203. Also the Plaintiff is performing Inside & outside Construction Work at Stillwater Correctional Facility Through Real Estates and Construction Services **(which is a Division of the Minnesota Department of Administration who is currently under Criminal Investigation by the BCA Bureau of Criminal Apprehension & Currently being Audited by the Minnesota State Legislature for wasting Tax Payers Money)** such as Carpentry & Masonry, Without being Paid Prevailing minimum Wage for similar work performed (these jobs start at .25cents an hour with a .25cents increase after 90 days up to $1.00 an hour.)

204. Where such Labor performed by the Plaintiff & All Similarly Situated Prisoners at Stillwater Correctional Facility is not a mandatory condition of Incarceration and Where the Work performed by the Plaintiff at Stillwater Correctional Facility as a Construction worker/Carpenter is Contracted Labor which is subjected to the competitive bidding procedures required by Minnesota State Law which also includes as part of the biding process the rate of prevailing hourly wages to be paid and the total number of workers needed to complete the particular Construction work the Plaintiff is only being paid $1.00 an Hour for performing Construction work Labor & Carpentry as part of Construction labor

working Side By Side with Physical Plaint Contractors who are Directly Contracted to work on a remodeling or repair project, new construction project, or maintenance service contract, or providing a maintenance service and Therefore is in violation of Fair Labor Standard Act.

205. Therefore the Minnesota Department of Administration has subjected the plaintiff to Financial Extortion, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations For Profit.

**206. (A). Overview of the MNDOC System and MNDOC Defendants**

**207. Minnesota Department Of Correctional Services,** is a public entity duly organized and existing under the laws of the state of Minnesota . (MNDOC) employs 4300 Contracted Correctional Employees or more and is ultimately responsible for, and retains ultimate authority over, the operations of the Minnesota State Prisons, including the housing and treatment of Plaintiff and all Prisoners housed in Minnesota Correctional Facilities State Wide. MNDOC receives state and federal funding for the operations of the State Prisons and has received such funds at all times relevant to this complaint.

208. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The Minnesota Department of Corrections Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

209. **MNDOC Defendants (Defendants MNDOC, Schnell, and Smith) are currently responsible for operation of all MDOC facilities, which currently houses over 10,000 prisoners and Community Services.**

210. **Ron Solheid, Former Deputy Commissioner, the former Deputy Commissioner of MNDOC Central Region probation and supervised release and Community Service Division.** And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of law. Ron Solheid is responsible for the operations of comprehensive community based correctional programs through effective administration of the Community Corrections Act (CCA) subsidy program. APPLICABILITY: Minnesota Department of Corrections (DOC); grants and subsidies unit staff, field services staff, financial services unit staff, and participating counties POLICY: Counties that voluntarily participate in the CCA subsidy program are required to submit for department approval, a comprehensive plan (including budget) every other year for the provision of community-based correctional services.

211. These services may include such examples as preventive or diversionary programs, probation, parole/supervised release and community corrections centers, and facilities for the detention or confinement and/or care and treatment of persons convicted or adjudicated of a crime. DEFINITIONS: None PROCEDURES: A. The grants and subsidies unit director sends a letter to CCA county directors indicating that the comprehensive plan is due. B. Upon receipt of the draft plan, grants and subsidies unit staff provides a copy of the budget to central office finance staff for review and approval. Approved budgets are retained in financial services.

212. C. Grants and subsidies unit staff review the program content of the draft comprehensive plan and schedule a site visit with the corresponding county. D. Site visits may be conducted by grants and subsidies unit staff to discuss the comprehensive plan with the community corrections director and staff. E. CCA counties may make suggested revisions to the submitted comprehensive plan. If revised,

CCA counties must submit the final version to the grants and subsidies unit. The final plans are retained by the grans and subsidies unit. F. When approved, a letter of plan approval is sent to the county. A copy is retained with the approved final plan. The disproportionate allocation of correctional funds has forced community corrections agencies to work even harder to do more with less. Increased legislative attention to crime issues has resulted in added responsibilities, new crime categories, and enhanced penalties and increased Technical Parole Violations which has greatly contributed to the toxic overcrowding conditions within all Minnesota Correctional Facilities for profit.

213. Most of these changes have benefited public safety, but the length of time offenders are under supervision has increased while funding for these services has not increased proportionately. Several Halfway Houses Such as Eden House in St. Paul, 180 Halfway – North Minneapolis, Damascus Way-Golden Valley, Volunteer of America – South Side of Minneapolis, Portland House-South Minneapolis have been abusing Parolees by confiscating all or large portions of the Parolees General Assistance Checks in addition some of these halfway houses have developed a scheme regarding Violating Parolees for violating Halfway house rules after the halfway house has received the contracted Funds from the Minnesota Department of Corrections regarding the parolee the Halfway house then does not report that the parolee has been violated so that the Half way house can continue to receive the funding for the parolee at the same time the same bed is being contracted out for another parolee causing a double dipping situation this process has been going on at 180 Halfway house for a very long time also the same Parolees seem to be the subject of this revolving door Scheme for profit. Adult Halfway House/Emergency Housing Fund Use PURPOSE is To provide payment for adult halfway house and emergency housing placement for eligible offenders on supervised release and conditional release.

214. APPLICABILITY: Minnesota Department of Corrections (DOC) adult facilities, community services, hearings and release unit, financial services unit, and grants and subsidies unit. POLICY: As resources

permit, the department may provide limited financial assistance under the authority of the commissioner of corrections to house eligible offenders in adult halfway house placement and emergency housing in order to enhance public safety. Eligibility guidelines for use of adult halfway house and emergency housing funds have been established and the programs are managed by the grants and subsidies unit. DEFINITIONS: Adult halfway house - means any community-based residential facility, the primary function of which is to provide, through its own program or community resources, services to adults accused of, charged with, or convicted of a criminal offense. Eligible housing emergency – a temporary situation in which the offender is or may become homeless if some kind of financial assistance is not available.

215. The situation must have approval from the case manager and supervising agent based upon the need falling within the parameters of the adult halfway house and emergency housing eligibility guidelines and the proposed housing solution enhancing public safety. PROCEDURES: A. The grants and subsidies unit must establish housing priorities in consultation with the field services unit and the hearings and release unit. Use of funds must be sufficiently restrictive to ensure availability of resources throughout the state and availability of funds throughout the fiscal year. The grants and subsidies unit must maintain contractual agreements with adult halfway houses and request a multiple vendor purchase order for emergency housing. The grants and subsidies unit must approve payments and track expenditures. B. Adult halfway house placement 1. Upon determination that an offender needs a DOC funded adult halfway housing placement as part of a proper release plan, the case manager in conjunction with the supervising agent must review the eligibility guidelines.

216. If the offender is eligible, the case manager completes an Adult Halfway House Request/Authorization form (attached) and forwards the form to his/her facility supervisor/designee for approval. 2. The case manager supervisor/designee must contact the adult halfway house to verify and

obtain a bed availability date. 3. If a bed is available, the case manager supervisor/designee transmits the request to the grants and subsidies unit in central office. The grants and subsidies unit staff must review the request, approve/disapprove it based upon funding availability, and transmit it back to the case manager supervisor/designee. 4. The vendor must submit an invoice directly to the grants and subsidies unit in order to receive payment. 5. The grants and subsidies unit reviews invoices, approves them for payment, and forwards them to the central office finance unit for processing. 6. Initial funding availability is limited to up to 60 days. If an alternative approved residence is not established within that time, the supervising agent may request an extension on the Request for Extension form (attached) for DOC funding for up to 30 additional days. Such requests are reviewed on a case-bycase basis and may be approved if the offender is in compliance with release conditions and demonstrating substantial progress toward securing an approvable residence.

217. If the request is denied, alternative funding is required for continued placement at the adult halfway house. The alternate funding is the responsibility of the offender. C. Emergency housing funding 1. Upon determination that an offender has a housing emergency, the supervising agent must review the emergency housing fund criteria, and if the offender is eligible, complete an Emergency Housing Request/Authorization form (attached) and forward the form to his/her supervisor for approval. 2. If approved, the supervising agent must transmit the request to the grants and subsidies unit in central office. 3. The grants and subsidies unit staff must review the request, approve/disapprove is based upon the application of the availability of funds, and transmit it back to the supervising agent. 4. Financial services staff must arrange for a vendor number to be assigned if the vendor does not already have a number. 5. The supervising agent must provide a copy of the Emergency Housing Request/Authorization and Emergency Housing Funds Invoice form (attached) to the vendor. 6. The vendor must submit the Emergency Housing Funds Invoice form directly to the grants and subsidies unit in order to receive

payment. 7. The grants and subsidies unit reviews invoices, approves them for payment, and forwards them to the central office finance unit for processing.

218. Mary Dombrovski, is the Grants & Subsidies Supervisor for the MNDOC Community Service Division, and she is sued herein in her Individual & Official Capacity. At all times relevant hereto, she is acting under color of state law. Mary Dombrovski Has entered into a Conspiracy to interfere with the Plaintiffs and all similarly situated Minnesota Department of Corrections Prisoners and Parolees Civil Rights regarding the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding , Community Corrections Act Subsidy and MNDOC Policy: 205.130 Title: Adult Halfway House/Emergency Housing Fund Use Issue Date: 8/18/15 Effective Date: 9/1/15, As resources permit, the department may provide limited financial assistance under the authority of the commissioner of corrections to house eligible offenders in adult halfway house placement and emergency housing in order to enhance public safety.

219. Eligibility guidelines for use of adult halfway house and emergency housing funds have been established and the programs are managed by the grants and subsidies unit. DEFINITIONS: Adult halfway house - means any community-based residential facility, the primary function of which is to provide, through its own program or community resources, services to adults accused of, charged with, or convicted of a criminal offense. Eligible housing emergency – a temporary situation in which the offender is or may become homeless if some kind of financial assistance is not available. The situation must have approval from the case manager and supervising agent based upon the need falling within

the parameters of the adult halfway house and emergency housing eligibility guidelines and the proposed housing solution enhancing public safety.

220. However Mary Dombrovski is part of an continued conspiracy on behalf of The Minnesota Department of Corrections and it's Venders who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries and MINNCOR BRIDG Program which operates within all contracted HalfWay houses.

221. Prisoners that are being Paroled Pursuant to Life Sentences must Mandatorily enter into the MINNCOR Bridge Program for 90days during which time the Prisoner is only receiving $3.00 an Hour from the Prisoners Prevailing Minimum Wages earned while folding balloons for Anagram International – INC , 7700 Anagram Drive Eden Prairie MN 55344, who also has Work Shops set-up within all MINNCOR Industry cites within all Minnesota Correctional Facilities. Other Prisoners are also forced into the same contract agreement with the Bridge Program before release. The Contracted HalfWay Houses Still Receives the Grants & Subsidies for Housing the Paroled Prisoners for the Initial funding availability 60days, in addition the Prisoners General Assistance Funds and other Appropriated Funds for the Welfare of the Parolee are confiscated by the Halfway houses.

222. None of the Parolees are being assisted with finding further Employment or Residents outside of the 60day or 90day window which has led to Technical Parole violations or working for other MNDOC Venders for cheap wages while continuing to reside at the Halfway house because of no other

alternative while paying rent to the Vender. In addition these Adult halfway house - means any community-based residential facility, the primary function of which is to provide, through its own program or community resources, services to adults accused of, charged with, or convicted of a criminal offense, don't provide Parolees appropriate or effective or reasonable treatment of illness or disability that triggered the plaintiffs involuntary confinement .

223. **Craig Fruen , Executive Director/CEO, Damascus Way Reentry Center, Inc,** Is Responsible for contracts between the State of Minnesota, Acting through its Commissioner of Corrections ("State") and Damascus Way Reentry Center, Inc (Contractor) He is being sued herein his Individual and Official capacity. Has entered into a Conspiracy to interfere with the Plaintiffs and all similarly situated Minnesota Department of Corrections Prisoners and Parolees Civil Rights regarding the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding , Community Corrections Act Subsidy and MNDOC Policy: 205.130 Title: Adult Halfway House/Emergency Housing Fund Use Issue Date: 8/18/15 Effective Date: 9/1/15, As resources permit, the department may provide limited financial assistance under the authority of the commissioner of corrections to house eligible offenders in adult halfway house placement and emergency housing in order to enhance public safety. The vendor submits an invoice directly to the grants and subsidies unit in order to receive payment which is based upon fraud and Misrepresentation of facts for Profit.

224. **Dennis Cummings, Executive Director, The Duluth Bethel,** Is Responsible for contracts between the State of Minnesota, Acting through its Commissioner of Corrections ("State") and Duluth Bethel (Contractor) He is being sued herein his Individual and Official capacity. Has entered into a Conspiracy

to interfere with the Plaintiffs and all similarly situated Minnesota Department of Corrections Prisoners and Parolees Civil Rights regarding the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding , Community Corrections Act Subsidy and MNDOC Policy: 205.130 Title: Adult Halfway House/Emergency Housing Fund Use Issue Date: 8/18/15 Effective Date: 9/1/15, As resources permit, the department may provide limited financial assistance under the authority of the commissioner of corrections to house eligible offenders in adult halfway house placement and emergency housing in order to enhance public safety. The vendor submits an invoice directly to the grants and subsidies unit in order to receive payment which is based upon fraud and Misrepresentation of facts for Profit.

225. **Dan Cain, President, RS EDEN,** Is Responsible for contracts between the State of Minnesota, Acting through its Commissioner of Corrections ("State") and RS EDEN (Contractor) He is being sued herein his Individual and Official capacity. Has entered into a Conspiracy to interfere with the Plaintiffs and all similarly situated Minnesota Department of Corrections Prisoners and Parolees Civil Rights regarding the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding , Community Corrections Act Subsidy and MNDOC Policy: 205.130 Title: Adult Halfway House/Emergency Housing Fund Use Issue Date: 8/18/15 Effective Date: 9/1/15, As resources permit, the department may provide limited financial assistance under the authority of the commissioner of corrections to house eligible offenders in adult halfway house placement and emergency housing in

order to enhance public safety. The vendor submits an invoice directly to the grants and subsidies unit in order to receive payment which is based upon fraud and Misrepresentation of facts for Profit.

226. **Dan Pfarr, Chief Executive Officer,** Is Responsible for contracts between the State of Minnesota, Acting through its Commissioner of Corrections ("State") and 180 Degrees, Inc.(Contractor) He is being sued herein his Individual and Official capacity. Has entered into a Conspiracy to interfere with the Plaintiffs and all similarly situated Minnesota Department of Corrections Prisoners and Parolees Civil Rights regarding the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding , Community Corrections Act Subsidy and MNDOC Policy: 205.130 Title: Adult Halfway House/Emergency Housing Fund Use Issue Date: 8/18/15 Effective Date: 9/1/15, As resources permit, the department may provide limited financial assistance under the authority of the commissioner of corrections to house eligible offenders in adult halfway house placement and emergency housing in order to enhance public safety. The vendor submits an invoice directly to the grants and subsidies unit in order to receive payment which is based upon fraud and Misrepresentation of facts for Profit.

227. Kary Gerlicher , is the former Office of Special Investigations Director of the MNDOC, she is responsible for the actions of Mary Swanson Former OSI Agent Stillwater Correctional Facility, Joyce Knowlter –Bureau of Criminal Apprehension, **Steve Mccarty Former Office of Special Investigation Stillwater Correctional Facility, Mike McMahon Former Office of Special Investigation Supervisor Stillwater Correctional Facility** and She is sued herein in her individual & official capacity. At all times relevant hereto, she is Acting under color of Law.

228. Sarah J. Fitgerald, is Communications Personal for the MNDOC, and She is being sued herein in her official capacity. At all times relevant hereto, she is acting under color of Law.

229. Lydia Newlin, is the Director of Victim Services for MNDOC, and She is being Sued herein in her Official capacity. At all times relevant hereto, she is acting under color of Law.

230. Sheila Packwood, as Corrections Program Director, R.D.N, L.D, Food & Nutrition Services oversees the Minnesota Department of Corrections Foodservice Process or Programming, and She is being Sued herein in her Official capacity. At all times relevant hereto, she is acting under color of Law.

**231. (1). Chronic Overcrowding at MDOC Facilities:**

232. **Bruce Reiser, is the former Deputy Commissioner of MNDOC Facilities Division, and he is sued herein in his Individual & official capacity.** At all times relevant hereto, he is acting under color of state law. MNDOC facilities are chronically and severely overcrowded. MNDOC Facilities have been overcrowded for over twenty years, and during that time the problems have worsen. the Defendants have continued to Cause the Plaintiff Continued harm and Jeopardy to his Health and Safety and has continued to show deliberate indifference in regards to depriving the Plaintiff of his liberty and Property without Due Process and Jeopardizing the Plaintiffs Health and Safety Due to the Toxic overcrowding conditions that has currently continues to over taken the Minnesota Department of Corrections Facilities and County Jails State Wide.

233. The Plaintiff is alleging that conditions at Stillwater Correctional Facility and all MDOC facilities violate prisoners' constitutional rights under 42 U.S.C.§ 1983, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 and the Rehabilitation Act, 28 U.S.C. § 794, and the Religious Freedom Act, Including harrowing accounts of maltreatment at its core and claims that MDOC facilities are underfunded Due to Funding Misappropriations, Fraud and understaffed. At over 10,111 prisoners the state's prison

population is around 160% of its capacity. This "extreme" overcrowding reportedly has resulted in "needless suffering." (Population By Facility/Location; Stillwater – 1611 15.9%, Faribault – 1,987 19.6%, Lino Lakes – 1,321 13.1%, Moose Lake – 1,049 10.4%, Rush City - 1,018 10.1%, St. Cloud – 999 9.9%, Shakopee – 647 6.4%, Oak Park Heights – 432 4.3%, Willow River – 174 1.7%, Red Wing – 43 0.4%, Togo – 40 0.4%, County Jail (Contract) – 486 4.8%, Work Release – 215 2.1%, Institution Community Work Crews – 37 0.4%, Total Estimate 10,119 Prisoners.

234. Additionally, the MDOC has disproportionality screened out prisoners with disabilities and Mental illness and failing to provide accommodations for disabled and Mentally Ill Prisoners and Violent Special Education Prisoners that have caused riot situations and chaos are placed in regular Cellblocks that houses 300 hundred prisoners in each cellblock. For over twenty years, Minnesota's state prisons have been overcrowded, under resourced, and understaffed. The result has been a dangerous system in perpetual crisis," Past Court documents allege prisoners are frequently denied medical, dental and mental health care.

235. The treatment we receive often comes after long delays, causing physical and mental suffering or – in the case of prisoners contemplating suicide - resulting in deaths. Prisoners with physical disabilities such as blindness, deafness or paralysis are often denied medical devices needed to assist them with their disabilities. Those lucky enough to receive items such as wheelchairs, canes, crutches, Braille books, talking alarm clocks and access to American Sign Language (ASL) interpreters or TTY phones do so only after long delays. Frequently, the assistance devices are confiscated by staff – especially when disabled prisoners are placed in isolation. MDOC facilities, even those built after the ADA was enacted, lack mandated disability – assistance devices such as wheelchair ramps and grab bars in toilets. Also solitary confinement is overused. Minor, nonviolent infractions often result in placement in segregation, and mentally ill prisoners are held in solitary for behavior that is symptomatic of their

psychiatric conditions. In lieu of mental health treatment, suicide attempts are punished with segregation as incidents of self-mutilation.

236. This should be enough reason why the U.S. Department of Justice must intervene and report findings regarding the suicide rate in Minnesota prisons. The Plaintiff further alleges that prisoners in isolation, including juveniles, have been held in five point restraints for days on end, placing their lives at risk. Prisoners in solitary are routinely denied medical care; Such Conditions are overcrowded in segregation cellblocks and has led to prisoners being unable to receive programming required for their release on parole, thus they remain incarcerated. These Toxic overcrowding conditions suggest that the MDOC Facilities and Department are unwilling or unable to increase the number of Educational staff for Academic and Vocational training programs in tandem with the rise in the number of inmates.

237. It is not the case that the MNDOC were unable to hire staff in general , but rather, when the number of inmates increased, some types of staff, particularly correctional officers, were rapidly hired, while educational professionals, Recreation Professionals, Cogitative Thinking Programming Professionals and Casemanager Professionals were not. Selling of Labor of Inmates is Prohibited, It is unlawful for the commissioner of corrections, or the chief executive officer of any state adult correctional facility, or any person exercising control of or supervision over any inmate sentenced to and confined in the facility to enter into any contract or agreement, or any arrangement, in which the labor or service of the inmate is either sold or leased or otherwise disposed of for hire to any person or to any party."

238. The plaintiff has performed Labor for the following Private Food Service Providers Contracted by the Minnesota Department of Corrections to operate the Departments Correctional Facilities Kitchens, for wages that did not amount to Prevailing Minimum wages where the work performed was not a mandatory condition of Incarceration and therefore is in violation of Fair Labor Standard Act &

State Law which requires that Private Companies pay Prisoners Prevailing wages Minimum Wages for work Performed Such as Work performed by the Plaintiff & Similar prisoners at Stillwater Correctional Facility for Private Kitchen Contractors: CWF Solutions, & A'Vianvs Food Service. And Construction Services for Stillwater Correctional Facility Lieutenant Jenny Careful .

239. Only a fraction of that fee would be retained by the Plaintiff. Instead, the bulk of the wages --- "80% or more," would be deducted as contributions to the MDOC for the costs of confinement while some Private Companies did not pay neither Federal or State Minimum Wages nor Prevailing Wages for similar work performed by the Plaintiff. Along with providing labor to private entities, Prisoners At Stillwater Correctional Facility also are Assigned tasks through Private Companies & Building & Maintenance Construction Contractors, around the facility, such as kitchen Assignments , Inside & Outside Construction, Electrician, Pluming, Painter, Yard Crew, Welding, Carpentry, & Masonry, for examples. The Plaintiff alleges that MINNCOR and MINNOR'S Private Business Contractors and Building & Maintenance Construction Contractors pays less than the Federal minimum wage to prisoners for these jobs and the Plaintiff and all Similarly Situated Prisoners at Stillwater Correctional Facility and are forced to work under extremely Hot and Humid Conditions due to lack off Air Conditioning System within the Industry Buildings, Kitchen and Dining Hall Buildings and Cell Blocks.

240. Therefore the Minnesota Department of Corrections as an Agency has subjected the plaintiff to Financial Extortion, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations for Profit. Which Substantial demonstrates the infliction of unnecessary and wanton pain, and is grossly disproportionate to the severity of crimes warranting the Plaintiffs imprisonment.

241. Bill Pal-Freeman , is Chief Business Technology Officer (CBTO) for the MNDOC. In his role as CBOT, Bill manages the technology used to help Minnesotans receive the services they need, and he is sued herein in her Individual & Official Capacity. At all times relevant hereto, he is acting under color of state law. Bill Pal-Freeman Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff and All Similarly situated Prisoners housed at Stillwater Correctional Facility and in all other similarly situated Minnesota Correctional Facilities The Plaintiff alleges The Minnesota Department of Corrections Conspired with official's from the Contracted Vender JPAY regarding the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by the Minnesota Department of Corrections as an Agency and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure and the Financial Extortion of Funds from the Plaintiff and his Friends, Family and Loved ones for profit regarding Incoming Funds sent to him. Incoming funds are all funds received by an offender/resident from any source, excluding compensation earned while under DOC jurisdiction. 1. Offenders/residents may not receive or obtain money from any source other than as permitted in MNDOC policy.

242. They may not receive money from or send money to: a) Another incarcerated offender/resident; or b) Non-incarcerated offenders/residents still on paper supervision; or c) Patients in other secure treatment facilities in Minnesota. 2. Money orders and offender/resident deposits from outside financial institutions must be addressed to the contract vendor at the following address: JPAY P.O. Box 246450 Pembrook Pines, FL 33024 3. Money orders must be made payable to the approved contracted vendor and must include a completed money order deposit form. The offender/resident name and identification number must be clearly written on the money order and the deposit form. The sender's full name and complete, verifiable address must also be included on the money order deposit form as

well as on the envelope. All information must be written in a legible manner. 4. Electronic funds transfers are accepted for offenders/residents through the approved contracted vendor.

243. Additional information on how to send money is available on the DOC public website, mn.gov/doc.Facility. JPAY Charges the Plaintiff's Family, Friends, and Loved ones an $6.95 fee to send $100.00 dollars to the Plaintiff and a $2.00 dollar fee for each additional $100.00 Dollars up to the $300.00 dollar Limit however once the money reaches the Correctional facility where the Plaintiff is being held he is then assessed an Cost of confinement surcharge of 10% percent the surcharge is deducted from incoming offender receipts to be spent on facility law library and offender personal support costs the plaintiff is being charged Twice for having money sent to him by outside persons the Plaintiff is being charged by the MDOC Contracted vender JPAY and the subsequently by the MNDOC once the Funds reaches the Plaintiff at the Facility he is being housed in. (1) Prior to this current Incoming funds Process Money sent to the Plaintiff by outside Persons was sent to the Moose Lake Correctional Facility which served as the Cost Center for All Prisoners Incoming Funds not to JPAY .

244. The Plaintiff was only charged or assessed an Cost of confinement surcharge of 10% percent but the outside person sending the Plaintiff Funds was not charged a fee for doing so. The Money was then processed and distribution to the Prisoners Accounts Electronically State Wide. (2) Prior to this Incoming Funds Process All Prisoners Incoming Funds was sent by the outside person to the specific Prison where the Prisoner is being housed by the MNDOC. Once the Incoming Funds were received the Correctional Facilities Finance department processes the funds then electronically deposited the funds into each prisoners account. MNDOC financial services staff must deposit the ten percent surcharge from all non-exempt offender incoming monies into an account established for adult facility operations. Expenditures from this account are limited to payments for law library services, mattresses, laundry, foot lockers, offender clothing, gate money, funerals and other items appropriately charged to the personal offender

support budget as defined in the Facility Account/Funding Structure. All transaction documentation regarding cost of confinement must be retained in financial services according to the records retention guidelines.

245. Kiosk services are designed to provide offenders with improved visiting access, enhanced communication with family and friends, and entertainment activities consistent with department security and rehabilitation goals. Kiosk services also provide community members an alternative means of communication with offenders/residents in addition to traditional visiting, mail, and phone calls. All kiosk services are paid for by offenders/residents or community members registered as customers of the kiosk service provider. However the Minnesota Department of Corrections (DOC), adult offenders and juvenile residents are prohibited from and must not be able to access the internet, e-mail, or any form of unmonitored communication through facility kiosks. Facilities; offenders/residents, and community members must follow the procedures outlined by MNDOC directive regarding the operation and use of the kiosks. All kiosks are not accessible to persons with mobility restrictions or aids. And it is unclear where proceeds from offender kiosk services are going because the proceeds are not being used for the welfare of all prisoners.

246. **Tracy Hosking** , is Capacity Management for the MNDOC Facilities Division, and she is sued herein in her Individual & Official Capacity. At all times relevant hereto, She is acting under color of state law. Tracy Hosking Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff and All Similarly situated Prisoners housed in all Minnesota Correctional Facility The Plaintiff alleges that this double-Bunking policy and overcrowded conditions put s MCF Stillwater prisoners at increased risk of physical danger The Threat of injury is real and immediate, not conjectural or hypothetical. Through a pattern of, practice or policy, The Minnesota Department of Corrections Facilities State Wide frequently placed inmates in cells with hostile cellmates, unnecessarily increasing

the risk of inmate-on- inmate violence. As illustrated by the amended complaint, the number of prisoners now detained at MCF-Stillwater strains the ability of the MDOC officials to maintain adequate health services, Mental Health Programing, and sanitary conditions, Prisoner Work Assignments, Recreation Programming, and Education Programming, Religious programing and Cogitative Thinking Programing, and Treatment Programs, at this facility.

247. Further the double bunking policy and overcrowded conditions increases the risk that prisoners will be assaulted by other prisoners, Sexually Assaulted by other prisoners, Increase Theft of Prisoners property & Canteen Items & Suicides Attempts by prisoners and Fatal Suicide Attempts and also Increased Gang Violence & Riot Activity for example: Sometime between the months of August 2016 and September 2016, former Program Director Darryle Goebel and former warden Steve Hammer moved forward with plans to move all Higher Education Prisoners which consisted of mostly all young Click Gang members with violent behavioral issues to Cellblock A-West disregarding all information from Security Staff, and Prisoners who informed both program Director Darryle Goebel and former Warden Steve Hammer that such a move would be hazardous because of the large number of Click Gangs and other Gangs along with shot callers for these gangs would be all placed in the same cellblock.

248. Consistently over time Stillwater Correctional Facility Administration continued to dump more and more Higher Education prisoners in A-West at the same time also ignoring all of the escalating violence and group gang fights that continued to grow bigger until the big Gang Riot occurred on Saturday August 5th, 2017 at 9:44am. The Riot was also reported on all local News Media Stations and Social Media. As a result the Stillwater Correctional Facility Administration decided to split-up the now more than 160 higher education prisoners by placing half of them in cellblock A-East were the Plaintiff Currently is being housed.

249. To do so the MNDOC Stillwater Defendants, Lisa Stenseth, John Quist, and Lanthan Scott Issued an Internal Memo on August 18th, 2017 informing MCF Stillwater Prisoners about Living by Assignment Moves that occurred on Tuesday August 22nd 2017. The plaintiff was being housed in a positive worker Cellblock but now because of the moves Cellblock A-East now houses over 130 none Worker Prisoners where the large percent of these none workers are young violent click gang bangers that have ongoing click gang rivalries with other click gang members from North & South Minneapolis (E-Block) Minnesota, and Selby EastSide ST. Paul Minnesota mostly triggered because of the shoot outs with one another which resulted in one or more of these click gang members being killed or a family member being killed. Now because of the moves Cellblock A-East has been on Security Lockdown Several time due to uncontrollable Gang Violence in the Cellblock.

250. This Toxic problem is currently Plaguing All Minnesota Department of Corrections Facilities & County Jails at a rapidly consistently growing pace. Canteen Deliveries to Stillwater Correctional Facility and all other Minnesota Correctional Facilities were delayed on both October 23rd 2017 and October 30th 2017, because of Group Gang Fights at MCF Oak Park Heights Maximum Security Prison which is where MINNCOR Canteen is Headquartered. Also Increased Extortion & Increased Sexual Assaults involving Prisoners being housed in double bunks, Extreme Isolation of Prisoners in Solitary Confinement without Programing. The Budgetary Crisis at Stillwater Correctional Facility has continued to cause Prisoner Cell Block Modified Lock Downs because of shortness of Security Staff & Budgetary restraints, Closing of Recreational Programing Activities, Loss of Shower privileges, loss of Telephone privileges, loss of E/mail & Kiosk Privileges. And the Prisoner Mail is now being withheld and passed out by security staff after 10:00 pm at night.

251. The Minnesota Department of Corrections as an agency has a 80% percent Recidivist return rate regarding Parole Violations. More than 3,400 of Minnesota's 10,111 prisoners are incarcerated right

now for technical parole violations – doing time for being late to a meeting with a parole officer, failing a drug test, having an unauthorized cell phone, or other such minor infractions. The Minnesota Department of Corrections has manufactured an overcrowding crisis in Minnesota's prisons for profit. This crisis has been capitalized on to call for the expansion of the prison system - opening new or formerly closed down prisons such as the facility in Appleton, MN - along with expanding the use of county jails to warehouse prisoners. Families and communities who have been directly impacted by the policies of the MN DOC and the criminal legal system at large will greatly benefit from the immediate reduction of the Minnesota Prison Population. Current parole policies and both Past & Present harsh sentencing Enhancements for criminal offenses without realistic rehabilitative and Treatment goals harm Minnesota communities. Prisoners and Loved ones are unnecessarily subjected to isolation, medical neglect, financial extortion and other deprivations as a direct result of the MN DOC's parole policies and the State of Minnesota's Harsh Sentencing Enhancements.

252. Efforts must be made to end the use of county jails as overflow, demand an immediate release of all prisoners incarcerated on technical violations, and reinvest resources currently wasted on locking up technical parole violators into reentry and other community based programs and needs. According to the Vera institute for Justice, the Minnesota Department of Corrections spends $41,366 per year to incarcerate a single prisoner yet the Prisoners Conditions of confinement have continued to rapidly get worse in All Minnesota Correctional Facilities State Wide.

253. Where has the money been going? This means the state is spending around $150 million every year to lock up parolees for technical parole violations – NOT for committing new crimes. If the funds used to lock parolees up were instead devoted to community needs to help prisoners upon release from Minnesota Correctional Facilities such as affordable housing, quality schools, living wage jobs, Treatment Programs, Support Groups, etc – as determined by those who know what is needed –

recidivism would drop significantly. Prison is not a means of making our communities safe. Overcrowded Prisons that lack Adequate Treatment & Cogitative Thinking Programs and lack Adequate Prisoner Jobs & Compensation wages for work performed by prisoners for profit and lack of resources and support for prisoners once they are released from prison devastates our communities.

**254. Chris Dodge, as, Chief Financial Officer Dept. of Corrections and he is sued herein in his Individual & Official Capacity.** At all times relevant hereto, is acting under color of state law. Chris Dodge is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff and All Similarly situated Prisoners housed in all Minnesota Correctional Facility and neglect due to the fraudulent request and inappropriate spending of Tax Payers Funds Used by the State Legislature for State Appropriated Legislature Funding request by State Agencies and Federal Funds received for a specific activity or purpose regarding Minnesota Department of Corrections Facilities Funding Structure Prisoner Rehabilitation Programs, Prison Work Programs and Prison Rape Elimination ACT Funding .

255. The biennial budget is prepared on a programmatic basis. The overall responsibility for the request lies with the Commissioner of Corrections, who ensures the request provides adequate resources for department programming, that the budget materials presented are sufficient and in compliance with Minnesota Management and Budget directives, and appropriate personnel participate in the budget process. The annual spending plan is prepared by financial services staff in compliance with the legislative intent and Minnesota Management and Budget directives. Input from program managers is utilized when appropriate. During the year, the annual spending plan may be modified to more accurately reflect the level of receipts and/or expenditures. Written requests from applicable program managers must be obtained to document the modifications.

256. DEFINITIONS:

1. Department budget manager – an employee having substantive responsibility for determining how and when department resources are collected and/or expended.

2. Department budget status report – a document prepared by the department agency budget manager and staff that summarizes the facility services, community services, and operations support account budget, expenditures, and obligations, and identifies surplus and/or shortages.
3. Department monthly budget summary – a narrative document prepared by the department chief financial officer (CFO) highlighting the budget status for all facility services, community services, and operations support accounts.
4. Facility budget summary – a set of fiscal reports distributed by regional/facility finance directors consisting of a budget narrative, budget summary, and any other reports required by the CFO. The reports are submitted to the department CFO and facility management teams by the 10th of each month (except for June, July, and August).
5. Salary/current expense transfer summary – a document prepared by the agency budget manager and staff that reviews and summarizes transfers between salaries and current expense budget.

257. On receipt of the biennial budget instructions from Minnesota Management and Budget, the department must coordinate the construction of the biennial budget. Managers and supervisors must participate in the process as requested by the department. The commissioner reviews and approves the budget document and coordinates participation in the budget process by agency personnel. On receipt of funding from the legislature and directives from Minnesota Management and Budget, the department chief financial officer (CFO) must coordinate the construction of the annual spending plan. Designated agency budget managers must provide input on receipts and/or expenditures for the annual spending plan and modifications. Financial services staff must prepare and monitor respective budgets in accordance with the established Facility Account Structure and Definitions (attached as Exhibit). Two to three months prior to the end of the fiscal year, designated financial services staff must review with individual budget managers the current status of the budget and the

spending requirements for the upcoming fiscal year. The finance director must review the budget needs identified by facility budget managers with the facility executive teams and reconcile those needs to the facility's funding level. A signed copy of the final budget approved by the facility warden and/or executive team is maintained in financial services with other budget documentation and is retained per the retention schedule.

258. The finance director or designee must prepare and enter in the state accounting system the expense budget documents for all salary and current expense budgets. Base budgets for the facility equipment and repair project account must remain whole unless central office approves a change. The regional/facility finance director is responsible for the completion of the facility budget summary. Facility budget summaries are not required for May, June, and July. Completed documents must be submitted to the department CFO and facility management teams by the 10th of each month (except for June, July, and August). Original documents are retained at the facility according to the retention schedule.

259. Two to three months prior to the end of the fiscal year, central office financial services staff must review with individual budget managers the current status of budget and spending requirements for the upcoming fiscal year. The central office budget manager must review the budget needs identified by central office budget managers with the department executive management team and reconcile those needs to the agency's overall funding. A signed copy of the final budget approved by the deputy and or assistant commissioner is maintained in financial services with other budget documentation and is retained per the retention schedule. Central office financial services staff must prepare and enter the expense budget documents in the state accounting system for all central office salary and current expense budgets.

260. The central office budget manager and financial services staff must complete the department budget status report by the 10th of each month (except for June, July, and August). Originals are

retained in central office finance unit according to the retention schedule. The agency CFO and financial services staff must complete the monthly agency budget summary for the commissioner's executive team by the 20th of each month (except for June, July, and August). Originals are retained in central office finance unit according to the retention schedule. Financial services staff must monitor and adjust spending plans during the year to more accurately reflect the level of receipts and/or expenditures. Written requests from applicable program managers must be obtained to document the modifications. Adjustment requests are retained in the appropriate finance department.

**261. Paul Schnell, In his Individual Capacity & Official Capacity as Commissioner of Minnesota Department of Corrections,** Is responsible for the management and delivery of services, such as inmate chemical dependency and sex offender treatment, education, inmate medical care, and treatment, religious programming, inmate transfer and classification, criminal investigations, fugitive apprehensions, building improvements, expansion, investigations, workplace safety, and correctional industries (MINNCOR). Commissioner Schnell has inherited the Toxic Mass incarceration and Toxic overcrowding conditions that continue to place The Plaintiff under imminent danger of serious physical injury For the Previous Administration.

**262. Tom Roy, in his Individual &Former Official Capacity as Commissioner of Department of Corrections &Former MINNCOR Industries Board Member,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The Minnesota Department of Corrections Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and

mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

263. ROY, has continued to deliberately disregard implementing or mandating State wide Prison Population Limits necessary to remedy the toxic overcrowding conditions and double bunking of prisoners in all Level Four Correctional Facilities and other Correctional Facility State Wide. These Levels of overcrowding are sever and render prison conditions plainly deficient, overtaxing virtually every constitutionally required support system and service and creating a harmful and intolerable environment. Prison overcrowding, Inmate idleness, and the threat of violence among inmates, combined with the continuous frustrations of reasonable expectation produced by administrative incompetence, resulted in an ascertainable psychological deterioration of Minnesota's prison population.

264. The overpopulation increased stress, tension, and violence among prisoners and creating Toxic Racial Divisions, increased health risk, such as the likelihood of the spread of communicable diseases resulting an adverse impact on the Physical and Mental Well-being of Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility and Rush City Correctional Facility, Causing unnecessary and unacceptable pain. State Law Makers and Prison officials have repeatedly discussed the Chronic overcrowding of the State's Correctional Facilities which are bursting at the seams and crumbling under the weight of overcrowding and neglect but has yet to Act to remedy the situation. In addition to lacking adequate beds and sleeping spaces, the Stillwater Correctional Facility and Rush City Correctional Facility is Plagued with Mice, ants and other vermin.

265. These Conditions are exacerbated by the oppressively Hot Temperatures of Many of the Stillwater Correctional Facilities Living quarters. Where each year the Stillwater Correctional Facility and all other similarly situated Minnesota Correctional Facilities experiences Heatwaves within each Living

Cellblocks Due to Lack of an Air Condition System for Prisoners Cellblocks however the Administration Offices and Security Lieutenants Offices have Air Conditioning. The only ventilation that the 300 Prisoners housed in each cellblock at Stillwater is through open windows or fans that hang from the Cellblock Walls or fans purchased through MINNCOR CANTEEN.

266. These toxic overcrowding Conditions overtime which was caused in-part due to more than 3,400 of Minnesota's 10,111 prisoners being incarcerated right now for Technical parole violations which has had an extremely toxic impact on all Treatment Programs, Mental Health Programing, Educational programming, Health Services, Canteen Deliveries, Smaller Food Portions during prisoner Feeding time in the Dining hall, has totally Strained the Communication Services through prison telephones and JPay Kiosk & Communication Devices without Internet Access and other services at Stillwater Correctional Facility and Rush City Correctional Facility.

267. Due to Rehabilitation Programming Staff Shortages and CaseManagment Shortages and Psychology Staff Shortages, The Toxic overcrowding conditions has resulted in Crisis Management with respects to ongoing Gang Riots, Prisoners Riots, Staff Assaults, Assaults with Metal Prison Shanks at Stillwater Correctional Facility and the recent Murder of Correctional Officer Joseph Gomm in the MINNCOR Industry Prisoner work Site at Stillwater Correctional Facility on July 18th 2018, Rush City Correctional Facility and Faribault Medium Security Prison and Oak Park Heights Maximum Security Prison (Which is where MINNCOR CANTEEN is Headquarters) which continues to remain on lock down status off and on Since January of 2018 due to continued staff assaults and other extreme violence, and has Crippled Canteen and Property Deliveries State Wide.

268. Prisoner Sexual Assaults have evaluated due to the double bunking of Prisoners in Level Four Correctional Facilities & Major Drug Addictions Created by the Minnesota Department of Corrections facilities lack of oversight and lack of Treatment programs to battle the rapidly increasing Drug Abuse &

Addictions regarding the misuse of Neuroleptic Medications issued through the Psychology Departments located within each Minnesota Department of Corrections Facilities by Prisoners who mix these Neuroleptic Medications with other Neuroleptic Medications to create a Cocaine like substance that is then snorted through the nose creating spontaneous uncontrollable violent and inappropriate behavior acted out by prisoners, and the frequent Gas Leaks which has caused evacuations of Stillwater Correctional Facility and ongoing gang related Prison Riots At Stillwater Correctional Facility that has caused the facility to be placed on Lockdown statuses and has seriously jeopardized the Health & Safety of the Plaintiff & All Similarly Situated prisoners housed at Stillwater Correctional Facility and all Similarly Situated Correctional or Lock-Up Facilities Throughout the State of Minnesota with serious medical and psychological conditions and Mental Health Issues as well.

269. Nor has The Commissioner Tom Roy enforced Policy initiatives that Reduced recidivism nor has the Commissioner Tom Roy truly promoted offender change through proven strategies during safe and secure incarceration and effective community supervision and failing to provide the Plaintiff with Evidenced based – programs that have been researched and are proven to be effective at reducing recidivism.

270. And the Lack of Sex Offender Treatment Programs at Stillwater Correctional Facility or any other Minnesota Department of Corrections Facility that would fulfil the Mandatory Patterned Sex Offender Sentencing Enhancement Statutory mandates that Govern the Plaintiff's Mandatory Conditions of Incarceration Depriving The Plaintiff of his liberty and Property without due process of law because there are no Sex offender treatment Programs available within the Minnesota Department of Corrections that would satisfy any meaningful relationship between the Program and an end to the Plaintiff's indefinite detention within and beyond his presumptive term of imprisonment. *therefore the Commissioner continues to* over populate & *Double Bunk* Stillwater Correctional Facility & Rush City

Correctional Facility & All other Similarly Situated Minnesota Correctional Facilities and County Jails beyond the Correctional Facilities Infrastructure and Programing Space.

271. The Commissioner of Corrections Tom Roy, as Chief Administrative Officer of the Department, is responsible for operation of Adult and Juvenile State Correctional Facilities, provisions of probation, supervised release, and parole services, Administration of the State Community Corrections Act; and provisions of assistance and guidance on a Statewide basis in the management of Criminal Justice programs and facilities. Responsibilities of the Commissioner of Corrections in Minnesota are much broader than is typical of most other states.

272. For example Minnesota is one of the fewer than a dozen states where the Commissioner is responsible for determinations regarding the parole of first degree murders; in most states, this function is the responsibility of a separate parole board. The provision of probation and parole services is also a function of a separate agency in many states. By Statute, the Commissioner also services as a member of the Minnesota Sentencing Guidelines Commission.. Planning and Performance. Government Relations . Communications Office, Policy and Legal Service.

273. The Commissioner Tom Roy is also responsible the management and delivery of services, such as Offender Chemical dependency and Sex offender Treatment, Education, Offender Medical Care and Treatment, Religious programming, offender Transfers and classification, Criminal Investigations, Fugitive Apprehensions, building improvements, expansions, investigations, workplace safety, and Correctional Industries (MINNCOR).

274. Tom Roy has failed to provide the Leadership and Guidance needed to efficiently staff facilities and control the departments extraordinary overtime costs. There are breaches in prison Security that seriously jeopardized public Safety where the Misclassification of Inmates resulted in inmates being improperly confined in lower-security levels or incorrectly released into Community furlough programs.

Also the Plaintiff and all other similarly situated prisoners at Stillwater and Rush City Correctional Facility were not provided with adequate access to Health Care Services nor are prisoners Grievances addressed in a timely manner if not at all. The Minnesota Department of Corrections Continues to experience unusual patterns of sick leave and overtime cost are significant. The Department Facilities maintain a significant outstanding balance of salary overpayments that cannot be collected.

275. The Department has difficulty reconciling and transferring inmate trust account balances accurately and timely. The Commissioner of Minnesota Department of Corrections Tom Roy is solely responsible for providing appropriate Mental Health Programs and Vocational and Educational Programs with employment –related goals for Inmates who desire to voluntarily participate in such programs and for Inmates who are required to participate in the programs under the disciplinary offense rules adopted by the Commissioner (this section was Amended in 1999).

276. "The Selection, design and Implementation of programs under this section shall be the sole responsibility of the commissioner, acting within the, limitations imposed by the funds appropriated for such programs." However the Commissioner Tom Roy has deliberately presented fraudulent information to the Public and the State Legislature regarding programs within the Department of corrections facilities that do not "Reduce Recidivism" nor "promotes offender Change through proven Strategies." Including None Existent, Appropriate and Effective Sex Offender Treatment Programs. This Fraudulent Information was released in the Minnesota Department of Corrections Strategic Plan 2015 (Exhibit PA8-PA20) this also includes the Fraudulent use of funds appropriated for such programs. See Minnesota DOC Budget Fiscal Year 2016-2017 (Exhibit PA5-PA7).

277. The Commissioner Tom Roy and the other Defendants have assist him in Committing the crimes of; Slavery, Extortion, Fraud, Theft, Embezzlement, and Racketeering just to name a few Offenses, All regarding the Abuse & Misuse of Prisoners Labor for Profit & Lease to Private Business Contractors for

Profit, Theft of Both Legislative Appropriated Funds and Federal Funds for Safety, Security, Rehabilitation, Educational, Vocational training, and Programs that supposedly reduces Recidivism, and Mental Health Programs and Staffing that is not being used for the Welfare of the Prisoners At Stillwater Correctional Facility & Rush City Correctional Facility.

278. Where the Commissioner Tom Roy has subjected the plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility and Rush City Correctional City and All other Minnesota Correctional Facilities State Wide to Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations and Hate Crimes regarding the Human Trafficking of the Plaintiff through the Minnesota Criminal Justice System based upon fraudulent implementation and passing of Civil Commitment Statutes that are disguised as Criminal Sentencing Enhancement Statutes that apply only to Sex Offenders which has permitted the state to detain the Plaintiff beyond his presumptive sentences.

279. **(Sentencing Structure received for his Criminal convictions for First Degree Criminal Sexual Conduct that occurred in May of 1997, in Washington County (186 months consecutive to 48 months ), Ramsey County (Life Sentence & Consecutive to 98 months), & Dakota County (30 year sentence & Consecutive 48 month Sentence) all run consecutively where the Plaintiffs Presumptive Sentences should have been (Washington County 81months & 48 month run Concurrently)(Ramsey County 110months & 48 months run Concurrently)and (Dakota County 139months & 48 Months run Concurrently) sentences to be run Concurrently, which means the Plaintiff should have been released from prison Nine Years ago)** without Due process and therefore depriving the Plaintiff of his Liberty or Individual Freedom based upon a Civil Commitment Process that was disguised as an Criminal procedure

and was not narrowly Tailored so that detention is absolutely limited to a Period of time necessary to achieve any narrow Government Objectives.

280. **Michelle Smith, As Deputy Commissioner of Corrections Facilities Division, And Former Warden of Oak Park Heights Correctional Facility** which is Currently the Headquarters for MINNCOR CANTEEN, Due to Continued Inmate Idleness, and the Threat of Violence among inmates, Staff Assaults, Staff Deaths and Prisoners Deaths, Combined with continuous frustrations of reasonable expectations produced by Administrative incompetence, resulting in an ascertainable psychological deterioration in Oak Park Heights Prison Population which has Consistently interfered with Canteen Deliveries and Distributions within All Minnesota Correctional Facilities State Wide Including Stillwater Correctional Facility and Rush City Correctional Facility Causing Prisoner Work Strikes and other Violence. Michelle Smith is deliberately a party to a continued conspiracy to interfere with the Civil Rights of the Plaintiff and all Similarly Situated Prisoners State Wide and She is Sued herein in her Individual and Official Capacity As Deputy Commissioner of Corrections Facilities Division. At All times relevant hereto, She Is Acting under Color of Law.

**281. Defendant MINNCOR INDUSTRIES,** is a public entity duly organized and existing under the laws of the state of Minnesota . (MINNCOR) is ultimately responsible for, and retains ultimate authority over, the operations of the Minnesota State Prisons Industries, including the housing and treatment of Plaintiff and all Prisoners housed in Minnesota Correctional Facilities State Wide. MINNCOR receives state and federal funding for Its operations and Welfare of The Prisoners and has received such funds at all times relevant to this complaint.

282. Joseph Bjelland, as MINNCOR Industries Chief Financial Officer, is responsible for MINNCOR'S financial services and has not complied with GAAP for all financial operations recorded within an enterprise fund where the determination of net income is determined necessary. The MINNCOR chief

financial officer (CFO) reviews and signs financial statements after verifying the information each month Final financial statements are reviewed by the MINNCOR executive team monthly and are retained at MINNCOR Central Office. As MINNCOR (CFO) he is sued herein in his Individual & official capacity. At all times relevant hereto, he is acting under color of state law.

**283. David Milton, MINNCOR Industries Chief Executive Officer, Individual & Official Capacity, ,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit in addition under State Law Pursuant to the Consultation plain "in developing a five year business plan, the consultant shall assume that a private corporation will be operating prison industries and that the corporation will be required to: Employ at least the same number of inmates by the end of its first year of operations as MinnCor employed on July 1st, 1996." In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse which Has Jeopardized the Plaintiffs Health & Safety for Profit and caused him continued adverse impact on the physical and mental well-being of the plaintiff causing unnecessary and unacceptable pain .

284. and continue to show Deliberate Indifference by continuing to subject the Plaintiff to the Toxic Dangerous and Environmentally Unsafe working conditions for profit and also has contributed to creating the Toxic Overcrowding and Double Bunking condition at Stillwater Correctional Facility for profit which has exceed the limits of Stillwater Correctional Facilities infrastructure and programming

space. and not to mention the water-pollution the Plaintiff has been exposed to regarding the release of Perfluorochemicals or PFCs through the MINNCOR Industries Plaints Operations at Stillwater Correctional Facility which is effecting the Drinking Water the Plaintiff must consume which can cause cancer, birth defects and Thyroid problems in laboratory animals, there is also no Air Conditioning System available within the MINNCOR Industry Shops forcing the Prisoners to work under extremely Hot and Humid Working Conditions.

285. MINNCOR Industries was Established for the purpose of providing adequate, regular and suitable employment, educational training, and to aid the Prisoners of State correctional facilities however the Plaintiff is being denied prison industry enhancement certification program Prevailing Wages or Minimum Wages(PIECP) for performing Inside & outside Construction Work at Stillwater Correctional Facility Through Real Estates and Construction Services **(which is a Division of the Minnesota Department of Administration who is currently under Criminal Investigation by the BCA Bureau of Criminal Apprehension & Currently being Audited by the Minnesota State Legislature for wasting Tax Payers Money)** such as Carpentry & Masonry, and Demolition.

286. Without being Paid Prevailing minimum Wage for similar work performed (these jobs start at .25cents an hour with a .25cents increase after 90 days up to $1.00 an hour) where such Labor performed by the Plaintiff & All Similarly Situated Prisoners at Stillwater Correctional Facility is not a mandatory condition of Incarceration and Where the Work performed by the Plaintiff at Stillwater Correctional Facility as a Construction worker/Carpenter is Contracted Labor which is subjected to the competitive bidding procedures required by Minnesota State Law which also includes as part of the biding process the rate of prevailing hourly wages to be paid and the total number of workers needed to complete the particular Construction work the Plaintiff is only being paid $1.00 an Hour for performing Construction work Labor & Carpentry as part of Construction labor working Side By Side with Physical Plaint Contractors who are Directly Contracted to work on a remodeling or repair project, new

289. Also because MINNCOR has only supplied the Plaintiff with 1099 –MISC income tax filing forms that did not reflect the Net Total amount of wages earned for each Income tax filing year the Plaintiff has been forced due to his status as a prisoner to commit Tax Fraud by under reporting both Federal & State Income Taxes performed for or on behalf of private businesses where the Labor performed was not a mandatory condition of the plaintiffs incarceration and where the Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility are currently performing Labor for the following Private Business Contractors which MINNCOR Leased the Plaintiffs Labor for the following work performed for the following:

290. **3M Company: the Plaintiff Manufactured custom designed Stethoscope Plastic hardware & Assembled Plastic Clip Hooks & Warehoused Assembled Fish Houses. Plastech Corporation's: The Plaintiff Manufactured Wood Product, Wal-Mart Stores, Inc.: The Plaintiff Assembled various types of Cartoon and Action Figure type Balloon Products & Assembled Cards ." The Plaintiff signed and performed (PIECP) work at the following Correctional Facilities but was only paid the none MINNCOR wages pursuant to MNDOC Policy (1) Stillwater Correctional Facility: Upholstery & Custom Upholstery, Furniture Assembly, Forklift Driver, Product Inventory Clerk, Ware House Clerk, Upholstery Shop Shipping Clerk. (2)Oak Park Heights Maximum Security Prison: Canteen Inventory Clerk, Canteen Warehouse Worker.**

**291.** Without Being Paid the Preveling Wages $12.50 an hour which the Private Companies were giving MINNCOR Industries yet the Plaintiff was only being paid $2.20 an hour for similar work performed where such Labor performed by the Plaintiff & All Similarly Situated Prisoners at Stillwater Correctional Facility is not a mandatory condition of Incarceration and therefore is in violation of Fair Labor Standard Act.

292. In response to former Governor Elect Jesse Ventura's & the Minnesota State Legislatures (1997 - 1998) Mandate requiring that MINNCOR Industries which is the centralized organization structure for

**Furniture Assembly, Forklift Driver, Product Inventory Clerk, Ware House Clerk, Upholstery Shop Shipping Clerk. (2)Oak Park Heights Maximum Security Prison: Canteen Inventory Clerk, Canteen Warehouse Worker.**

**291.** Without Being Paid the Preveling Wages $12.50 an hour which the Private Companies were giving MINNCOR Industries yet the Plaintiff was only being paid $2.20 an hour for similar work performed where such Labor performed by the Plaintiff & All Similarly Situated Prisoners at Stillwater Correctional Facility is not a mandatory condition of Incarceration and therefore is in violation of Fair Labor Standard Act.

292. In response to former Governor Elect Jesse Ventura's & the Minnesota State Legislatures (1997 - 1998) Mandate requiring that MINNCOR Industries which is the centralized organization structure for the Minnesota Department of Corrections Industry Program & centralized canteen, must be Self Sufficient by the Year 2003 or 2004.

293. In order for each Correctional Facilities MINNCOR Industry & Centralized Canteen to Operate Self Sufficiently the facilities needed to increase canteen purchases, Phone time Purchases and other revenue making systems which involved Increasing the State of Minnesota's Prison Population and entering prisoners into contracts with the federal and state government regarding tax filing status as Private Contractors without the prisoners knowledge or consent, Improper Tax Deductions From Prisoner's Wages Earned as Part of Prisoner's Voluntary Agreement of Participation in The Private Sector/Prison Industries Enhancement Project (PIECP.)

294. and discontinuing mandatory State & Federal Tax Also Private Contractors such as; 3M Corporation, Walmart Corporation, Plastech Corporation, Anagrom International – INC, have systematically set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota

Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor.

295. None of these Private companies have Complied with Federal and State Regulations regarding both Federal & State Tax deductions and other mandated deductions . An employee receives direct instructions from the employer. The Plaintiffs task and instructions for his work production was given directly By MINNCOR Industry Supervisors, and the Plaintiff was given tools to perform those tasks; Therefore the Plaintiff is Considered an employee and not an independent contractor. The Federal tax rate is a progressive system.

296. This means that tax rates increase as your taxable income goes up. For example income is taxed at seven rates – 10%, 15%, 25%, 28%, 33%, 35%, and 39.6%. The rate depends on your taxable income; Minnesota has 4 state income tax rates: 5.35%, 7.05%, &.85% and 9.85%. The rate depends on your taxable income. Taxes withheld for health and medical income and also those from Social Security are not reflected in 1099-MISC forms. The reason behind this is that companies who hire independent contractors are not responsible to deduct such taxes from their payments. However, the Plaintiff must still collect all of the 1099-MISC forms and submit them to the IRS. Instead of using the W-3 form, The Plaintiff must use the 1096 form for the compilation.

297. A striking difference between the two is that when you submit a 1099-MISC form, the Plaintiff is solely responsible for all the taxes and deductions withheld from the Plaintiffs total earnings. Employees on the other hand, will have the company sharing with them these tax obligations and deductions. W-2 forms reflect and declare the employee's overall income and revenue. Furthermore, all earnings and proceeds from medical and health income and benefits as well as remunerations from Social Security is also reflected in W-2 forms. Deductions for federal taxes and those that are withheld for local and state-governed taxes also are declared on W-2 forms.

298. Neither MINNCOR Nor the Private Business Contractors used by MINNCOR did not pay the Plaintiff the Net Total Income for each pay period which MINNCOR was required to do for Independent Contractors the Plaintiff has been forced due to his status as a prisoner to commit Tax Fraud by under reporting both Federal & State Income Taxes for Labor performed for MINNCOR & MINNCOR'S Private Contractors and on behalf of private businesses where the Labor performed was not a mandatory condition of the plaintiffs incarceration and where the Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility are currently performing Labor Trades regarding MINNCOR INDUSTRIES for profit labor such as:

299. Upholstery, Custom Upholstery, Assembling Furniture, Assembling & Welding Docks, Industrial Painting of Products, and Packaging & Distribution of MINNCOR Canteen Products for Retail without being paid a Prevailing Minimum wage (Jobs start at .50 cents an hour and top out at $1.00 an hour after receiving a .25 cents raise each 90 days evaluation period).* MINNCOR began consolidating industries *into single facilities to reduce costs and eliminate competition among facilities* MINNCOR INDUSTRIES has subjected the plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility and Rush City Correctional City and All other Minnesota Correctional Facilities State Wide to Financial Extortion, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Sex where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations For Profit.

**300.** Jeff Lonski, as MINNCOR Industries Vice President of Operations, he is sued herein in his Individual & official capacity. At all times relevant hereto, he is acting under color of state law. as MINNCOR Industries Vice President of Operations, Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff has Knowingly caused the overcrowding and double bunking conditions which currently Exist at Stillwater Correctional Facility and Rush City Correctional Facility and all other similarly situated Minnesota Department of Corrections Facilities and the County