Jails to meet MINNCOR Industries Financial needs and 1996-1997 Legislative Mandate to become Self-sufficient by the year 2003, through a series of Racketeering influenced like practices by Individuals with no oversight and have access to lots of Public funds & unpaid Tax dollars & Prisoner minimum wage funds that were unfairly confiscated as a result of unauthorized Deductions made by the Minnesota Department of Corrections Finance Department at the Direction of the MINNCOR Industries Board of Directors who also change the prisoners tax status without their knowledge to Private Contractors to avoid Federal and State mandatory tax obligations and mandatory federal programs.

301. Aimed at Confiscating wages and other funds from the Plaintiff and all similarly Situated prisoners at Stillwater Correctional Facility, Rush City Correctional Facility & all other Similarly situated Minnesota Correctional facility state wide. Guided by decision-making fiscal appropriations, all Facility industry directors developed supplementary guidelines to augment the broader instructions and guidelines issued by MINNCOR which Has violated the State of Minnesota's Statutory Mandate & Policy of zero tolerance of violence relevant as applicable to the Plaintiff & All Similarly Situated Prisoners housed at Stillwater Correctional Facility & Rush City Correctional Facility & All other overcrowded and Double Bunked Minnesota Correctional Facilities & Lock-up Facilities, where every person in the state of Minnesota has a right to live free from violence.

**302. Walmart Corporation 702 Southwest 8th Street Bentonville Arizona 72716,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a

written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And Wal mart is sued in Individual & Official Capacity, at all time relevant hereto, is acting under color of law. Wal mart Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

**303. 3M Corporation 3M Center St. Paul MN 55144,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit.

**304.** Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified

consideration. And 3M is sued in Individual & Official Capacity, at all time relevant hereto, is acting under color of law.

**305. Plastech Corporation 920 South Frandsen Avenue Rush City MN 55069,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using the Plaintiff and other Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit.

306. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of law.

**307. Department of Labor 443 Lafayette Road St. Paul MN 55155,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

**308. A'Vianvs Food Service 1751 County Road B-West Suite 300 Roseville MN 55103,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit.

**309.** Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And is sued in Individual & Official Capacity, at all time relevant hereto, is acting under color of law.

310. **A'Vianvs Food Service** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to

produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

312. **CWF Solutions LLC 2860 Middle Street Little Canada Little Canada MN 55117,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit Offender labor arrangements include subcontract and contract manufacturing work completed for customers at MINNCOR locations.

313. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of law.

314. **CWF Solutions LLC** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has

Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit .

**315. Anagram International – INC, 7700 Anagram Drive Eden Prairie MN 55344,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit Offender labor arrangements include subcontract and contract manufacturing work completed for customers at MINNCOR locations.

316. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of law.

317. **Anagram International – INC** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local

Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

318. **Minnesota Department of Natural Resources,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit Offender labor arrangements include subcontract and contract manufacturing work completed for customers at MINNCOR locations.

319. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of law.

320. **Minnesota Department of Natural Resources** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other

State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

**321. Minnesota Department of Transportation,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit Offender labor arrangements include subcontract and contract manufacturing work completed for customers at MINNCOR locations.

322. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of law.

323. **Minnesota Department of Transportation,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff The MINNCOR has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

**324. Anderson Windows Corporation 100 4th Avenue North Bayport MN 55003,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit.

325. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And he is sued in his Individual & Official Capacity, at all time relevant hereto, he is acting under color of

law. Anderson Windows Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff for Profit and the Company is sued herein in the Companies Individual and Official Capacity. At All Times relevant hereto, the Company is Acting under Color of Law.

**326. Century College 3300 Century Avenue North White Bear Lake MN, 55110,** has systematically been allowed to set-up business work spaces at Stillwater & Rush City Correctional Facilities and other Minnesota Department of Corrections Facilities across the state through MINNCOR Industries using Prisoner Labor as Slavery to violate labor laws with the help of MINNCOR Industries & the Minnesota Department of Corrections regarding the miss-use and abuse of inexpensive Prisoner Labor to produce goods for Business and the Public thereby undercutting competition from other Private Business that do not use inexpensive Prisoner Labor for Profit.

327. Offender labor agreement – an agreement for subcontract work to be performed for customers by MINNCOR offender workers. Purchase order – a written confirmation of purchase issued by an authorized representative of the purchaser for any product or service to be provided by MINNCOR that includes the following general terms: 1. Description of the product or service to be provided; 2. Price; 3. Delivery; and 4. Terms of sale. Revenue contract – a formal, written agreement with an individual or corporation under which MINNCOR performs specified services in exchange for specified consideration. And Century College is sued in its Individual & Official Capacity, at all time relevant hereto, Century Collage is acting under color of law.

**328. JPay, INC, 12864 Biscayne Blvd. Suite 243 Miami, FL 33181,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff with the Minnesota Department of Corrections for Profit And JPay is sued in its Individual & Official Capacity, at all time relevant hereto, JPay is acting under color of law. JPay is currently owned by Securus Technologies, INC, which is a Private Industry Corrections, Telecommunications Company Founded in 1986 and is Headquarters In Dallas, Texas, USA. Richard Rick Smith, is Chairman/CEO. Securus Technologies is s United States based

Prison technology Company. [1] it was founded in 1986 and is headquartered in Dallas, Texas with regional offices located in Carrolton Texas, Allen, Texas and Atlanta, Georgia. The Company employs approximately 1,000 people and is reported to have contracts with 2,600 correctional facilities in the United States.

329. [2] Securus announced in July 2016 that it had invested more than $600 Million in Technologies, patents and acquisitions in three years [3] Securus Technologies was founded in 1986 in Dallas, Texas. [4] In September 2004, T-Netix and EVERCOMTWO industry leading corrections market industry companies *merged. [5] In June 2007, Securus acquired the "International brand Leader in Offedner Management Systems Syscon Justice Systems. [6] The Company changed its name from TZ Holdings INC, to Securus Technologies in April 2009.[7] During the 2010s, Securus was one of a number of Companies which provided telephone services to inmates in United States Prisons. [8] Securus was partially acquired by ABRY Partners from Castle Harlan in 2013. [9] The Company was the target of a data breach of about 70 million records of phone calls in July 2015. [10] since its inception, Securus has acquired 20 Government Services, Software-based businesses, technologies, patents and exclusive partner agreements.

330. [11] Products [edit] The Company introduced a system to control contraband Cell Phones. By 2016, Securus managed Access Solutions had received approval in more than five Department of Corrections facilities. [12] Securus Partnerd with Harris Corporation in July 2016 on *Cell Defender* technology. [13] In 2017, the Company announced its Wireless Containment Solution, which was developed to prevent Contraband Cell phones from connecting to mobile Networks. [14] As of November 2017, the company reported that the wirless containment solution System has blocked 1.7million inmate Calls From Prisons.

**331. Guy Bosch, Warden Stillwater Correctional Facility, , In his Individual & official Capacity,** Is Currently the Newly Appointed Chief Executive Officer, and is Responsible for Salaries and expenses

related to the Operation of the Office of the Institution Head. This Account may include expenses related to American Corrections Association (ACA), food expenses for meetings, marketing and administrative support for this office. Stillwater Correctional Facility is a Leased Facility and is a public entity duly organized and existing under the laws of the state of Minnesota. Stillwater Correctional Facility employs several hundred Contracted Correctional Employees or more and Warden Guy Bosch is ultimately responsible for, and at the time retains ultimate authority over, the operations of the Stillwater State Prison.

332. **Steve Hammer Former Warden Stillwater Correctional Facility , In his Individual & official Capacity as Warden of Stillwater Correctional Correction Facility ,** was the Chief Executive Officer, and was Responsible for Salaries and expenses related to the Operation of the Office of the Institution Head. This Account may include expenses related to American Corrections Association (ACA), food expenses for meetings, marketing and administrative support for this office. Stillwater Correctional Facility is a Leased Facility and is a public entity duly organized and existing under the laws of the state of Minnesota . Stillwater Correctional Facility employs several hundred Contracted Correctional Employees or more and Warden Steve Hammer was ultimately responsible for, and at the time retained ultimate authority over, the operations of the Stillwater State Prisons Prior to his Termination In September of 2016, including the housing and treatment of the Plaintiff and all Prisoners housed in Stillwater Correctional Facilities. Warden Steve Hammer received state and federal funding for the operations of the State Prison and has received such funds at all times relevant to this complaint.

**333. Eddie Miles, In his Individual & official Capacity as Former Warden of Stillwater Correctional Correction Facility ,** was the Chief Executive Officer, and is Responsible for Salaries and expenses related to the Operation of the Office of the Institution Head. This Account may include expenses related to American Corrections Association (ACA), food expenses for meetings, marketing and administrative support for this office. Stillwater Correctional Facility is a Leased Facility and is a public entity duly

organized and existing under the laws of the state of Minnesota . Stillwater Correctional Facility employs several hundred Contracted Correctional Employees or more and Warden Eddie Miles is ultimately responsible for, and retains ultimate authority over, the operations of the Stillwater State Prisons, including the housing and treatment of Plaintiff and all Prisoners housed in Stillwater Correctional Facilities. Warden Eddie Miles receives state and federal funding for the operations of the State Prison and has received such funds at all times relevant to this complaint.

334. The Plaintiff hereby states that he is under imminent danger of serious Physical Injury Due to Overcrowding and Double Bunking Conditions of Confinement which has caused Escalating Violence, The July 18th 2018, Murder of Security Officer Joseph Gomm, Inadequate Security, Drug Abuse is rampant in the Prison, Escalating Gang Violence and Riots, and The Physical facilities are dilapidated and poorly maintained. Partly Caused through a pattern of collusion and Fraud committed by Eddie Miles regarding what has amounted to Human Rights Violations and retaliatory Hate Crimes regarding targeting The Plaintiff and All Similarly situated Prisoners

335. Through ongoing pattern of illegal activity that is Organized Criminal Activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO, Which involved Fraud, Collusion, Employee Organization Representation Certification Fraud and Fraud regarding the Number of Volunteers being used To engage community partners in the provision of high quality programming for incarcerated prisoners in a safe and secure environment. To specify the lines of authority, responsibility, and accountability for citizen involvement and volunteer services programs. To assist department staff in identifying and recruiting qualified people to enhance and expand the services and programs offered to prisoners, and to accept such services as uncompensated and voluntary where there is not over 230 Volunteers working at Stillwater Correctional Facility.

336. Misappropriations of vast Sums of Legislative Appropriated funding, Federal Funding and other funds appropriated for the welfare of Stillwater Prisoners housed in the Facility, Community Corrections

Subsidy Act Counties Funding and Halfway housing Funding, Prison Rape Elimination Act Funding and Minnesota Department of Corrections Facility Funding Structure. Eddie Miles Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

337. The facilities, medical care, treatment, education, Visiting, Solitary Confinement and employment programs are shockingly inadequate as to offend notions of common decency. Stillwater Correctional Facility is in need of repairs and renovations. There is overcrowding and inadequate security. The Warden Eddie Miles failed to provide the Plaintiff and all similarly situated Prisoners at Stillwater Correctional Facility adequate shelter, sanitation, medical care, and personal safety commingling Technical Parole Violators with Convicted Prisoners and Drug abuse is rampant at Stillwater Correctional Facility. The Plaintiff must also be afforded reasonable opportunities to exercises the religious freedom guaranteed by the First and Fourteenth Amendments.

338. A restriction on the Plaintiffs ability to Participate in at least Two Catholic Religious Retreats at Stillwater Correctional Facility is not reasonable In light of the Miss-Appropriations or inappropriate spending of Funding for such events by the Warden and his Administration. Nothing even hints at the inability of the Warden Eddie Miles to comply with the commands of the Constitution. What is clear to anyone who cares to give even cursory attention to the evidence supplied by the Plaintiff before this

Court is that the intolerable cruelty of the conditions forced on the Plaintiff and All similarly situated Prisoners at Stillwater Correctional Facility is caused by the intentional acts and omissions, of the defendants and their agents and employees.

339. This has been true for decades: The Problems which this Warden Eddie Miles and his Administration faces have been a long time in the making. But the Warden Eddie Miles and every person now before the Court has acted or omitted to act to perpetuate the systematic violations of the Plaintiff and all Similarly Situated Prisoners housed at Stillwater Correctional Facility. The Changes in the Plaintiffs Conditions of Confinement Has Jeopardize the Plaintiffs Health & Safety for Profit, Due to the fact that the degree of Confinement to which the Plaintiff is being subjected to is not within the sentence imposed upon the Plaintiff.

340. Sentencing Guidelines Commission deliberate side stepping of the Minnesota Civil Commitment and Treatment Act (MCTA) Process by implementing and subjecting the Plaintiff to preventive Detention without Jurisdiction Through Aggravating Sentencing Departure Provisions within the Sex Offender Criminal Sentencing Enhancement Statues which are in reality Civil Commitment Provisions, depriving the Plaintiff of his Life, liberty, and Property, without Due Process and Jeopardizing the Plaintiffs Health and Safety Due to the Toxic overcrowding conditions that has currently over taken Stillwater Correctional Facility which has exceed the limits of Stillwater Correctional Facilities infrastructure and programming space.

341. The conditions over time has had an extremely toxic impact on all Treatment Programs such as the use of untrained prisoners to provide facilitation of both Treatment Programs and Cognitive Thinking Programs and Mental Health Programing & Educational programming and services at Stillwater Correctional Facility due to Programming Staff Shortages, Mental Health Staff, Special Education Teachers Shortages & Casemanagment Shortages and also has resulted in Crisis management with respect to the ongoing Prison Gang Riots & maintenance of the Facilities quickly deteriorating

Infrastructure, major Maggots Infestation in the Prisoner Kitchen dock area & Unsanitary Prisoner Dinning Hall & Kitchen Conditions & Unsafe Prisoner Kitchen Infrastructure, Cellblock Pluming issues regarding prisoner cells, Brown water issues in the Cellblocks effecting each prisoner cell room running water & Major Gas Leaks due to old outdated underground Pipes which has caused Stillwater Correctional Facility to Lock down the Facility several times and evacuate the Correctional Facilities Staff from the Facility and securing the Prisoners in their Cells several Times between the months of January thru May of this year 2017 not counting the year 2016.

342. Stillwater is currently a Ticking Time Bomb although Stillwater Correctional Facility alone has received a conservative estimate of approximately $768 Million Dollars over a Twenty Year period of time not including federal funding or Funds generated from MINNCOR. Stillwater Correctional Facility received 38.8 Million dollars for the 2016 – 2017 fiscal Budget on June 1st 2016 Yet within three months the Stillwater prison Administration managed to somehow use up 80% of the Budget and also within three months of receiving the fiscal budget over $600,000 dollars was paid out to security staff due to extreme shortage of security staff yet the Stillwater Correctional Facility has for many years received Legislative funding for the purposes of hiring additional security staff also Security Staff Members earned as much as $100,000 dollars a year due to Security Staff overtime per each individual security member with tenure.

343. The Warden Eddie Miles has failed to provide the Leadership and Guidance needed to efficiently staff facilities and control the departments extraordinary overtime costs which is evident regarding the FY 2018 – Minnesota Department of Corrections Stillwater Facilities, Education and Health Services: Salary Budgets – Final /Current Expense Budget – Final. In relevant part: Total Facilities, Education and Health Services Salaries = $39,228,720 compared to Total Facilities, Education and Health Services Current Expense = $7,810,024. Irrelevant Part: Chief Executive Officer Salary = $268,793, Compared to Current Expense Chief Executive = $5,638, Security Salary = $25,112,670, Compared to Current Expense,

Security = 113,641, Adult Basic Education Salary = $0, Compared to Current Expense, Adult Basic Education = $11,434, Nursing Services Salary = $2,980,172, Compared to Current Expense, Nursing Services = $69,911, Mental Health Services Salary = $985,995, Compared to Current Expense = $6,981, Chemical Dependency Services Salary = $536,896, Compared to Current Expense =$883, And Religious Services Salary = $133,756, Compared to Current Expense = $179. These Totals don't reflect the Federal Grants that where Requested and received by Stillwater Correctional Facility for Specific Purposes or Projects nor does these totals reflect all the Deducted Funds from( 80% or more) the Plaintiffs and All Similarly Situated Prisoners housed at Stillwater Correctional Facility Wages Earned as part of work assignments at Stillwater Correctional deducted for cost of confinement.

344. There are breaches in prison Security that seriously jeopardized public Safety where the Misclassification of Inmates resulted in inmates being improperly confined in lower-security levels or incorrectly released into Community furlough programs. Also the Plaintiff and all other similarly situated prisoners at Stillwater Correctional Facility were not provided with adequate access to Health Care Services nor are prisoners Grievances addressed in a timely manner if not at all. The Minnesota Department of Corrections Continues to experience unusual patterns of sick leave and overtime cost are significant. The Department Facilities maintain a significant outstanding balance of salary overpayments that cannot be collected.

345. The Department has difficulty reconciling and transferring inmate trust account balances accurately and timely. The Budgetary Crisis at Stillwater Correctional Facility is Causing Prisoner Cell Block Modified Lock Downs because of shortness of Security Staff & Budgetary restraints , Closing of Recreational Programing Activities, Loss of Shower privileges, loss of Telephone privileges, loss of E/mail & Kiosk Privileges. And the Prisoner Mail is now being withheld and passed out by security staff after 10:00 pm at night. None of the Legislative funding has been used for expanding or creating at Stillwater Correctional Facility Evidenced based – programs that have been researched and are proven to be

effective at reducing recidivism regarding Treatment programs such as Chemical dependency , Drug Addiction, Sex Offender Treatment Programming, Restorative Justice Programming or (VOD) Victim/Offender Dialogue or for Mental Health Programming, Mentorship Programs, Domestic Violence Programs, Alternative to Violence Programs, Parenting Programs, Prerelease Programs, Positive Programs for Segregation Unit & Shu Housing Cellblocks.

346. The Warden Eddie Miles has also disregarded Minnesota Legislative Directive that the Commissioner of Corrections unitize inmate labor to the greatest extent feasible where Stillwater Correctional Facilities unemployment Idol Rate is Extremely high with more than 1300 Hundred of the little more than 1600 hundred prisoners are without jobs due to lack of Job opportunities caused by the July 18th 2018, murder of MINNCOR Industries Security officer Joseph Gomm while working in Industry by a Prisoner serving Time for Murder.

347. none of the Unemployed Prisoners are receiving an unemployment wage from the Stillwater Correctional Facility for being on Idle Status which MINNCOR Industries was Created to resolve in the first place. Where has the Money Been Going? Also Allowing Security Staff Lieutenants to serve as Supervisory Employees violating Public Employment Labor Relation Laws Specifically those Laws that Require that Employees from a nonsupervisory appropriate unit for the purpose of designating the employee as "supervisory employees' did not have prior approval from the Commissioner of the Bureau of Mediation Service before being placed in none Correctional Guards Security Unit Positions and also designating these Security Staff as Professional Employees which has allowed These Security Staff Lieutenants to Abuse Purchasing Policies for personal use and the Collective Bargaining Agreement Process.

348. by Receiving both Professional Employee and Supervisory employee Pay and Benefits while working in none Security Staff Job Positions such as Discipline Hearings Supervisor, Mail Room Supervisor, Kiosk Supervisor, Recreation Supervisor, Visiting Room Supervisor , Canteen Supervisor,

Property Supervisor, Program Directors, American Corrections Association Personnel (ACA) and other none security staff positions. These Job Positions are not Classified as Security Staff positions within the Minnesota Department of Corrections This is an Illegal Process which has also created chaos Within the Stillwater Correctional Facility Due to the Incompetent Decisions made by these Security Staff Persons that were Placed in none Security Staff Positions which continues to Jeopardize the health and Safety of the Plaintiff.

349. The Warden Eddie Miles has also Broadly Limited & Completely Denied (without showing that this Department of Corrections Facilities Wide Policy Directive & State Statute is Necessary or legitimate to serve the purposes of keeping convicted Sex Offenders away from vulnerable victims)the Plaintiff Access to the Internet such as Cyberspace, Social Media, JPay Kiosk, withholding WIFI for JPay Communication & Messaging Devices, Internet Cellphones, Computers, Books, Magazine Publications, Photos, Packages through the Mailroom & Property Control Department where Social Media would allow the Plaintiff to gain access to information and communicate with other users on any subject that might come to mind and seek help or legal representation regarding the Plaintiff Toxic Conditions of Confinement, Financial Assistance, Banking, Educational Needs or Communications with Family.

340. Given the toxic overcrowding conditions at Stillwater Correctional Facility, the only meaningful means of communication for the Plaintiff & All other Similarly Situated Prisoners at Stillwater Correctional Facility with the outside world is through the JPay Communication Devices Purchased by the Plaintiff and the very out-dated Stillwater Correctional Facility Prisoner Telephone System. Because of the continued daily breaking down of the only two JPay Kiosk stationed in each Stillwater Correctional Facility Cellblocks to service an estimated 300 hundred Prisoner in each Cellblock & the daily Breaking down of the Ten Side by Side Telephones provided in each Cellblock and constant prison lockdowns because of Riots at Stillwater Correctional facility, has greatly limited the Plaintiff Freedom of Speech and Jeopardizes the Plaintiffs Health & Safety due to the Frustrations and tension and assaults by

prisoners waiting to use the limited Kiosks or Telephones that are consistently breaking downs. The Warden Eddie Miles continues to recklessly expose the Plaintiff to a substantial risk of a serious physical injury violating his Eighth Amendment rights.

**351. Victor Wanchena, Official Capacity as Associate Warden Administration Stillwater Correctional Facility,** He Provides Salary and expenses related to the operations of the office of the Associate Warden of Administration including administrative support and administrative Corrections Program Directors. Victor Wanchena Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Prisoners and Neglect by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

352. Victor Wanchena, continue to show Deliberate Indifference in regards to Construction Projects or repair/replacement related requests contracted, inadequately performed and Deficient all of which needed Stillwater Correctional facility Buyer consultation prior to initiation by the outside Physical Plaint Contractors who were directly contracted or subcontracted of working with a firm that is directly contracted or subcontracted with the State of Minnesota to work on a remodel or repair project or New Construction project.

353. The Plaintiff who works side by side with Physical Plaint Contractors as part of his work assignment has witnessed the misuse of Appropriated Department Funds regarding Construction projects that was not subjected to the proper bidding process. Although Funding was appropriated years ago to remedy the much needed Maintenance of Stillwater Correctional Facilities Infrastructure requested needs, Stillwater is currently in need of emergency maintenance of the Facilities quickly deteriorating Infrastructure, major Maggots infestation in the Prisons Kitchen Dock area Due to Incompetent and wasteful spending of State Funds regarding the purchasing of defective food recycling

354. equipment and Dumpsters, Unsafe Kitchen Celling and Dinning hall Celling Structures, Asbestos infested Prisoner Kitchen and Prisoner Dining Hall Windows Structures also located in the Cellblock and old outdated Industry Buildings, Unsafe Kitchen Floor Structure that is being held up with Construction Scaffolding, Cellblock Pluming Issues regarding Brown water coming out of Prisoners Cell faucets, and old out dated showers that have black mold issues, Open Front Cells which causes safety issues regarding prisoners throwing bodily fluids or other Bio hazardous liquids on other Prisoners through the open front cells, no Air Conditioning in the Cellblocks the Plaintiff and All other Prisoners at Stillwater Correctional Facility must purchase fans from MINNCOR Industries for a small amount of comfort during the extremely hot Summer Months.

355. Also not to mention the major gas leaks Due to old outdated underground pipes which has caused Stillwater Correctional Facility to lockdown the Facility several times and evacuate the Correctional Facilities Staff from the facility and securing prisoners in their Cells Several Times between the months of January thru May of this year 2017 not Counting the year 2016 and another major Gas leake as of January and 2018 at 8:00 am.

356. Stillwater is Currently a ticking time bomb and not to mention the water-pollution the Plaintiff has been exposed to regarding the release of Perfluorochemicals or PFCs through the MINNCOR

Industries Plaints Operations at Stillwater Correctional Facility which is effecting the Drinking Water the Plaintiff must consume which can cause cancer, birth defects and Thyroid problems in laboratory animals. Construction Projects or repair/Replacement-related request require Stillwater Correctional Facility Buyer Consultation prior to initiation however the Plaintiff who works side by side with Physical Plant contractors has had to do what can be called warranty construction work and Masonry work regarding construction work that an outside Construction Company was paid to do after consultation with the Stillwater Buyer but had done the Job very poorly also Industry Building #25 is in serious Condition and is in Danger of Collapsing killing both prisoners and Staff due to the stress fractures located throughout the concrete bases that cover the bending steal metal infrastructure Beams.

357. The Associate Warden has allowed his Kitchen Supervisor Daniel Kiser to Retaliate against the Plaintiff by misusing Security staff Resources such as Canine Security Officers and other security staff to intimidate the Plaintiff & also Making False Accusations to other Staff Members regarding the Plaintiffs Disciplinary Status & Banning the Plaintiff from receiving certain Job Assignments & also restricting the Plaintiffs movements within the Stillwater Correctional Facility Based upon false Information regarding the Plaintiff which was provided to the Staff at Stillwater Correctional Facility by the named Supervisor in order to cause the plaintiff harm & to try and silence the Plaintiff from Speaking out about the harmful & Dangerous & Increased Violent overcrowded & Double Bunking Prison Conditions & Lack of Positive Programing & Lack of Jobs at Stillwater Correctional Facility.

358. Also Allowing Security Staff Lieutenants to serve as Supervisory Employees violating Public Employment Labor Relation Laws Specifically those Laws that Require that Employees from a nonsupervisory appropriate unit for the purpose of designating the employee as "supervisory employees' did not have prior approval from the Commissioner of the Bureau of Mediation Service before being placed in none Correctional Guards Security Unit Positions and also designating these

Security Staff as Professional Employees which has allowed These Security Staff Lieutenants to Abuse Purchasing Policies for personal use and the Collective Bargaining Agreement Process by Receiving both Professional Employee and Supervisory employee Pay and Benefits while working in none Security Staff Job Positions such as Discipline Hearings, Mail Room, Recreation, Visiting Room, Canteen, Property, Program Directors, American Corrections Association Personnel (ACA) and other none security staff positions.

359. These Job Positions are not Classified as Security Staff positions within the Minnesota Department of Corrections This is an Illegal Process which has also created chaos Within the Stillwater Correctional Facility Due to the Incompetent Decisions made by these Security Staff Persons that were Placed in none Security Staff Positions which continues to Jeopardize the health and Safety of the Plaintiff such as overseeing the JPay Kiosks, Stillwater Correctional Facility like all other Minnesota Correctional Facilities State Wide has only Two J/Pay Kiosk Available in each Cellblock which houses up to 300 hundred Prisoners per cell block, requiring prisoners to use J/Pay Kiosk for both Death Bed visitations and Funerals strains even more an already limited and strained service provided to all the Minnesota Department of Corrections Prisoners State Wide by J/Pay.

360. J/Pay can offer the Plaintiff and all Similarly situated Prisoners housed at Stillwater Correctional Facility WIFI which is the name of a popular wireless Networking technology that uses radio waves to provide wireless high-speed internet and Network connection through the Hand held Communication devices that were sold to the Plaintiff and all similarly situated Prisoners at Stillwater Correctional Facility by J/Pay. J/Pay is also already established within Stillwater Correctional Facility, Rush City Correctional Facility as well as other Minnesota Correctional Facilities State wide. the Plaintiff can be connected through Jpay to the Internet to engage in expressive activity, currently the Plaintiff is potentially being restricted from communicating with hundreds of millions and perhaps billions of adults and their Companies, Law Firms, Innocents Projects, Legal Research, Access to the Judicial System,

Banking and more despite the fact that the communication has nothing what so ever to do with criminal activity or Minors.

361. Given the toxic overcrowding conditions at Stillwater Correctional Facility the only meaningful means of communication for the Plaintiff & All other Similarly Situated Prisoners at Stillwater Correctional Facility with the outside world is through the JPay Communication Devices Purchased by the Plaintiff and the very out-dated Stillwater Correctional Facility Prisoner Telephone System. Because of the continued daily breaking down of the only two JPay Kiosk stationed in each Stillwater Correctional Facility Cellblocks to service an estimated 300 hundred Prisoner in each Cellblock & the daily Breaking down of the Ten Side by Side Telephones Contracted Through Globel Tele INC, provided in each Cellblock and constant prison lockdowns because of Riots at Stillwater Correctional facility, has greatly limited the Plaintiff Freedom of Speech and Jeopardizes the Plaintiffs Health & Safety due to the assaults that continue to occur due to the long waiting lines prisoners endure each day in order to down load E/Mails from Loved ones or Send E/mails or video Visits from the only two kiosk machines Available in Each Cell Block. In addition currently and in the past no JPay Kiosk Repair Logs are not being kept by staff to document the frequent Kiosk break downs in each Stillwater Correctional Facility Cellblock nor is any Telephone repair Logs being kept by staff regarding the Telephone system break downs in each Cellblock.

362. **Victor Wanchena** bars access to what for the Plaintiff & All similarly situated Prisoners at Stillwater Correctional facility are the Principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square and otherwise exploring the vast realms of human thought and knowledge by broadly limiting and denying access to the Internet by way of the JPay Communications Device and Denying Internet Cell Phones. **Victor Wanchena** has not shown a rational or logical connection between the MNDOC Policy Directives or State Statute and its Legitimate Security Interests.

363. Victor Wanchena has allowed the Staff under his supervision to continue to Tamper with and Confiscating the Plaintiffs Legal & Regular Mail. On May 27th 2016, the Plaintiff was Administratively moved from Rush City Correctional Facility back to Stillwater Correctional Facility. The Plaintiff was placed in a double bunk cell and placed on T.U non worker status once he arrived at Stillwater Prison. The PLaintiff immediately started to be harassed by Former Program Director Regina Stepnay , Program Director Lisa Stenseth & Food Service Supervisor Daniel Kiser. The Plaintiff filed a Harassment Complaint with the Wardens Office which former warden Steve Hammer replied back to the Plaintiff that he would be meeting with the Plaintiff soon regarding the matter. The Former Warden Steve Hammer never meet with the Plaintiff. Because the Harassment started to escalate more and more the Plaintiff decided to file a formal Harassment complaint with the Minnesota Department of Corrections Commissioner Tom Roy. In the early morning during breakfast at about 6:30AM while the Plaintiff was in the prisoner dining hall, the Plaintiff was pulled from the dining hall and escorted to the Operations Area where the Plaintiff meet with Program Director John Quist & Associate Warden Victor Wanchena.

364. At the start of the meeting Program Director John Quist did most of the talking he informed the Plaintiff that both he and AWA Victor Wanchena where speaking on behalf of the Commissioner Tom Roy. During the Meeting the Plaintiff was assured that he would not be having any more problems and that if the Plaintiff needed any assistance with anything that he Program Director Quist would try to help as best as he could. The Plaintiff later that morning found out that Former Warden Steve Hammer was suspended pending an investigation. The Plaintiff continues to experience harassment.

365. Victor Wachena has also Allowed Correctional Staff under his supervision to use the Plaintiffs Labor for Profit, the Plaintiff is performing Inside & outside Construction Work at Stillwater Correctional Facility Through Real Estates and Construction Services **(which is a Division of the Minnesota Department of Administration who is currently under Criminal Investigation by the BCA Bureau of Criminal Apprehension & Currently being Audited by the Minnesota State Legislature for wasting Tax**

**Payers Money)** such as Carpentry & Masonry, Without being Paid Prevailing minimum Wage for similar work performed (these jobs start at .25cents an hour with a .25cents increase after 90 days up to $1.00 an hour) where such Labor performed by the Plaintiff & All Similarly Situated Prisoners at Stillwater Correctional Facility is not a mandatory condition of Incarceration and

366. Where the Work performed by the Plaintiff at Stillwater Correctional Facility as a Construction worker/Carpenter is Contracted Labor which is subjected to the competitive bidding procedures required by Minnesota State Law which also includes as part of the biding process the rate of prevailing hourly wages to be paid and the total number of workers needed to complete the particular Construction work the Plaintiff is only being paid $1.00 an Hour for performing Construction work Labor & Carpentry as part of Construction labor working Side By Side with Physical Plaint Contractors who are Directly Contracted to work on a remodeling or repair project, new construction project, or maintenance service contract, or providing a maintenance service and Therefore is in violation of Fair Labor Standard Act.

367. Therefore Victor Wanchena has subjected the plaintiff to Financial Extortion, and his Failed Leadership is resulting an adverse impact on the Physical and Mental Well-being of Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility, Causing unnecessary and unacceptable pain, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations For Profit.

368. **Doug Greene, Individual & Official Capacity as Physical Plant Director Stillwater Correctional Facility,** is responsible Plant Operations, Salary and expenses related to the general upkeep of a facility which include building repair and replacement maintenance, grounds keeping supplies, maintenance agreement on fire alarms and other building systems, water softener expenses, all non-hazardous waste disposal, unique clothing, waste management fee, portable toilets, equipment repair parts and supplies,

floor care equipment, floor maintenance equipment, non-offender transport vehicle and expenses (maintenance, perimeter security, k-9, etc.) and fire extinguisher maintenance, and other related expenses, Doug Greene Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit.

369. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned as an Inside & Outside Construction Worker. Doug Greene is also in violation of Minnesota Department of Corrections Policy Directive Pursuant to **103.220 Title: Personal Code of Conduct of Employees** "An employee must not directly supervise, hire, evaluate or discipline anyone with whom the employee is related by blood, marriage, adoption, or anyone with whom the employee has an intimate/romantic relationship. An intimate/romantic relationship includes dating, sexual activity, or a continual relationship of an intimate, emotional nature. Doug Greene supervises his son Travis Greene who is the Plaintiffs Work Assignment Supervisor and also a Defendant in this current Civil Action.

370. **Lathan Scott Individual & Official Capacity as Corrections Program Director, Offender Job Assignment Supervisor and Casemanagement Supervisor at Stillwater Correctional Facility,** is responsible for Salary and expenses related to operation of offender programs for specific objectives including meeting basic and essential prisoner/client service needs. Case management supervisors must establish, and may actively participate in, a peer-review process. the peer-review process must include

randomly-selected LS/CMI assessments for adult offenders and randomly-selected YLS/CMI 2.0 assessments for juveniles. (See Policy 203.015, "Level of Service Inventory – Revised and Youth Level of Service Inventory/Case Manager Inventory Assessment Process.") The assessment rating/review forms must be kept in the supervisory file.

371. Case management supervisors must observe ICM case managers' practice and complete Quality Assurance Professional Development – Integrated Principles of EBP forms with each case manager as time permits, but at least once. Completed rating forms must be retained in the supervisory file. Case management supervisors must conduct five case plan audits annually for each case manager who is practicing ICM and provide feedback to the case manager. Completed audit forms must be retained in the supervisory file. Case management supervisors must review the files for five offenders per year for each casemanager. The files must be chosen on a random basis by the supervisor. The supervisor must review case notes, PRT reports, Request for Agent Assignment reports/packets and any other available written documentation of the case manager's work with the offenders for a determination as to the accuracy of information, timely and thorough completion of processes, and the quality of the work, including adherence to risk and need principles and other evidence-based practices.

**372.** Lathan Scott is Deliberately a part of a continued conspiracy to displace the Plaintiffs Job Assignment as Inside & OutSide Construction Worker for Building #24 Maintenance without showing a legitimate PenaLogical Security Need that is Real but instead has shown that such a displacement is purely in retaliation after the murder of Security Staff Joseph Gomm in MINNCOR Industry Metal Shop Building #20 on July 18th 2018 by a Prisoner Serving time for Murder which resulted in the displacement of all Prisoners Work Assignments at Stillwater Correctional Facility.

373. **Determining offender assignments/placing offenders Facilities post vacancies or place offenders in work/programming assignments based on facility and offender needs.** Facilities utilize the

application process and, when applicable, the factors outlined below. The assignment committee/coordinator determines all offender assignments and considers the following when placing offenders: Application for assignment; Interview process, if applicable; Needs of the facility and security; Offender's work experience/history/attainment of GED or high school diploma; Racial diversity; Offender's past disciplinary action; Offender's classification score; Relevant incompatibility issues; Literacy mandate; Any required programs; Offender's ability to apply; Skills screening, if applicable; and Length of remaining sentence. The assignment committee/coordinator and/or work area supervisor must not discriminate against an offender qualified for an assignment based on disability. Reasonable accommodation is considered if the offender is otherwise qualified for the assignment.

374. The assignment committee/coordinator reviews all staff requests for intermittent assignments. The assignment committee/coordinator must be informed in writing of all offenders placed in any status that interferes with routine assignments including such examples as special duty and segregation. The assignment committee/coordinator uses the Allocation for Offender Assignment (attached) whenever offender assignments are being reconsidered and/or reviewed. The assignment committee/coordinator must be informed in writing of all terminations and the circumstances of the terminations so appropriate reassignments can be made. The assignment committee/coordinator receives the master count sheet and computer reports of all offenders eligible for assignment.

375. The Plaintiff's Worker Assignment Displacement is not Rationally related to a legitimate penological objective because Minnesota Department of Corrections Policy Directives already have procedures in place to deal with Behavior initiated assignment – reassignment to a new job due to the offender's negative behavior including such examples as positive urinalysis or poor facility adjustment and Offender's past disciplinary action. The Stillwater Assignment Failed to Initiate or follow these Procedures which lead to the Murder of Officer Joseph Gomm and the unnecessary and retaliatory

Displacements of all Prisoners Work Assignment and the elimination of all Vocational, Labor, Construction and Trades Work Assignments even though when constitutional rights of both inmates and outsiders are implicated, the Standard of review becomes whether the regulation is reasonably related to legitimate penological objectives, or whether it represents an exaggerated response to those concerns as illustrated by Lathan Scott therefore his actions are Deliberate and Indifferent.

**376. Chris Pawelk, Individual & Official Capacity As Former Associate Warden Operations Stillwater Correctional Facility,** Is Responsible for Salaries and expenses related to the functioning of the Associate Warden of Operations office, which includes administrative support and operational Correctional Program Directors. Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Prisoners all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

377. Chris Pawelk Has Jeopardize the Plaintiffs Health & Safety and continue to show Deliberate Indifference Because she has failed to provide Leadership and Control The Prisons Violence Due to Incompetent Decisions by the Security Captains, Program Directors and Security Staff that are under Chris Pawelk's control which has caused the Increased Gang Violence & Riot Activity at Stillwater Correctional Facility.

378. Sometime between the months of August 2016 and September 2016, former Program Director Darryle Goebel and former warden Steve Hammer moved forward with plans to move all Education Prisoners that have Learning disabilities and violent temperaments which consisted of mostly all young Click Gang members with violent behavioral issues to Cellblock A-West disregarding all information from Security Staff, and Prisoners who informed both program Director Darryle Goebel and former Warden Steve Hammer that such a move would be hazardous because of the large number of Click Gangs and other Gangs along with shot callers for these gangs would be all placed in the same cellblock.

379. Consistently over time Stillwater Correctional Facility Administration continued to dump more and more Education prisoners in A-West at the same time also ignoring all of the escalating violence and group gang fights that continued to grow bigger until the big Gang Riot occurred on Saturday August 5th, 2017 at 9:44am. The Riot was also reported on all local News Media Stations and Social Media. As a result the Stillwater Correctional Facility Administration decided to split-up the now more than 160 higher education prisoners by placing half of them in cellblock A-East were the Plaintiff Currently is being housed. To do so the MNDOC Stillwater Defendants, Lisa Stenseth, John Quist, and Lanthan Scott Issued an Internal Memo on August 18th, 2017 informing MCF Stillwater Prisoners about Living by Assignment Moves that occurred on Tuesday August 22nd 2017.

380. The plaintiff was being housed in a positive worker Cellblock but now because of the moves Cellblock A-East now houses over 130 none Worker Prisoners where the large percent of these none workers are young violent click gang bangers that have ongoing click gang rivalries with other click gang members from North & South Minneapolis (E-Block) Minnesota, and Selby EastSide ST. Paul Minnesota mostly triggered because of the shoot outs with one another which resulted in one or more of these click gang members being killed or a family member being killed. Now because of the moves Cellblock A-East has been on Security Lockdown Several time due to uncontrollable Gang Violence in the Cellblock

and continues to be plagued with even more gang violence that has resulted in five Stabbing in one week in Cellblock A-East during the week of May 7th 2018 and Security Lock Down from May 12th until May 16th 2018 and more recently the murder of Security Officer Joseph Gomm In MINNCOR Industries by a Prisoner that had an history of murder and Aggravated Assaults on July 18th 2018 which caused the Lock Down of All Minnesota Correctional Facilities State Wide.

381. This Toxic problem is currently Plaguing All Minnesota Department of Corrections Facilities & County Jails at a rapidly consistently growing pace. Canteen Deliveries to Stillwater Correctional Facility and all other Minnesota Correctional Facilities were delayed on both October 23rd 2017 and October 30th 2017 and January through May 2018, because of Group Gang Fights at MCF Oak Park Heights Maximum Security Prison which is where MINNCOR Canteen is Headquartered. In Addition Chris Pawelk has allowed Program Director Lisa Stenseth to Retaliate against the Plaintiff by misusing Security staff Resources such as Canine Security Officers and other security staff to intimidate the Plaintiff & also Making False Accusations to other Staff Members regarding the Plaintiffs Disciplinary Status & Banning the Plaintiff from receiving certain Job Assignments & also restricting the Plaintiffs movements within

382. the Stillwater Correctional Facility Based upon false Information regarding the Plaintiff which was provided to the Staff at Stillwater Correctional Facility by the named Program Director's in order to cause the plaintiff harm & to try and silence the Plaintiff from Speaking out about the harmful & Dangerous & Increased Violent overcrowded & Double Bunking Prison Conditions & Lack of Positive Programing & Lack of Jobs at Stillwater Correctional Facility & Also Tampering with and Confiscating the Plaintiffs Legal & Regular Mail.Therefore Chris Pawelk's Failed Leadership is resulting an adverse impact on the Physical and Mental Well-being of Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility, Causing unnecessary and unacceptable pain, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations.

**383. Lisa Stenseth, Individual & Official Capacity as Associate Warden Operations & Former Corrections Program Director Cellblock A-East, Former Offender Job Assignment Supervisor and Casemanagement Supervisor at Stillwater Correctional Facility, and she is sued herein in her Individual & Official Capacity. At all times relevant hereto, She is acting under color of state law.** Lisa Stenseth is responsible for Salary and expenses related to operation of offender programs for specific objectives including meeting basic and essential prisoner/client service needs. Lisa Stenseth continues to Jeopardize the Plaintiffs Health & Safety show Deliberate Indifference resulting an adverse impact on the Physical and Mental Well-being of the Plaintiff Causing unnecessary and unacceptable pain, to what has amounted to Human Rights Violations. Prior to July 18th 2018 The Date that Officer Joseph Gomm was murdered in The MINNCOR Industry by Prisoner Edward Muhammad Johnson at Stillwater Level Four Correctional Facility, The Plaintiff was advised by Prisoner Edward Muhammad Johnson Two Weeks Prior to the Murder of Officer Joseph Gomm that Johnson had written "offender Kites" to both Former A-East Lieutenant Eric Hennen who Program Director Lisa Stenseth Supervised and to Program Director Lisa Stenseth regarding his desire to be hired as a Cellblock Cleaning Crew worker.

384. Johnson's Request was denied and he was then placed in the MINNCOR Metal Shop out in Industry Building #20 even though Johnson was previously fired from MINNCOR Metal Shop R-Shop for Verbal Altercation with Staff and having a very lengthy Aggravated Assaultive History Starting from the County Jail and continuing during his Custody with the MNDOC. After that incident in R-Shop no foreman That Supervised MINNCOR Industry would hire Johnson for future work assignments. At the Time Edward Muhammad Johnson was placed out in MINNCOR Industry Metal Shop in Building #20, Lisa Stenseth was the Supervisor for Offender Job Assignments at the time and has violated Minnesota Department of Corrections Policy Division Directive: 204.010 Title: Offender Assignment and Compensation Plan Issue Date: 12/20/16 Effective Date: 1/3/17, by ignoring the Procedures that serve as a safety net regarding Prisoners Work Assignments in relevant part which ultimately and

unfortunately Lead to the Murder of Officer Joseph Gomm and Jeopardizing the Health and Safety of All Prisoners and Staff Assigned to the Metal Shop work Sight In Building #20;

385. **"PROCEDURES: A. Determining offender assignments/placing offenders 1. Facilities post vacancies or place offenders in work/programming assignments based on facility and offender needs. Facilities utilize the application process and, when applicable, the factors outlined below. 2. The assignment committee/coordinator determines all offender assignments and considers the following when placing offenders: a) Application for assignment; b) Interview process, if applicable; c) Needs of the facility and security; d) Offender's work experience/history/attainment of GED or high school diploma; e) Racial diversity; f) Offender's past disciplinary action; g) Offender's classification score; h) Relevant incompatibility issues; i) Literacy mandate; j) Any required programs; k) Offender's ability to apply; l) Skills screening, if applicable; and m) Length of remaining sentence.**

**386. 3. The assignment committee/coordinator and/or work area supervisor must not discriminate against an offender qualified for an assignment based on disability. Reasonable accommodation is considered if the offender is otherwise qualified for the assignment. 4. The assignment committee/coordinator reviews all staff requests for intermittent assignments. 5. The assignment committee/coordinator must be informed in writing of all offenders placed in any status that interferes with routine assignments including such examples as special duty and segregation. 6. The assignment committee/coordinator uses the Allocation for Offender Assignment (attached) whenever offender assignments are being reconsidered and/or reviewed. 7. The assignment committee/coordinator must be informed in writing of all terminations and the circumstances of the terminations so appropriate reassignments can be made. 8. The assignment committee/coordinator receives the master count sheet and computer reports of all offenders eligible for assignment."**

**387.** Lisa Stenseth Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff which involves The Minnesota Department of Corrections who has Conspired with officials from other State Government Agencies, Prison Union Representatives and State Legislators, to Create a Cheap Work Force using Minnesota State Prisoners to produce Wares, Products, services for State Government Agencies, Local Government Agencies, Municipal Government Agencies, None Profits and Private Companies for Profit. In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Extortion and Confiscation of Prisoners Wages Earned through MINNCOR Industries, And physical and mental abuse and even murder by Prisoners & Neglect by Staff all of which has continued to Jeopardize the Plaintiffs Health and Safety for Profit.

**388.** On May 27th 2016, the Plaintiff was administratively moved from Rush City Correctional Facility back to Stillwater Correctional Facility. The Plaintiff was placed in a double bunk cell and placed on T.U non worker status once he arrived at Stillwater Prison. The Plaintiff immediately started to be harassed by former Program Director Regina Stepney , Program Director Lisa Stenseth & Food Service Supervisor Daniel Kiser. The Plaintiff filed a Harassment Complaint with the Wardens Office which former warden Steve Hammer replied back to the Plaintiff that he would be meeting with the Plaintiff soon regarding the matter. The Former Warden Steve Hammer never meet with the Plaintiff. Because the Harassment started to escalate more and more the Plaintiff decided to file a formal Harassment complaint with the Minnesota Department of Corrections Commissioner Tom Roy.

389. In the early morning during breakfast at about 6:30AM while the Plaintiff was in the prisoner dining hall, the Plaintiff was pulled from the dining hall and escorted to the Operations Area where the Plaintiff meet with Program Director John Quist & Associate Warden Victor Wanchena. At the start of the meeting Program Director John Quist did most of the talking he informed the Plaintiff that both he and AWA Victor Wanchena where speaking on behalf of the Commissioner Tom Roy. During the

Meeting the Plaintiff was assured that he would not be having any more problems and that if the Plaintiff needed any assistance with anything that he Program Director Quist would try to help as best as he could. The Plaintiff later that morning found out that Former Warden Steve Hammer was suspended pending an investigation. The Plaintiff continues to experience harassment.

390. On November 20th 2016 the Plaintiff sent an Offender Kite to warden Eddie Miles regarding the harassment the plaintiff was being subjected to by his Administrative Staff, the Plaintiff referred to warden Miles information that he shared with his administrative staff at the November 8th 2016 meeting held in the Cellblock A-East Casemanagment Office regarding the October 27th 2016 assignment restriction committee-decision to ban the plaintiff from the Dining Hall and from receiving employment in the Kitchen. The Plaintiff, Program Director Lisa Stenseth, Program Director John Quist, and Plaintiff Casemanger Abbie Domogaski were all present.

391. The Plaintiff informed the Parties present at the meeting that he the Plaintiff had received information from his supervisor Travis Green at his Building & Maintenance construction work assignment who stated to the Plaintiff that Food Service Director Daniel Kiser told him to keep the plaintiff close by because the plaintiff attempted to Rape A Staff Member in the Kitchen this is why the Plaintiff was sent to Rush City Correctional Facility and this is why both Food Service Director Daniel Kiser & Program Director Regina Stepnay are banning the Plaintiff from the Kitchen & Dinning Hall Areas. Yet the Plaintiff Had no Disciplinary segregation sanctions when he was sent to Rush City Correctional Facility from his Job Site in the Kitchen at Stillwater Correctional Facility in May of 2014. Which was also reflected in the Plaintiff annual Reviews with his Casemanager since May of 2014.

392. **Lisa Stenseth's** Failed Leadership regarding the ongoing Violence and Riot situations that continue to occur in Cellblock A-East regularly is resulting an adverse impact on the Physical and Mental Well-being of Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility, Causing unnecessary and unacceptable pain, Racial Injustices and Discrimination due to the Plaintiffs Criminal

status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations.

393. **Andrew Reed Individual & Official Capacity as Program Director Stillwater Correctional Facility, ,** Has Jeopardize the Plaintiffs Health & Safety and continue to show Deliberate Indifference by excluding the printed materials of the Plaintiff sent to him through the United States Mail on the basis of its political perspective and as retaliation for the Plaintiff bringing forward this Civil Action. Larry Stracke who is a visitor of the Plaintiff has been a regular visitor and has kept in touch with the Plaintiff Via mail and phone Since his arrest and incarceration in May of 1997.

394. Trough Amazon Larry Stracke sent the Plaintiff two-books, Mr. Stracke also mailed a package with information about an audit conducted in Hawaii (which Larry Stracke feels will be very beneficial as this will serve as a template for a Audit request that the Plaintiff is requesting) along with the receipt for the two books. The content of the package was about an audit report to the Governor and Legislature of the State of Hawaii in regards to the Department of Public Safety's Contracting for Prison Beds and services regarding the overcrowding conditions in that State. The Plaintiff needed the receipts to claim the books from property when the book arrived. The books that were ordered are: Interior Freedom and Mother Teresa of Calcutta-A Personal Portrait. Booth books were scheduled to arrive on January 24th 2018. Before ordering the books and mailing package to the plaintiff, Larry Stracke called Stillwater Prison Mail Room to make Sure he understood their policy on sending books to inmates and checking the mailing weight policy.

395. Both are what Larry Stracke and the Plaintiff understood is that Mr. Stracke must mail the receipt for the books to the Plaintiff and the books must be new. A package Can't weigh more than 16 ounces. The Mailroom at the Direction of Program Director Andrew Reed Sent the Package that was mailed to the Plaintiff by Larry Stracke back to him Three times even though the United States Post Office Clearly Stamped the weight on the package as being less than 16 ounces. Andrew Reed has

excluded printed materials of the Plaintiff for an unlawful basis and has conjured up a false pretext for its exclusion.

396. **Defendants AFSCME COUNSEL #5 Corrections Guard Unit Representatives Individually & Official Capacity as Corrections Guard Unit, Representatives,** is a Public Employee Representative entity duly organized and existing under the Laws of the State of Minnesota. AFSCME LOCAL Counsel #5 is ultimately responsible for, and retains ultimate authority over, the Representation of all Minnesota Department of Corrections Correctional Officers through Tim Henderson Associate Director AFSCME Counsel #5 , Including Influencing the mistreatment of the Plaintiff and the class of other Prisoners. AFSCME Counsel #5 Receives State and Federal Funds and has received such funds at all times relevant to this complaint.

**397. AFSCME UNION LOCAL 600 Indiviidually & Official Capacity as Corrections Guard Unit, Representatives Stillwater Correctional Facility ,** has entered into a Conspiracy to interfere with the Plaintiffs civil rights Preventing the Wardens at Stillwater Correctional Facility, Rush City Correctional Facility, and all other Minnesota Correctional Facilities state wide from performing their Duties, and has Has Jeopardize the Plaintiffs Health & Safety and continue to show Deliberate Indifference .

398. The existence of the AFSCME Union has created a divisive element within the inmate population Also not to mention the tension between both Staff and Prisoners which has Now resulted in several Stabbings regarding Staff and Prisoners with Metal Prison Shanks, and the Low morale of both the Prisoners & Staff. In a time when the Cellblocks at Stillwater Correctional Facility which are already seriously over-crowded, such an element has greatly aggravated already tense conditions jeopardizing the Plaintiffs Health & Safety.

399. The purpose of the union may well be worthwhile projects. But it is evident that the AFSCME Union Local 600 Representatives Dan Gorman Industry Security officer & John C. Hillyard Property Sargent, recognized as spokesman for all Security Staff Members At Stillwater Correctional Facility, has

made themselves to be power figures among the Security Staff at Stillwater Correctional Facility and alienating none Security Staff Members for whom they Both also Represent as Well. If the union Representatives continue to be successful in being power figures for the Security Staff at Stillwater Correctional Facility both Dan Gorman & John Hillyard would continue to be in position to misuse their influence.

400. After the AFSCME UNION Local 600 has become established, there has been nothing the Minnesota Department of Corrections could do to terminate its existence, even though its activities became overtly subversive and dangerous to the functioning of the Minnesota Department of Corrections Mission &Goals to reduce Recidivism & reduce overcrowded conditions within all Minnesota Department of Corrections Facilities. Work stoppages such as Strikes by taking concerted actions in failing to report for duty, the willful absence from one's position, the stoppage of work, slowdown, or the abstinence in whole or in part from the full, faithful, and proper performance of the duties of employment for the purposes of inducing, influencing, or coercing a change in the conditions or compensation or the rights, privileges, or obligations of employment.

401. AFSCME UNION Representatives mutinies with the Stillwater Correctional Facility Administration and antagonizing /Provoking Prisoners has greatly interfered with the Plaintiff & All Similarly situated Prisoners At Stillwater Correctional Facility Educational Programing, Industry Work Programs, Recreational Programing, Canteen, Property, Mail, Food Service and more. Riots, Staff Assaults, the murder of Correctional Officer Joseph Gomm chaos continue to erupt as an inevitable result.

402. Thus, even if the purposes of the union are as stated in State Statute because the AFSCME UNION LOCAL #5 Corrections Guard Unit is operating as if it is an independent Political Party setting its own agenda in violation of State Statute the potential for more dangerous situations exists, situations such as the mass Assaults of Security Staff in all Minnesota Correctional Facilities which cannot be

brought under control and Jeopardizes the Health & Safety of the Plaintiff & All similarly situated Prisoners at Stillwater Correctional Facility.

403. AFSCME UNION LOCAL 600 Representatives Political Operations which has Influenced the Interest of MINNCOR INDUSTRIES & other Private Business, Community Groups Such as, Legislators, other Government Workers and their own financial Interest by also violating Public Employment Labor Relation Laws Specifically those Laws that Require that Employees from a nonsupervisory appropriate unit for the purpose of designating the employee as "supervisory employees' did not have prior approval from the Commissioner of the Bureau of Mediation Service before being placed in none Correctional Guards Security Positions

404. which has allowed These AFSCME UNION LOCAL #5 Representatives to Abuse the Collective Bargaining Agreement Process by Perpetrating a Fraud regarding continuing to receive Security Guard Staff Pay and Benefits while working in none Security Staff Job Positions that are lower paying none security staff positions such as Property Control, Laundry Department, Canteen Department, Mail Room Department, Food Service, Recreation Department for examples and receiving Fraudulent Pension Benefits and retirement benefits based upon these fraudulent None Correction Guards Job Positions .

405. These Job Positions are not Classified as Security Staff positions within the Minnesota Department of Corrections but the AFSCME Security Guards Unit Staff are performing those job task and still retaining their Security Guard Unit Pay and Benefits which is more than the none Security job pay and Benefits This is an Illegal Process which has also created chaos Within the Stillwater Correctional Facility Due to the Incompetent Decisions made by these Security Staff Persons that were Placed in none Security Guard Staff Positions which continues to Jeopardize the health and Safety of the Plaintiff. Also both AFSCME and MAPE UNIONS have helped to support a profit-driven Justice system produce a level of Mass incarceration that is anything but just and Jeopardizes the Health & Safety of the Plaintiff & all Similarly Situated Prisoners At Stillwater Correctional Facility which has created Racial Injustices and

Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male.

406. **AFSCME Union Local 1539 Individually and Official Capacity as Corrections Guard Unit, at Rush City Correctional facility,** has entered into a Conspiracy to interfere with the Plaintiffs civil rights Preventing the Wardens at Stillwater Correctional Facility, Rush City Correctional Facility, and all other Minnesota Correctional Facilities state wide from performing their Duties , Jeopardizing the Plaintiffs Health and Safety for Profit by Creating the Circumstances which had led to the removal of the Plaintiff from Stillwater Correctional facility where the Plaintiff was the Chief Cook for the Private Food Service Contractor provider A'Viands and being Administratively Sent to Rush City Correctional Facility with the Goal of Disrupting and Sabotaging A'Viands Food Service Contract for financial gains for the AFSCME Bargaining Unit Number 5 and the Minnesota Department of Corrections based upon the Conspiracy efforts of Minnesota House Representative Debra Hilstrom sponsored Bills (HF2401) and (HF2400) and False Testimony in support of the Bills given by AFSCME Corrections Guard Unit Representatives Paul Gammel ( Rush City Correctional Facility), Tim Henderson a Counsel #5 Field Representative who was a corrections officer for 19 years, Tim Haag (Rush City Correctional Facility) and Joe Broge, a Corrections officer at Stillwater Correctional Facility.

407. There Conspired Efforts has resulted in the Fraudulent Appropriations of Tax Payers funds appropriated by the State Legislature requested by the Minnesota Department of Corrections for other purposes but instead used to eliminate the out sourcing of food service in Minnesota State prisons which has Neted 74 New State employees with the vast being corrections Cooks being placed within AFSCME Corrections Guard Unit bargaining Unit and the Misappropriation of over 2.5 million a year of the Legislative appropriated funds that was supposed to be used for other purposes. Since the Switch over the Plaintiff and all similarly situated prisoners at Stillwater Correctional Facility and Rush City

Correctional Facility have been subjected to poor food quality, smaller food portions, and unsanitary kitchen and Dining Hall conditions.

408. **Byron Matthews , Individual & Former Official Capacity as Security Captain & Canine Unit Officer Supervisor at Stillwater Correctional Facility,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff. On Sunday April 2nd 2017 between 8:00am & 8:30am Officer Jennings Canine Units employed at Stillwater Correctional Facility Attempted to assault the Plaintiff as the Plaintiff passed by the Canine unit coming from the Prisoner Dinning Hall during mass movement. The Plaintiff immediately informed the Staff in his Cellblock about the incident and followed up with writing an Offender Kite to the Stillwater Facility Captain in Charge of the Canine Units Programming (Byron Matthews).

409. The Captain never responded to the Plaintiff Kite regarding the Incident so the plaintiff continued to write Kites up the Chain of Command regarding the matter yet the Plaintiff did not receive any response from any of the Administrators including the Warden Eddie Miles the Plaintiff also did not receive any of his Offender Kites back from any of the Administrators regarding the incident. During this time the Plaintiff also talked with his Cellblock A-East Lieutenant Andreachi regarding the matter on several occasions and how the Canine Units are violating Policy; Minnesota Department of Corrections Division Directive Almost Two months after the Plaintiffs incident, a Prisoner in Cellblock B-West was attacked by the Canine unit while the Prisoner was on the ground.

410. The Prisoner was bitten twice once in his private parts and on his leg. These are just two examples of excessive force regarding the Canine Units that has resulted in sever injury of prisoners at Stillwater Correctional facility for many years. Facility which has created Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male.

made themselves to be power figures among the Security Staff at Stillwater Correctional Facility and alienating none Security Staff Members for whom they Both also Represent as Well. If the union Representatives continue to be successful in being power figures for the Security Staff at Stillwater Correctional Facility both Dan Gorman & John Hillyard would continue to be in position to misuse their influence.

400. After the AFSCME UNION Local 600 has become established, there has been nothing the Minnesota Department of Corrections could do to terminate its existence, even though its activities became overtly subversive and dangerous to the functioning of the Minnesota Department of Corrections Mission &Goals to reduce Recidivism & reduce overcrowded conditions within all Minnesota Department of Corrections Facilities. Work stoppages such as Strikes by taking concerted actions in failing to report for duty, the willful absence from one's position, the stoppage of work, slowdown, or the abstinence in whole or in part from the full, faithful, and proper performance of the duties of employment for the purposes of inducing, influencing, or coercing a change in the conditions or compensation or the rights, privileges, or obligations of employment.

401. AFSCME UNION Representatives mutinies with the Stillwater Correctional Facility Administration and antagonizing /Provoking Prisoners has greatly interfered with the Plaintiff & All Similarly situated Prisoners At Stillwater Correctional Facility Educational Programing, Industry Work Programs, Recreational Programing, Canteen, Property, Mail, Food Service and more. Riots, Staff Assaults, the murder of Correctional Officer Joseph Gomm chaos continue to erupt as an inevitable result.

402. Thus, even if the purposes of the union are as stated in State Statute because the AFSCME UNION LOCAL #5 Corrections Guard Unit is operating as if it is an independent Political Party setting its own agenda in violation of State Statute the potential for more dangerous situations exists, situations such as the mass Assaults of Security Staff in all Minnesota Correctional Facilities which cannot be

brought under control and Jeopardizes the Health & Safety of the Plaintiff & All similarly situated Prisoners at Stillwater Correctional Facility.

403. AFSCME UNION LOCAL 600 Representatives Political Operations which has Influenced the Interest of MINNCOR INDUSTRIES & other Private Business, Community Groups Such as, Legislators, other Government Workers and their own financial Interest by also violating Public Employment Labor Relation Laws Specifically those Laws that Require that Employees from a nonsupervisory appropriate unit for the purpose of designating the employee as "supervisory employees' did not have prior approval from the Commissioner of the Bureau of Mediation Service before being placed in none Correctional Guards Security Positions

404. which has allowed These AFSCME UNION LOCAL #5 Representatives to Abuse the Collective Bargaining Agreement Process by Perpetrating a Fraud regarding continuing to receive Security Guard Staff Pay and Benefits while working in none Security Staff Job Positions that are lower paying none security staff positions such as Property Control, Laundry Department, Canteen Department, Mail Room Department, Food Service, Recreation Department for examples and receiving Fraudulent Pension Benefits and retirement benefits based upon these fraudulent None Correction Guards Job Positions .

405. These Job Positions are not Classified as Security Staff positions within the Minnesota Department of Corrections but the AFSCME Security Guards Unit Staff are performing those job task and still retaining their Security Guard Unit Pay and Benefits which is more than the none Security job pay and Benefits This is an Illegal Process which has also created chaos Within the Stillwater Correctional Facility Due to the Incompetent Decisions made by these Security Staff Persons that were Placed in none Security Guard Staff Positions which continues to Jeopardize the health and Safety of the Plaintiff. Also both AFSCME and MAPE UNIONS have helped to support a profit-driven Justice system produce a level of Mass incarceration that is anything but just and Jeopardizes the Health & Safety of the Plaintiff & all Similarly Situated Prisoners At Stillwater Correctional Facility which has created Racial Injustices and

Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male.

406. **AFSCME Union Local 1539 Individually and Official Capacity as Corrections Guard Unit, at Rush City Correctional facility,** has entered into a Conspiracy to interfere with the Plaintiffs civil rights Preventing the Wardens at Stillwater Correctional Facility, Rush City Correctional Facility, and all other Minnesota Correctional Facilities state wide from performing their Duties , Jeopardizing the Plaintiffs Health and Safety for Profit by Creating the Circumstances which had led to the removal of the Plaintiff from Stillwater Correctional facility where the Plaintiff was the Chief Cook for the Private Food Service Contractor provider A'Viands and being Administratively Sent to Rush City Correctional Facility with the Goal of Disrupting and Sabotaging A'Viands Food Service Contract for financial gains for the AFSCME Bargaining Unit Number 5 and the Minnesota Department of Corrections based upon the Conspiracy efforts of Minnesota House Representative Debra Hilstrom sponsored Bills (HF2401) and (HF2400) and False Testimony in support of the Bills given by AFSCME Corrections Guard Unit Representatives Paul Gammel ( Rush City Correctional Facility), Tim Henderson a Counsel #5 Field Representative who was a corrections officer for 19 years, Tim Haag (Rush City Correctional Facility) and Joe Broge, a Corrections officer at Stillwater Correctional Facility.

407. There Conspired Efforts has resulted in the Fraudulent Appropriations of Tax Payers funds appropriated by the State Legislature requested by the Minnesota Department of Corrections for other purposes but instead used to eliminate the out sourcing of food service in Minnesota State prisons which has Neted 74 New State employees with the vast being corrections Cooks being placed within AFSCME Corrections Guard Unit bargaining Unit and the Misappropriation of over 2.5 million a year of the Legislative appropriated funds that was supposed to be used for other purposes. Since the Switch over the Plaintiff and all similarly situated prisoners at Stillwater Correctional Facility and Rush City

Correctional Facility have been subjected to poor food quality, smaller food portions, and unsanitary kitchen and Dining Hall conditions.

408. **Byron Matthews , Individual & Former Official Capacity as Security Captain & Canine Unit Officer Supervisor at Stillwater Correctional Facility,** Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff. On Sunday April 2nd 2017 between 8:00am & 8:30am Officer Jennings Canine Units employed at Stillwater Correctional Facility Attempted to assault the Plaintiff as the Plaintiff passed by the Canine unit coming from the Prisoner Dinning Hall during mass movement. The Plaintiff immediately informed the Staff in his Cellblock about the incident and followed up with writing an Offender Kite to the Stillwater Facility Captain in Charge of the Canine Units Programming (Byron Matthews).

409. The Captain never responded to the Plaintiff Kite regarding the Incident so the plaintiff continued to write Kites up the Chain of Command regarding the matter yet the Plaintiff did not receive any response from any of the Administrators including the Warden Eddie Miles the Plaintiff also did not receive any of his Offender Kites back from any of the Administrators regarding the incident. During this time the Plaintiff also talked with his Cellblock A-East Lieutenant Andreachi regarding the matter on several occasions and how the Canine Units are violating Policy; Minnesota Department of Corrections Division Directive Almost Two months after the Plaintiffs incident, a Prisoner in Cellblock B-West was attacked by the Canine unit while the Prisoner was on the ground.

410. The Prisoner was bitten twice once in his private parts and on his leg. These are just two examples of excessive force regarding the Canine Units that has resulted in sever injury of prisoners at Stillwater Correctional facility for many years. Facility which has created Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male.

**411. Stephen Harding, is the Former Security Captain at Stillwater Correctional Facility,** He is responsible for the Actions of the Security Staff under his Command Including Lieutenant Jennifer Meyers Industry Security Supervisor/Education Security Supervisor, who have caused the Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility continued trauma, In the Process Abusing the Prisoners and Violating their Civil Rights by subjecting the prisoners to unconstitutional Living & working Conditions that are toxic, Combined with continuous frustrations of reasonable expectations produced by Administrative incompetence, resulting in an ascertainable psychological deterioration in Stillwater Correctional Facilities Prison Population which has Consistently interfered with All Programming ,He is sued herein in his individual & official capacity. At all times relevant hereto, he is Acting under color of Law.

**412. Rick Raven, is Security Lieutenant and Supervisor For the following Areas: Mail Room, Visiting, Kiosk/Jpay, and Commissary Warehouse, Stillwater Correctional Level Four Facility.** he is responsible for the Actions of the Security Staff under his command and the delivery of services to prisoners regarding these areas. Lieutenant Raven Is deliberately a Party to a continued Conspiracy to interfere with the Civil Rights of the Plaintiff through a series of Fraud regarding misappropriations of Funding for; Staffing days & Hours for operating the Visiting Room, expansion Construction or upkeep of the Visiting Area and Regulations created to limit the Visiting time and Days of operation regarding the Visiting Area which has Substantially interfered with the Relationships between the Plaintiff and his visitors without a penological interest. Rick Raven, is sued herein in his individual & official capacity. At all times relevant hereto, he is Acting under color of Law.

Lieutenant Raven has failed To provide the opportunity for the Plaintiff to receive visits during his period of incarceration at Stillwater Correctional Facility in an effort to maintain ties to family and friends; to enhance the Plaintiffs' transition from prison to the community; and to enable the Plaintiff to

continue to foster relationships with significant individuals by restricting the Plaintiffs Visits in violation of MNDOC Policy.

413. Pursuant to the MNDOC Visiting Policy 302.100; **"Visits must not exceed two hours in length, except extended, special, and non-contact (NC) visits. a) The facility custody level determines the total visiting time, according to the following guidelines: (1) Level five and four: 16 hours per month; (2) Level three: 24 hours per month; (3) Level two, including MCF-Shakopee (MCF-SHK): 36 hours per month; and (4) Offenders in the Challenge Incarceration Program (CIP): visiting hours and total visiting time is determined by each CIP in relation to the specific program. b) The offender is responsible to keep track of length of visit and number of hours used for the month."** However the Plaintiff has only been receiving 1hr visits and 2hr special visits. The up to two hour visits are only allowed on Thursday and Friday and on the weekends the Plaintiff is only allowed 1hr visit. Monday thru Wednesday the Visiting Area is closed. In addition the Process for Visiting Privilege Application and Approval of Prospective visitors ages 18 and older who must complete the Visiting Privilege Application and return it to the designated processing facility which is currently Rush City Correctional facility as stated on the DOC website, unreasonably prolongs the processing time of the Application for more than six weeks which is not reasonably related to any legitimate penological objectives but represents an exaggerated response to those concerns.

414. **Jeff Titus, Individually & Official Capacity as Newly Appointed Warden of Rush City Correctional Facility,** has continued to allow Rush City Correctional facility under his supervision to double bunk prisoners in single occupancy cells which has exceed the limits of each Correctional Facilities infrastructure and programming space which was constructed to house only 543 prisoners in single cells now the prison population has doubled to more than over 1000 prisoners yet there has been no additional construction to create more infrastructure and programming space to meet the facility needs. Rush City Correctional Facility is an Level Four Correctional Facility and was originally designed

and built to occupy 543 total prisoners in single cells when the Correctional Facility opened in year 1998 or 1999 since then the population at Rush City Correctional Facility has grown to over 1,000 prisoners forced to double bunk with other prisoners yet there has been no changes to both the prison infrastructure or programming space to accommodate the increase of prisoners (see Exhibits PB83 – PB84).

415. The Department of Corrections deliberately caused the overcrowding conditions by increasing the number of parole violations and the Introduction of ISR (Intensive Supervised release) in response to former Governor Elect Jesse Ventura's (1998 – 2002)Mandate requiring that all Minnesota Correctional Facilities must Operate Self Sufficiently by the Year 2004 or 2005. in order for each Correctional Facility to Operate Self Sufficiently the facilities needed to increase canteen purchases, Phone time Purchases and other revenue making systems which required more prisoners as consumers.

416. Rush City Correctional Facility routinely sold the Plaintiff and other similarly situated prisoner's poor quality electronics and also routinely confiscated canteen from prisoner's just so that the items can be repurchased again and again also no kind of log was kept by Rush City Correctional Facility property control indicating what was done with confiscated property (see Exhibits PB76 –PB80). Also the Plaintiff and other similarly situated prisoners are also required to pay for used state issued clothing. There was not an tremendous spike in crime from the years 1997 to 2014 that would have caused such an rapid increase of Minnesota's Male Prisoners Prison population in such an short period of time, it also must be noted that Minnesota's only Female Prison Shakapee was not effected in anyway regarding prisoner population rapid increases. Rush City Correctional Facility is also home to a Sex Offender Treatment Program which also houses mentally ill prisoners and other prisoners in the same cell block or complex they are all placed in double bunked cells in the sex offender treatment program exposing them to sexual assault and physical and psychological harm every minute of the day and night.

417. Rush City Correctional Facility is also the dumping ground for all of the Minnesota Department of Corrections problematic prisoners, Gang leaders and parole violators that were released from both low and high custody level Correctional Facilities across the state of Minnesota and out of state prisoners as well. Rush City Correctional Facility is also a Level Four Correctional Facility and therefore houses Prisoners that have been convicted of very serious and dangerous Crimes such as Murder, Aggravated Assaults, Rape, and other Serious Crimes against persons. The Plaintiff and all other similar situated prisoners at Rush City Correctional Facility regardless of their crimes of mental or physical disabilities are forced to double Bunk with one another.

418. because of this type of mixture of prisoners it is highly likely that both physical and sexual assaults will occur at a much higher rate where the Plaintiff and both Sex Offenders and mentally ill prisoners and physically disabled prisoners will likely be targeted because there is no type of isolation or separation for both the problematic prisoners and gang affiliated prisoners that are known to pray upon vulnerable prisoners, sex offenders, and mentally ill prisoners and physically disabled prisoners at Rush City Correctional Facility because of the forced double bunking. Rush City prison is a 98% double bunked Correctional Facility, this makes prison conditions at Rush City very unsafe and makes it very difficult for prison staff to detect or manage predatory behavior that may threaten the security and safety of both staff and prisoners at Rush City Correctional Facility due to overcrowding, double bunking and shortness of staff in the prison complexes.

419. The Plaintiff has personally witnessed several continued premeditated and severe aggravated assaults and extortion of sex offenders and physically disabled prisoners here at Rush City Correctional Facility (see Exhibits PB54 –PB57)&(Exhibits PB58 –PB60). This is and was happening on a regular bases in complex 3-south of Rush City Correctional Facility were the plaintiff is currently being housed and also is where the plaintiff is Prisoner Representative. As you will see the plaintiff tried as prisoner representative to bring these issues to the attention of the administration on more than one occasion.

At the June 3rd 2015 prisoner representative meeting the plaintiff began to realize that the Severe assaults of Sex Offenders and other prisoners was being covered-up by staff because at the meeting the plaintiff made some very spontaneous, direct and passionate statements to AWO Gregg Smith, regarding the assaults and extortion of Sex Offenders in Complex -3-south. The Plaintiffs comments came after another prisoner representative was telling AWO Gregg Smith and lieutenant Darling, about what was going on in Complex- 4-south regarding the disrespectful nature of staff when dealing with the prisoners in that complex.

420. AWO Gregg Smith was defending both Lieutenant Darling and his staff's behavior which prompted the plaintiff to spontaneously join in on the last minute conversation. AWO seemed very upset that the plaintiff brought both the issue regarding the Assaults of Sex Offender's and Staff telling other prisoners that the assaulted sex offender was snitching on them AWO Gregg Smith even down played the fact that there was or is a major problem. Newly appointed Warden Jim Benson was present at this Prisoner Representative meeting on June 3rd 2015, and he seemed concerned and surprised about what the plaintiff had brought up about the assaults. Some days after the prisoner representative meeting the plaintiff was approach by a certain lieutenant at Rush City Correctional Facility while the plaintiff was at his prison job cite and was warned that AWO Gregg Smith is very upset with me and that AWO Gregg Smith has ordered prison staff to "reel me in." the plaintiff took this as a direct threat to his personal safety especially since the staff at Rush City Correctional Facility has already been treating the plaintiff with such disrespect since he arrived at the Correctional Facility in May of 2014. (see appendices PA1 –PA3)&(see appendices PA6 –PA48)&(see Exhibits PB61 –PB65). Rush City Correctional Facility is now sixteen years young, during these sixteen years Rush City Correctional Facility has now had six Warden changes and very little if any at all lower level administrators changes such as Associate Warden Operations & Associate Warden Administration & Complex Directors. Because of the constant changes in wardens the staff and prisoners at Rush City Correctional Facility have come to realize and

except the fact that AWO Gregg Smith is the unofficial warden of Rush City since his promotion to Associate Warden Operations.

421. Since AWO Gregg Smith has been in charge at Rush City Correctional Facility for well over five years, violence has continued to rise extremely high because of Double Bunking and over-crowded conditions there is nowhere to put prisoners with special needs or mentally ill inmates who are all placed in double bunked cells with other violent prisoners where sexual assaults will occur as well as aggravated assaults and extortion. Continued Rotation of Wardens At Rush City Correctional Facility & Lack of Positive Programming Options, Lack of Programing space, Lack of Positive Communication Between Staff and prisoners , lack of Minorities as regular prisoner staff & as prison Education Staff or prison Administration Staff combined with overcrowded conditions and Double Bunking are the main highly contributors to the extremely excessive violence and frequent sexual assaults of prisoners that continue to plague Rush City Correctional Facility and continues to place the Plaintiff and other similarly situated prisoners at Rush City Correctional Facility in immediate danger at all times (see Exhibits PB66 – PB68)&(see Exhibits PB69 –PB72)&(see Exhibits PB73 –PB75)&(see Exhibits PB76 –PB80).

422. Gregg Smith, in his Individual & Former official capacity as Associate Warden Operations. has continued to allow Rush City Correctional facility under his supervision to double bunk prisoners in single occupancy cells which has exceed the limits of each Correctional Facilities infrastructure and programming space. AWO Gregg Smith has Also used his position of authority to intimidate the Plaintiff in order to prevent him from continuing to alert the Former warden Jim Benson and the Commissioner of the Department of Corrections Tom Roy of the Poor Prison Conditions, Possible Sexual Assaults of prisoners and aggravated Assaults of Sex Offender's at Rush City Correctional Facility.

423. On May 27th 2014, the day after the Memorial day holiday, the Plaintiff was transferred from the MCF Stillwater Level Four Correctional Facility and sent to MCF Rush City Correctional Facility for

what the plaintiff was told by his Prison casemanager was an none disciplinary transfer, no further information about why the plaintiff was suddenly transferred to what seemed like an disciplinary Prison was not disclosed to the plaintiff. While during the plaintiffs stay a Rush City Correctional Facility he managed to get voted in as Prisoner Representative for complex 3-south where the plaintiff is being housed within two months after his arrival at Rush City Correctional Facility (see Exhibits PB51 –PB53), from the time the plaintiff arrived at Rush City Correctional Facility he was experiencing some aggressively disrespectful behavior that was being directed towards him personally by prison officers and prison staff whenever the Plaintiff approached them with a question or concern.

424. This behavior by Prison Staff was happening so much and very frequently that the plaintiff wrote the former Warden Steve Hammer, OSI (Office of Special Investigations) and the Psychology department about his concerns for his safety because of the unpleasant and unprofessional treatment the plaintiff was receiving by the Rush City staff.

425. The Plaintiff and all other similar situated prisoners at Rush City Correctional Facility regardless of their crimes of mental or physical disabilities are forced to double Bunk with one another. because of this type of mixture of prisoners it is highly likely that both physical and sexual assaults will occur at a much higher rate where the Plaintiff and both Sex Offenders and mentally ill prisoners and physically disabled prisoners will likely be targeted because there is no type of isolation or separation for both the problematic prisoners and gang affiliated prisoners that are known to pray upon vulnerable prisoners, sex offenders, and mentally ill prisoners and physically disabled prisoners at Rush City Correctional Facility because of the forced double bunking.

426. Rush City prison is a 98% double bunked Correctional Facility, this makes prison conditions at Rush City very unsafe and makes it very difficult for prison staff to detect or manage predatory behavior that may threaten the security and safety of both staff and prisoners at Rush City Correctional Facility

due to overcrowding, double bunking and shortness of staff in the prison complexes. The Plaintiff has personally witnessed several continued premeditated and severe aggravated assaults and extortion of sex offenders and physically disabled prisoners at Rush City Correctional Facility.

427. This is and was happening on a regular bases in complex 3-south of Rush City Correctional Facility were the plaintiff is currently being housed and also is where the plaintiff is Prisoner Representative. As you will see the plaintiff tried as prisoner representative to bring these issues to the attention of the administration on more than one occasion. At the June 3rd 2015 prisoner representative meeting the plaintiff began to realize that the Severe assaults of Sex Offenders and other prisoners was being covered-up by staff because at the meeting the plaintiff made some very spontaneous, direct and passionate statements to AWO Gregg Smith, regarding the assaults and extortion of Sex Offenders in Complex -3-south.

428. The Plaintiffs comments came after another prisoner representative was telling AWO Gregg Smith and lieutenant Darling, about what was going on in Complex- 4-south regarding the disrespectful nature of staff when dealing with the prisoners in that complex. AWO Gregg Smith was defending both Lieutenant Darling and his staff's behavior which prompted the plaintiff to spontaneously join in on the last minute conversation. AWO seemed very upset that the plaintiff brought both the issue regarding the Assaults of Sex Offender's and Staff telling other prisoners that the assaulted sex offender was snitching on them AWO Gregg Smith even down played the fact that there was or is a major problem. Newly appointed Warden Jim Benson was present at this Prisoner Representative meeting on June 3rd 2015, and he seemed concerned and surprised about what the plaintiff had brought up about the assaults. Some days after the prisoner representative meeting the plaintiff was approach by a certain lieutenant at Rush City Correctional Facility while the plaintiff was at his prison job cite and was warned that AWO Gregg Smith is very upset with me and that AWO Gregg Smith has ordered prison staff to

"reel me in." the plaintiff took this as a direct threat to his personal safety especially since the staff at Rush City Correctional Facility has already been treating the plaintiff with such disrespect since he arrived at the Correctional Facility in May of 2014.

429. Rush City Correctional Facility is now sixteen years young, during these sixteen years Rush City Correctional Facility has now had six Warden changes and very little if any at all lower level administrators changes such as Associate Warden Operations & Associate Warden Administration & Complex Directors. Because of the constant changes in wardens the staff and prisoners at Rush City Correctional Facility have come to realize and except the fact that AWO Gregg Smith is the unofficial warden of Rush City since his promotion to Associate Warden Operations.

430. Since AWO Gregg Smith has been in charge at Rush City Correctional Facility for well over five years, violence has continued to rise extremely high because of Double Bunking and over-crowded conditions there is nowhere to put prisoners with special needs or mentally ill inmates who are all placed in double bunked cells with other violent prisoners where sexual assaults will occur as well as aggravated assaults and extortion. Continued Rotation of Wardens At Rush City Correctional Facility & Lack of Positive Programming Options, Lack of Programing space, Lack of Positive Communication Between Staff and prisoners , lack of Minorities as regular prisoner staff & as prison Education Staff or prison Administration Staff combined with overcrowded conditions and Double Bunking are the main highly contributors to the extremely excessive violence and frequent sexual assaults of prisoners that continue to plague Rush City Correctional Facility and continues to place the Plaintiff and other similarly situated prisoners at Rush City Correctional Facility in immediate danger at all times.

431. Sandy O'Hara, in her Individual & Former official capacity as Associate warden Administration & Chair Person For Property & allowable Items for The Dept. of Corrections. has continued to allow Rush City Correctional facility under her supervision to double bunk prisoners in single occupancy cells which

has exceed the limits of each Correctional Facilities infrastructure and programming space. The Department of Corrections deliberately caused the overcrowding conditions by increasing the number of parole violations and the Introduction of ISR (Intensive Supervised release) in response to former Governor Elect Jesse Ventura's (1998 – 2002)Mandate requiring that all Minnesota Correctional Facilities must Operate Self Sufficiently by the Year 2004 or 2005.

432. in order for each Correctional Facility to Operate Self Sufficiently the facilities needed to increase canteen purchases, Phone time Purchases and other revenue making systems which required more prisoners as consumers. Rush City Correctional Facility routinely sold the Plaintiff and other similarly situated prisoner's poor quality electronics and also routinely confiscated canteen from prisoner's just so that the items can be repurchased again and again also no kind of log was kept by Rush City Correctional Facility property control indicating what was done with confiscated property The Plaintiff and other similarly situated prisoners are also required to pay for used state issued clothing and has Therefore subjected the plaintiff and all Similarly Situated Prisoners at Rush City Correctional Facility to Financial Extortion, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations For Profit.

433. Joe Winiecki, Individually & Official Capacity as MINNCOR Industries Director and (PIECP)Coordinator Rush City Correctional Facility, Has Jeopardize the Plaintiffs Health & Safety and continued to show Deliberate Indifference by continuing to subject the Plaintiff while at Rush City Correctional Facility to the Toxic over Populated and Double Bunking condition for profit which has exceed the limits of Rush City Correctional Faculties infrastructure and programming space. ; MINNCOR Industries was Established for the purpose of providing adequate, regular and suitable employment, educational training, and to aid the Prisoners of State correctional facilities. MINNCOR Industries does

not provide the Plaintiff Nor other Similarity Situated Prisoners housed at Rush City Correctional Facility with Apprenticeship programs Educational Programs, nor training.

434. MINNCOR also Continues to deliberately Violate both Federal & Statutes Regarding the Deduction of both Federal & State Taxes from minimum wages that were not paid to the Plaintiff but was instead confiscated by the Minnesota Department of Corrections Financial Department, the Plaintiff only then received $2.20 an hour for his labor Pursuant to the Private Sector/Prison Industries Enhancement Program (PIECP), MINNCOR Industries Deliberately and consistently Deducted both Federal & State Taxes from the Plaintiff and All Similarly Situated Prisoners at Stillwater Correctional Facility & Rush City Correctional Facility as the Last Deductions from the Net total Gross Amount Earned after first making all other Deductions totaling 80% percent or more leaving very little left for Federal & State Tax Deductions which effected the amount of Federal & State Income tax Returns received by the Plaintiff at the end of each year which the Plaintiff has a State-created property interest in the deducted wages which did not reflect the Net total amount of Income earned for each year because both Federal & State Taxes were not the very first deduction made by MINNCOR as required by both Federal & State Law.

435. Also because MINNCOR has only supplied the Plaintiff with 1099 –MISC income tax filing forms that did not reflect the Net Total amount of wages earned for each Income tax filing year the Plaintiff has been forced due to his status as a prisoner to commit Tax Fraud by under reporting both Federal & State Income Taxes performed for or on behalf of private businesses where the Labor performed was not a mandatory condition of the plaintiffs incarceration and where the Plaintiff and all Similarly situated Prisoners at Stillwater Correctional Facility are currently performing Labor for the following Private Business Contractors which MINNCOR Leased the Plaintiffs Labor for the following work performed for the following: 3M Company: the Plaintiff Manufactured custom designed Stethoscope Plastic hardware & Assembled Plastic Clip Hooks. MINNCOR INDUSTRIES has subjected the plaintiff and

all Similarly Situated Prisoners at Rush City Correctional Facility to Financial Extortion, Racial Injustices and Discrimination due to the Plaintiffs Criminal status as a Sex Offender and also due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male, to what has amounted to Human Rights Violations For Profit.

**436. (i) Summary of Facts Regarding Death Of Correctional Officer Joseph Gohm By Prisoner John Doe:**

**437.** At approximately 12: 45 pm on July 18th, 2018, Correctional officer Joseph Gohm was allegedly beaten to death by a Stillwater offender with a hammer. This occurred at Stillwater Correctional Facility in the MINNCOR Industry Building #20 during a regular scheduled work shift.

438. John Doe: "I was working in building 20 welding bed frames together. I heard a noise and turned and turned to see Officer Gohm lying on the floor bloody and messed up. Seeing this, I tried to leave the floor but the exit door was blocked by a cart filled with metal that I pushed out of the way to open the door. While proceeding down the stairs to leave the bloody scene I had just witnessed, I ran into a Correctional Officer (Lucier) and the P-shop Foreman (Steve) standing on the steps leading up to the floor where officer Gohm was Lying injured.

439. They directed me to go back up the stairs and once again I saw Officer Gohm lying there bloody and injured. P-shop Foreman Steve standing before me looked as shook up as I was, shaking his head and saying "oh my God" and "holy shit" over and over. Seeing this concerned me about why he hadn't been up there doing his job in the first place and why were all the offenders left up there by themselves? I told them I was trying to get away from what I was seeing and was directed out through P-shop back stairs and into the L & O shop where the correctional officers held the offenders for about ten minutes before letting us out of the building while the medical staff rushed up the stairs to the scene as well as the paramedics who arrived shortly after.

440. I later learned from the broadcast news that Officer Gohm died from his sustained injuries. The BCA Came and got me from my cell to interview me about the event. I don't remember their names but it was a man and a women for my first interview, and I told them what I had seen while out there working in Building #20. Later that night I was awakened to do another interview with two different BCA officers and I told them the Same thing I had related to the earlier Officers. They challenged my recollection and we over a heated argument over what I had witnessed with my own two eyes! It turned into a shouting match and eventually a women came into the room and calmed the situation down, then had me escorted back to my cell.

441. A Full Five Days I was taken to Segregation for the argument I had with the officer's on July 18th 2018. I successfully challenged the charges brought against me and was finally returned to my cell seven days later. While back in my cellblock I overheard others who were on the same floor in Building #20 during the event, stating that the foreman had ran off and left Officer Gohm ( as well as all of the other offenders) to fend for himself during the attack. I have since heard that Foreman Steve is trying to get his job back and has been seen on the Stillwater campus again.

442. I declare that the facts and words of this document are true and accurate to the best of my recollection."

**443. (ii) Minnesota Department of Corrections Facility Funding Structure and Definitions:**

444. 1000 - General Fund, Legislative Appropriations: Salaries/Expenses – Funds salaries and expenses for facilities, institution support services, community services and operations support activity for the agency. Accounting structure is set up in accordance with the facility account structure and definitions document.

445. 2000 - Dedicated Receipts Funds Received for a Specific Activity OR Purpose. Facilities should spend the prior year's receipts within one year or risk canceling the funds to the general fund. COST OF

CONFINMENT (FCC) 10% deductions from non-exempt receipts for adult offenders. Funds must be used for law library cost & personal offender support purchases.

**446.** 2001- Dedicated Receipts: NON-Federal FUNDS RECEIVED FOR A SPECIFIC ACTIVITY OR PURPOSE. Facilities should spend the prior year's receipt within one year or risk canceling the funds to the general fund. Adult Basic Education Aid: Funds received from State used support ABE programs. Dedicated Receipts: Miscellaneous facility receipts. Funds used to reimburse facility for cost associated with revenue. Indirect Costs: Fees assessed against various state and federal funding and grants for overhead costs associated with managing these funds. The rate is derived from the indirect cost plan. Funds are used to reimburse associated administrative cost.

447. ML/DHS-MSOP SHARED SERVICE: Receipts from MSOP for water provided by MCF-ML. Expenses include water treatment costs, repair and maintenance costs associated with maintaining the well. Staff/Visitor Meals: Receipts from sale of offender meals to non-offenders. Funds used to reimburse offender food provisions account. Rental Utility And/or Service Agreements: Rental income received from outside sources for reimbursement of utilities and operational costs. RW PRE DISPOSITION EVALUATIONS: Funds received for a specific service at RW.VOCATIONAL WORK PROJECTS: Revolving funds for support institutional vocational programs. Receipts generated by sale of products produced & sold.

448. 2403- GIFTS &ACCEPTANCE DONATIONS: Funds Donated to the Department, Use of these funds may be restricted by donor specifications.

449. 3000- Federal Funds Received for a Specific Activity or Purpose: Adult Basic Education: Funds received from the Federal government used to support ABE programs. SCAAP (State Criminal Alien Assistance Program): Funds received from the Federal government to reimburse States for costs associated with incarcerating illegal aliens. Funds are expended for costs associated with housing these offenders as funded from offender personal support. Pre FY 2007, SCAAP funds could be used for

almost any central office or facility costs. Beginning with federal FY 2007 SCAAP awards, SCAAP funds must be used for corrections purposes only.

450. Appropriate used include salaries & overtime costs for CO'S, performance bonuses, retention & recruitment, facility construction, offender education, training, for corrections officers related to offender population management, medical & mental health services, offender transport vehicles, offender industry programs, pre-release & re-entry programs, offender management technology, disaster preparedness and consultations. To comply with the new restrictions, the department has established separate appropriations for pre and post 2007 awards.

451. FACILITY RELATED FEDERAL GRANTS: Child Nutrition, RW Juvenile Facility Analysis, Vocational Education, Special Education, Chp 1 Education.

452. 4400- MINNCOR REVOLVING: MINNCOR operating account, Funds may be disbursed to facilities via projects, typically for infrastructure of equipment. MINNCOR COST OF CONFINMENT: Funding received from offender payroll towards confinement costs. Funds may be disbursed to facilities via projects, typically for infrastructure of equipment.

453. 6000- OFFENDER ELECTRONIC COMMUNICATIONS: Funds Received From Use of Offender Electronic Systems: ELECTRONIC COMMUNICATIONS COMMISSIONS: Commissions received from offender telephone system, offender email, offender media purchases and video visitation. Receipts are used to fund cost associated with these systems. Commissions may also be used for costs related to offender recreation, offender visiting, chapel areas, publishing the offender newspaper, offender vandalism, offender libraries, academic and vocation programs, cable television and equipment, support or renovations to offender occupied areas... Expenditures for the law library should only be included here only if the cost exceeds what is available in the facility cost of confinement budget.

454. 6001- SOCIAL WELFARE: This fund is divided into individual offender accounts, the trust benefit account, and various specific special purpose accounts. All receipts and expenditures of offender funds

are recorded in individual offender accounts, including money received from family members, offender pay, offender obligations and offender withdrawals. The main revenue sources for the trust benefit account are unallocated interest and aged unclaimed offender funds. The trust fund benefit account must be used for direct operating cost of the offender trust fund accounting system and related operational costs (such as printing of vouchers recreation, offender vandalism, write- off of unpaid offender obligations and other expenditures for offender occupied areas. Juvenile facilities may use social welfare funds for structured incentive programming. Special purpose accounts are used to receipts and expenditures identified for specific purposes ( such as photo, postage, shipping and handling). Transfers between specific purposes accounts for any purpose unrelated to the orginal intent of collection must be approved by central office.

455. SPECIAL PURPOSE – PHOTO: Photo funds (via service tickets) are collected from offenders for personal photographs. The cost of offender photos are determined by each facility needs and should reflect the costs associated with purchase of camera, supplies, and offender photographer wages in accordance with DOC policy 204.085 "Offender Personal Photographs". Any excess fund collected may be transferred to the trust fund benefit account with written approval form central office.

456. SPECIAL PURPOSE – RESTORATIVE JUSTICE : Offenders have the opportunity to participate in facility fundraisers events designed to generate funds that will be expended on activities intended to repair the damage to crime victims. 20% of the profits from facility offender fundraisers is deposited to a centralized account to be spent on stipends for speakers during National Crime Victims' Rights Week, National Restorative Justice Week, and other activities designed to promote an understanding of crime victim impact: providing financial assistance to victims who participate in activities such as "Victim Offender Dialogue" and have a financial hardship; and to provide stipends to facilitators for Victim Offender Dialogues and Victim Offender Community A Restorative Experience. The remaining 80% profit is kept at the facility to be used solely to support community organizations providing direct crime victim

services. Funds in this account cannot be used to support general community restoration services and activities, offender programming or related offender resources. Because expenditures should be kept in timely alignment with collection efforts, funds raised in one quarter should be disbursed by the end the following quarter.

**457. (iii)(a) PURPOSE OF MINNCOR:**

MINNCOR began consolidating industries into single facilities to reduce costs and eliminate competition among facilities. In Late 1995, MINNCOR developed a five-year plan that called for a 25 percent reduction by fiscal year 2001 in General Fund grant or "subsidy" the department contributed annually to prison industry programs. The Legislature, however, was looking for greater savings. In 1996, it required the Commissioner of Administration to hire a Consultant to evaluate Minnesota prison industries and develop a five-year business plan. The consultant was to assume that a private corporation would be operating the prison industry program without a state subsidy. The same law required DOC to develop a five-year plan for its own operation of MINNCOR, although the law stopped short of requiring the department to assume that prison industries would operate without General Fund support.

The Legislature never privatized MINNCOR, but the message was clear: operate without a state subsidy. The department revised its five-year plan in 1997 with a major goal that MINNCOR achieve self-

458. sufficiency by fiscal year 2003. Self-sufficiency is not MINNCOR's only goal. According to state law: **"MINNCOR exists ....for the primary purpose of sustaining and ensuring MINNCOR industries' self-sufficiency, providing educational training, meaningful employment and the teaching of proper work habits to the inmates...and not solely as competitive business ventures."** MINNCOR's mission statement broadens its goals to include providing **"....services that benefit the community by operating a dynamic and profitable business.":**

**"79th Legislature; 1996,Regular Session (Chapter 408)**

**Sec. 27. [EVALUATION OF PRISON INDUSTY PROGRAM BY CONSULTANT.]**

By May 15, 1996, the commissioner of administration shall issue a request for proposals to serve as a consultant to evaluate the operation of prison industries in this state. By July 1. 1996, the commissioner shall select the consultant. The consultant shall develop a five-year business plan and report on the contents of the plan as required in section 28.

459. **Sec.28. [FIVE-YEAR BUSINESS PLAN TO BE DEVELOPED BY MINNCOR AND CONSULTANT.]** Subdivision 1. [BUSINESS PLANS.] (a) MinnCor and the consultant retained under section 26 shall develpoe five-year business plans for the operation of prison industries at state and local correctional facilities. By February 1, 1997, the consultant and the chief executive officer of MinnCor shall report to the governor and the majority and minority leaders of the senate and house of representatives on the contents of the respective plans. (b) Representatives of labor organizations certified to represent MInnCor employees may also develop a five-year business plan either separately or in conjunction with MinnCor and submit it to the governor and the majority and minority leaders of the senate and house of representatives by February 1, 1997. (c) The consultant and MinnCor shall consult with the representatives of labor organizations certified to represent MInnCor employees in preparing the five-year plans. Subd..2. [ACCESS TO INFORMATION.] (a) in developing the five-year plan, the consultant shall have access to:

(1) All records kept by MinnCOr in the course of its business, including financial records;

(2) All correctional facilities;

(3) All non-inmate employees of MinnCor; and

(4) All inmates employed by MinnCor.

460. Representatives of labor organizations developing a five-year plan pursuant to subdivision 1, paragraph (b), shall also have all the access specified in this subdivision. (b) The consultant shall have the right to conduct private, confidential interviews with all inmate and non-inmate employees of MinnCor who consent to be interviewed. The commissioner of corrections and the chief executive officer of

MinnCor shall cooperate with the consultant and the exclusive representative to ensure that the access specified in this subdivision is given. Subd. 3. [CONSULTANT'S PLAN.] (a) In developing a five-year business plan, the consultant shall assume that a private corporation will be operating prison industries and that the corporation will be required to:

461. (1) employ at least the same number of inmates by the end of its first year of operation as MinnCor employed on July 1, 1996; (2) Initially offer employment to nominate MinnCor employees prior to any other hiring, to fill available positions at the same salaries and benefits, including pension benefits, as the employees were earing as of July 1, 1996; (3) operate without any state subsidy; (4) provide adequate security at its own expense, including training employees in security techniques that conform to established standards of security and control specified in the American corrections association's standards for adult correctional institutions; (5) provide maintenance for lease facilities and equipment; (6) continue to operate commercial and industrial activities suitable to the profitable

462. employment, vocational training, and development of proper work habits of inmates at correctional facilities; and (7) demonstrate it has the experience and financial capacity to comply with appropriate correctional standards and court orders. (b) In developing its five – year business for $1 per year; (2) that the corporation will be liable within the limitations provided by applicable law for inmate injury due to its negligence; (4) that members of the corporation's board of directors will not be liable to any inmate for any injury sustained in an industry program; (5) that inmates will not be considered employees of the corporation for any purpose; and (6) that if the corporation is dissolved or otherwise ceases to function effectively, any interest of the corporation in buildings, land, furnishings, fixtures, equipment and other chattels purchased or leased in connection with its operation of industry programs shall automatically revert, subject to valid security interests, to the department of corrections.

463. (c) The plan must address the possibility of future capital expansion and improvements of industry programs at state and local correctional facilities. Specifically, the plan must address the need

for additional equipment and buildings, and improvements to existing equipment and buildings. The plan may assume that the state will finance these expanses, but will require the corporation to enter into leases to reimburse these expanses at cost. (d) The plan must describe the advantages and disadvantages of a private corporation operating prison industries as opposed to the department of corrections, specifically as relating to purchases, sales, management, marketing, security, and personnel decisions, including recruitment, retention, and training of employees. (e) The plan must describe the most feasible method and timetable for transferring the assets and operations of MinnCor if a private corporation were to assume control over prison industries. (f) The plan must consider the impact on Minnesota businesses of expanding industry products and services sold to private and public sector.

464. Subd. 4. [FIVE-YEAR PLANS OF CONSULTANT AND MINNCOR.] At a minimum, and in addition to the requirements applicable only to the consultant's plan contained in subdivision 3, both the consultant and MinnCor shall address in the respective five-year business plans :

(1) Method to increase the number of inmate workers;

(2) method to increase profits and expand markets, including recommending changes in the state use law;

(3) proposed new product lines;

(4) methods to employ inmates who require lower security in settings outside state and local correctional facilities;

(5) appropriate compensation for management, employees, and inmates;

(6) methods to determine what effect employment in prison industry program has upon recidivism of inmates who have participated in the program, including methods to track former inmate employees to determine recidivism.

**465. Sec. 29. [REPEALER.]**

Minnesota Statutes 1994, section 352.91, subdivision 3, is repealed.

**Sec. 30. [EFFECTIVE DATE.]**

Section 1 is effective June 1, 1996.

Section 2, 3, 7, and 8 are effective August 1, 1996.

Section 5 is effective August 1, 1997.

Section 6 and 25 to 28 are effective the day following final enactment.

Sections 9 to 18, 21 to 24, and 29 are effective on the first day of the first full pay period beginning after January 1, 1997.

Section 19 is effective July 1, 1996 and shall be used for calculating the community correction aid distribution for fiscal year 1997 and thereafter."

**466. (iii)(b) AFSCME UNION HEAD SUSPENDED:**

467. Counsel 5 did not specify the allegations against Executive Director John Westmoreland. The head of the large and politically powerful Minnesota Union, Counsel 5 of the American Federation of State, County and Municipal Employees, has been suspended from his job pending an investigation of unidentified allegations. John Westmoreland, AFSCME Counsel 5's excutive director, has been put on "temporary investigative leave" said Emily Weber, a union spokeswomen Tuesday August 20th 2019. The Executive Board the week of August 12th 2019, learned of allegations regarding staff of AFSCME Counsel 5, and Outside entity has been brought in to conduct an investigation. South St. Paul based Counsel 5 is an umbrella group for many AFSCME local unions, which together represent 43,000 state and local government workers in Minnesota. Counsel 5 has long been a critical base of support for Minnesota DFL Party.

468. Westmoreland ascended to the union's top job in November 2017 after the retirement of longtime AFSCME leader Eliot Seide. Westmoreland had previously been Counsel 5's assistant director and had also held other AFSCME positions. He became involved in the union while working as a prison guard in Stillwater. Counsel 5 is the largest of two AFSCME counsels in Minnesota. Benner, the interim

director, was executive director of AFSCME Counsel 6 in Minnesota from 1982 to 2005, when it was merged with Counsel 5.

**469. (iv) Minnesota Prison Population/Decarceration/Prisoner Abuses :**

In 2015, Newt Gingrich, Eric Holder, and Van Jones Called for a 50% reduction in US Prisons population, These Voices are not exceptional as the recent first –Step – Justice reform proposal shows even in a divisive time like ours, there is a broader bi – partisan consensus that the prison and parole system fail in view of what they are supposed to do; rehabilitate and reintegrate prisoners back into Society. Instead, lives are destroyed by disproportionately high sentences and people cycle in and out of crime, because it is made difficult for them to find housing and Jobs in particular, Communities of color have to pay a high price with many families livelihood destroyed. The tax money of all Minnesota residents is wasted on a solution that is no solution. Incarceration costs taxpayers an incredible $41,355 per person incarceration, Per year, almost double the cost of in-state tuition at the University of Minnesota, including room and board.

470. The mass increase in Minnesota prison population has led to an overcrowding crisis. Result of this include lack of access to rehabilitation and humane treatment, Minnesota prison population has increased over 500% since 1981 – Cost of Confinement (Vera Institute 2015) – 41,366/per person per year – number of people in on technical violations 6 – 10% of total population at any given time according to the Marshall Project. A 2017 Minnesota Department of Corrections Sponsored report from the National Institute of Justice shows high returns on Investment for programming $2 - $30 for every $1 spent, while reducing recidivism and in-prison "misconduct."

471. Mass decarceration is far from unprecedented and again and again saves the public millions while creating "No Adverse Effects on Public Safety." Countries such as the Netherlands or Norway have significantly reduced prison populations within a few years, seeing no Impact on crime. Five States – Connecticut, Michigan, Mississippi, Rhode Island, South Carolina – have reduced prison populations

from 15 – 25% over the last decade, freeing a total of 23,646 prisoners with no adverse effects on public Safety. And similar results in New York and New Jersey. More dramatically, California released 27,527 inmate in 15 months in the early 2010's, saving $453 Million a year with "no adverse effect on the overall safety of Californians." This release, more than double Minnesota's prison population, is saving tax payers $453 Million a year. Violence in Minnesota's prisons is an issue, and misdiagnosed. Solving these problems cannot be solved simply by adding Staff, as is proposed by "Joseph Gomm Bill" and the 328 New Staff it is requesting, and the 3.82 prisoner to staff ratio that would achieve. Why? If lowering the staffing ratio was crucial, It should be accomplished by decarceration, not an increase burden on tax payers. Reaching the Staffing ratio proposed by the Gomm Bill through decarceration would mean a 19% reduction in prison population by 19%, Saving the public 100/million/Year from now on.

472. Support all other changes that advance this goal, particularly those pushed by people in prison. Create accountability for the MNDOC by reinstating the Ombudsman, which was discontinued in 2003, Increasing investigative power. *the ombudsman should do more to formally identify system-wide issues, make MNDOC administration aware of them, and write conclusions, recommendations and results. No advocate group or prison internal procedure can make up for three basic functions of an ombudsman: 1) Creating a Central, non-biased access to the prison system for the public; 2) exercising investigating power and having access to all files and information within the MNDOC – system; 3) impacting lastingly the prison environment by virtue of the legislature in 2002 and 2007 stated that an ombudsman would increase security within prisons, first because prisoners can have trust in independent oversight and second, because an ombudsman can function as an early warning system, ending visitation restrictions for individuals, MNDOC Volunteers, and outside groups, spend our tax money on programming, instead of spending more Tax money on security and by doing so, making the Prison environment even more confrontational. A MNDOC – sponsored study by the National institute

of Justice shows that prison programming in Minnesota Consistently pays for itself with return on investments from $2 -$30 for every $1 spent.

473. Programming also reduces recidivism and in-prison *misconduct*. Including Prisoners in all decision – making involving changing the prison system, holding public safety hearings in prisons, invite prisoners to testify at outside hearings, arrange to meet with or talk with prisoners, involve prisoners in all MNDOC decision – making involving changing the prison system, hold public safety hearing in prisons, invite prisoners to testify at outside hearings, arrange to meet with or talk with prisoners, involve prisoners in all MNDOC decision. The inclusion of prisoners has many beneficial effects as, for example, the experiences in Germany show. Germany's Criminal law has introduced already in 1977 participatory rights for inmates. In Germany point to the facts, that, first, inmates inclusion and participation in decision making processes which concern their daily lives is an important practice in Social responsibility. It increases Social competence and is conductive to reintegration, a Second major impact of participatory inclusion is the reduction of tension and conflicts between prison staff and inmates. Inmates are sentenced to time in prison, nut they are not sentenced to be subjected to arbitrary measures and in transparent procedures. Inmates participation opens up communication channels, secures transparency and thus improves the lives of inmates and staff.

474. According to prisoners and Independent observers Creating Safety in prisons is caused by respect and accountability, not staffing Levels. Theatrice Williams, former Ombudsman for Corrections Said: "Safety in our prisons is not determined by the ratio of Correctional officers to prisoners. It's related more to whether prisoners believe they can get Satisfactory resolutions to their grievances ... The security of the staff is directly connected with the safety and security of the prisoners." Or from a current Prisoner "C.O.s ignoring or mistreating prisoners without accountability does result in death – but usually for prisoners. According to the Bureau of Justice Statistics 150 prisoners died behind walls in Minnesota between 2005 -2014."

475. Minnesota Already has a low staff ratio of 4.73 prisoners per staff, well below the National Average of 6.4 ( from Prison Legal News),If Supervisors are included in that ratio, Minnesota's Prison to Staff ratio is 4.1 prisoners per staff, nearly the 3.82 ratio the Bill proposes. If one staff can't supervise 4.7 prisoners Safely, one staff per 3.8 prisoners isn't enough either. The Incredible racism of our Prison System Causes Violence and demands Mass Decarceration. Research from all the Federal Prisons show "prisons with greater numbers of white staff had more misconduct of All types." While we know abuse is over-directed prisoners of color, and there are many instances of racism in access to programming and in daily treatment. African Americans are Nearly 5 times over represented in Minnesota's Prisons. Natives are Nearly 10 times over represented. Minnesota Department of Corrections employees are 94% White. If Americans were 5 – 10 times overrepresented in prison as Compared to the British, that would be a reason to call for their freedom.

**476.(v) Stillwater & Rush City Correctional Facilities Toxic Overcrowding Conditions of Confinement & Double Bunking: CLASSIFACATIONS: Medium & Close Custody Correctional Facilities &Minimum Security & Treatment Units or Facilitie :**

477. The treatment a prisoner receives in prison and the conditions under which he is confined are subjected to scrutiny under the Eighth Amendment." These conditions include measures taken to guarantee the safety of inmates, Prison Officials have a duty to take reasonable steps to protect inmates from physical abuse, (1) Medium Custody inmates represent the least risk from an institutional standpoint of any classification on the main yard. However, there has been a direct correlation between involuntary double-celling and the level of violence in medium custody Correctional Facilities such as Faribault, Moose Lake, Lino Lakes and St Cloud, Correctional Facilities.

478. Sexual Assaults, Gang Violence, and Assaults upon Correctional Security Staff and Prisoners, and suicides are not unknown to medium custody. There are significant freedoms enjoyed by medium custody inmates which increase the likelihood of violence. Evolving Standards of Decency that mark the progress of this Maturing Society requires this court to find that Double-celling is unconstitutional

because it is inescapable that double-celling dramatically decreases personal safety. Evidence of young men being brutally raped and the Correctional Security Staff being either unwilling or unable to respond to that young man's cries for help is sufficient basis for this court to take such an unwelcome step. Moreover, evidence that Correctional Security Staff must use inmates to ensure the safety of other inmates is a clear indication that personal safety is precarious with present staffing.

479. (2) Close Custody Level Four Facilities; at both Stillwater Correctional Facility and Rush City Correctional Facility, Prison Officials have not attempted to reduce the violence in these Close Custody Facilities by single-celling inmates but has reduced the openness of the tiers. Because of the high level of violence at both Stillwater Correctional Facility and Rush City Correctional Facility, this court is not constrained by the decision of the Supreme Court in Rhodes v. Chapman. These two situations are distinguishable because of the high level of violence at Stillwater Correctional Facility and Rush City

480. Correctional Facility and because the prison officials themselves have acknowledged the problems inherent in double-celling of Close Custody inmates. Substantial evidence will be introduced demonstrating that double-celling of Close Custody inmates resulted in the infliction of unnecessary and wanton pain, and is grossly disproportionate to the severity of crimes warranting the Plaintiffs imprisonment. Also See Annual Performance Report Required pursuant to Minn. Stat. 241.016 Subdivision 1(a)(1)(2)(3)(4) and Minn. Stat. 241.016 Subdivision 1(b.)

**481. (vi) Access to Law Library:**

The Minnesota Department of Corrections Facility Wide decided to have a Law Library to fulfill the requirements under Bounds. However the Law Library currently at Stillwater Correctional Facility is inadequate and has hurt the Plaintiffs Non-Frivolous Lawsuit and Habeas Corpus petitions. The Federal Courts have required that prison libraries provide tables and chairs, be of adequate size, and be open for inmates to use for a reasonable amount of time. Limitations and Cellblock Lockdowns set by the Stillwater Correctional Facility Administration are too restrictive and constitute a denial of the Plaintiffs

rights of access to the courts and these problems have caused actual injury to the Plaintiff. The Plaintiff in not allowed to go to Religious services on the days the plaintiff went to Law Library. The Plaintiff is forced to choose between using limited out of cell time for exercise or for access to Law Library. Prisoners who cannot visit the law library because they are in disciplinary segregation or extra-restrictive conditions do not have a meaningful access to the courts some other way without additional measures.

**482. (vii) Getting Help from a Jailhouse Lawyer and Providing Help to Other Prisoners:**

Stillwater Correctional Facility does not allow prisoners to help other prisoners with legal issues, Stillwater also does not provide some other reasonable alternative to assist in the preparation of petitions. The Plaintiff has no other way to work on his lawsuit except on getting help from other prisoners. The Plaintiff who is an Jailhouse Lawyer is restricted from helping or communicating with other prisoners regarding Legal Help or Filings with the Courts and State Public Defenders Office.

483. (viii) **Drug Problem Remains Inside Minnesota's Prisons: By Antonio Williams Contributing Commentator For Minnesota Spokesman Recorder and Inmate at Rush City Correctional Facility:**

484. It was a Normal start to a Sunday In Rush City's prison until a guy two cells away from mine started yelling for the officers. He said his cellmate had a seizure and wasn't moving. It was about 7:15am on June 16th 2019 in Complex 3 North, where most of the prisoners who have industry jobs are Housed. When the prisoner and two correctional officers ran back to the cell, they found his cellmate slumped in a chair, without a pulse. It took about 20 minutes for the paramedics to arrive. When incidents like this occur here, officials lock the whole unit down. Many prisoners stand at their single window trying to get a glimpse of the action. Not many stand at their cell door with a pen and paper to record as many of the details as possible.

485. I'm one who does. It took 40 minutes from the beginning of the incident for the guy to be taken out of his cell and transported to the hospital. Before he could actually get to the ambulance, he had to put on an orange jumpsuit identifying him as a Rush City Prisoner and be handcuffed and chained

around the waist. This guy didn't have a heart attack – he overdosed on heroin. And this wasn't an isolated incident. In fact, just a few weeks ago, another prisoner in a different unit overdosed on a nonprescription drug. A few months before that, another prisoner was so high on meth he tried to cut his friend's neck. This latter incident resulted in the dog program (where dogs were trained by prisoners) being taken out of the facility because prison officials said the shank was made from some of the dog handling parts.

486. The drug epidemic is in prison too, it's just not getting the same coverage. Most recently it's been the illegal drugs. But there has been an even bigger prescription drug problem going on since I've been incarcerated. Prison officials are well aware of it. But it seems to me they've been more concerned with adding more cameras and spending money on new sidewalks, guard towers, that come in. lots of inmates are self-medicating because they'er not getting the help they need through health or psych services. There aren't enough mental health care workers and the environment isn't accommodating to those who do want to talk to a psychologist. So you have guys buying, selling, trading and fighting over pills. Officials here in Rush City expend more energy making sure we fill up every seat in the chow hall and wear our IDs than they do trying to make this environment more conducive to rehabilitation. From what I've seen, it's all about making the prison look good, not actually do well for the inmates. There is good being done here though.

487. It's being done by inmates who voluntarily facilitate personal development groups, speak to the new inmates that come in every week and mentor the men in their living units. Instead of supporting that effort and fighting the rampant drug problem, officials are attacking inmates who are trying to make conditions better. I began writing complaints about aggressive and disrespectful abuse about eight months ago, talking to the media and educating fellow prisoners on how to write effective kites and grievances. And every prisoners around me has witnessed the harassment and retaliation I've been enduring: excessive, unwarranted cell searches, having my mail delayed; paperwork confiscated, sent to

solitary confinement and treatment with open hostility by certain corrections officers. Why isn't the drug problem and overdoses in Rush City's prison catching the attention of the media? If it were staff assaults it'd be one of the top stories because a guard would've leaked that to the media. With the visiting room heavily monitored and the mailroom and property department run by extremely vigilant staff, I think the issue is being kept quite because there may be guards complicit.

**488. (viiii) JPAY Communication Device/Appellants Email Journals:**

489. The Plaintiff Also States that he has been documenting the dangerous conditions of his confinement regarding his stay at Rush City Correctional Facility and Stillwater Correctional Facility starting from December of the year 2015 until the present year 2019 by sending his E/Mail Journals to Larry Strake who is a longtime friend and longtime visitor of the Plaintiff, through his hand held Electronic Communication Device that was purchased through the JPay Service Provider Contracted by the Minnesota Department of Corrections as Defendants, the Plaintiff has been Sending the Email Journals Electronically to his Friend and Father Figure Larry Stracke from December of the year 2015 until the Present Year 2019.

490. The Emails are permanently archived within the Minnesota Department of Corrections Kiosks System located within each Correctional Facility and can be Accessed by the MDOC Defendants at Stillwater Correctional Facility however for some unusual reason as of Wednesday March 6th 2019 the Plaintiffs Emails Dating from December of 2015 until August 11th of 2018 that were permanently being stored in the Kiosks Provided by the Minnesota Department of Corrections Defendants are now missing from the kiosk at Stillwater Correctional Facility and therefore the emails are no longer available in the Kiosk, however all the missing Emails are still stored and available to best of the Plaintiffs Beliefs or Knowledge, in the Plaintiffs JPay Mini Communications Device.

491. These Email Journals documented the Dates Times and names of the Rush City and Stillwater Correctional Facility Staff involved regarding placing the Plaintiff in imminent danger of serious physical injury, also involved with the Misappropriation or inappropriate spending of Legislative appropriations funding requested for the welfare of the Plaintiff and all other similarly situated Minnesota Prisoners and Minnesota Department of Corrections Facility Funding Structure, Theft of State Property and Resources, and Inappropriate spending of Federal Grants requested for Vocational Programs for Profit. The Plaintiff Request that the District Court Order the Minnesota Department of Corrections Defendants or JPAY Defendants who are currently contracted by the MNDOC Defendants , to produce all of the Out Going Emails of the Plaintiff, sent to Larry Stracke for use by this District Court regarding this Civil Complaint and any other use by this District Court.

## VI. CLASS ACTION ALLEGATIONS

### A. The MDOC Class #1

492. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs TONY DEJUAN JACKSON, Other Similarly Situated Prisoners At Stillwater Correctional Facility & Other Similarly Situated Prisoners At Rush City Correctional Facility & All other Minnesota Correctional Facilities & Contracted Half Way Housing, & Minnesota Association Of Community Corrections Act Counties, ( collectively, the "MNDOC Class Plaintiffs #1) brings this action on behalf of themselves and a class of all persons who are now, or will in the future be, subjected to the Inadequate and toxic policies and practices regarding programs, services, and activities that MNDOC Defendants provide to prisoners including but are not limited to unreasonable and unsafe Living Accommodations, sleeping, eating, showering, toileting, communicating with those outside the prison by mail and telephone and Electronic Communication Devices and Kiosks, exercising, entertainment, safety and security, the

prison's administrative, disciplinary, and classification proceedings, medical, mental health, and dental services, the Law library and Library, educational, vocational, substance abuse, and anger management classes, and discharge services. MNDOC' programs, services, and activities that are covered by the ADA.

**B. The MNDOC Class #2**

493. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs TONY DEJUAN JACKSON, Other Similarly Situated Prisoners At Stillwater Correctional Facility & Other Similarly Situated Prisoners At Rush City Correctional Facility & All other Minnesota Correctional Facilities & Contracted Half Way Housing, & Minnesota Association Of Community Corrections Act Counties, ( collectively, the "MNDOC Class Plaintiffs) bring this action on behalf of themselves and a class of all persons who are now, or will in the future be, subjected to the health care (including medical, mental health, and dental care) policies and practices of MNDOC(hereinafter, the MNDOC Class).

C. **The Isolation SubClass**

494. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs TONY DEJUAN JACKSON, Other Similarly Situated Prisoners At Stillwater Correctional Facility & Other Similarly Situated Prisoners At Rush City Correctional Facility & All other Minnesota Correctional Facilities & Contracted Half Way Housing, & Minnesota Association Of Community Corrections Act Counties, ( collectively, the "Isolation Subclass) bring this action on behalf of themselves and a class of all persons who are now, or will in the future be, subjected to Isolation ("Isolation SubClass"). "Isolation" is defined as confinement in a cell for 22 or more hours per day.

D. **The Disability Subclass**

495. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b), Plaintiffs TONY DEJUAN JACKSON, Other Similarly Situated Prisoners At Stillwater Correctional Facility & Other Similarly Situated Prisoners At Rush City Correctional Facility & All other Minnesota Correctional Facilities & Contracted Half Way Housing, & Minnesota Association Of Community Corrections Act Counties, ( collectively, the "Disability Subclass Plaintiffs") bring this action on behalf of themselves and a Subclass of all persons with disabilities who are now or will be in the future confined at any MNDOC Facility (Disability Subclass").

**1. Fed. R. Civ. P.23(a)(1): Impracticability of Joinder**

496. The MNDOC Class is so numerous that joinder of all class members is impracticable. MNDOC confines approximately 10,200 prisoners, all of whom are subjected to the Toxic Double Bunking & health care policies and practices of MNDOC. All MNDOC prisoners are at risk of Sexual Assault which will cause the spread of diseases and Serious Physical Assaults or Death and developing serious medical, mental health, or dental conditions while confined, and there are hundreds if not thousands of prisoners at any given time who already have such conditions, as a result of defendants' policies and practices, all MNDOC prisoners receive or are at risk of receiving inadequate health care while in MNDOC facilities. In addition, the class is fluid, as new prisoners enter NDC and others are released on a daily basis. MNDOC Class members are identifiable using records maintained in the ordinary course of business by the MNDOC.

**2. Fed. R. Civ. P.23(a)(2): Commonality**

**497.** There are multiple questions of law and fact common to the entire MNDOC Class, Including:

A) Whether Defendants' failure to operate a system that provides Safe Custodial Conditions and minimally adequate health care, including medical, dental, and mental health care, poses a substantial risk of serious harm.

b) Whether Defendants have been deliberately indifferent to the serious Safety Needs, health care needs, including medical, dental, and mental health care needs, of class members, and to the risk posed by their failure to maintain Safe Custodial Conditions and an adequate health care system.

c) Whether the extreme toxic levels of overcrowding in MNDOC facilities interferes with the provisions of adequate health care and Safe Custodial Conditions.

498. Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

**3. Fed. R. CIv. P.23(a)(3): Typicality**

**499.** The claims of the MNDOC Class Plaintiffs are typical of those of the MNDOC Class, as their claims arise from the same polices, practices, and courses of conduct, and their claims are based on the same theory of law as the Class claims.

**4. Fed.R. Civ. P.23(a)(4): Adequacy of Representation**

**500.** Each of the MNDOC Class Plaintiffs will fairly and adequately represent the interests of the MNDOC Class and will diligently serve as a class representative. Their interests are co-extensive with those of the MNDOC Class, and They have retained counsel in the form of a Jail House Lawyer who is experienced with litigations in both the State and Federal Courts also MNDOC and the State Of Minnesota Does Not Provided Prisoners with reasonable alternatives to assist prisoners in the Preparations of Petitions or Civil Suits Challenging There Unconstitutional Conditions of Confinement. Putative Class Counsel possesses the experience but not the resources to fairly and adequately represent the Class unless the Court Manages The Class or Appoint Class Counsel.

**5. Fed. R. CIv P.23(b)**

**501.** This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is approximately 10,200 and the prosecution of separate actions by

individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incomparable standards of conduct for Defendants. Additionally, the prosecution of separate actions by individuals could result in adjudications with respect to individual class members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

502. This action is maintainable as a Class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of the claims of the MNDOC Class are common to and apply generally to all members of the Class. All Statewide health care policies, Rehabilitation Policies, Work Assignment Policies, Double Bunking Policies, Recreation Policies, Visiting Policies, and Religious Resource Policies, Mail Room Policies, Food Service Policies and Volunteer Policies are centrally promulgated, disseminated, and enforced from MNDOC Central headquarters by Defendants, The Injunctive and Declaratory relief sought is appropriate and will apply as a whole to all members of MNDOC Class.

## VII. *Appointment Of Counsel*

***503. A.*** *Plaintiff Jackson asked the court on numerous occasions to Certify a Class under Rule 23(b)(2). Which applies when "the party opposing the Class has acted or refuse to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole." FED. R. CIV. P. 23(b)(2). The District Court Didn't analyze the Specific requirements of Rule 23(a) or Rule 23 (b)(2). Instead the Court Denied Jackson's motion for Class Certification because the Court incorrectly found that the Plaintiff was not a "Lawyer" However the Plaintiff Jackson is a "Jail House Lawyer" and has been practicing in such capacity for over 18yrs. The Relation back Doctrine maybe applied to relate a Now –moot individual Claim back to the date of the Class Action Complaint. See Sosna v. Iowa, 419 U.S. 393, 402 n 11. 95 S.Ct. 553 42 L.Ed.2d 532 (1975).*

***504. B.*** *Substantial issues: (1) Rule 9(b) of the Federal Rules of Civil Procedure requires The Plaintiff to include more details if The Plaintiff is alleging Fraud than he would for other types of claims. So Rule 8(a)(2) is inapplicable to the Plaintiffs Claim Alleged in the Civil Complaint where the Plaintiff is alleging that the Overcrowding and Violence that Plague The Minnesota Department of Corrections Facilities is caused due to Financial Fraud by the Defendants as illustrated in the Class Action Complaint.*

***505. C.*** *Fraud, Whether Intrinsic or Extrinsic: Prisoners or Inmates are voteless, politically unpopular and socially threatening, under these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions. There is no reason of comity, judicial restraint, or recognition of expertise for this United States District Court for the District of Minnesota to defer to negligent omissions of officials who lack the resources or motivation to operate prisons within limits of decency.*

506. REQUEST FOR RELIEF:

The Plaintiff & all Other Similarly Situated Prisoners At Stillwater Correctional Facility & Other Similarly Situated Prisoners At Rush City Correctional Facility & All other Minnesota Correctional Facilities & Contracted Half Way Housing, & Minnesota Association Of Community Corrections Act Counties County Jails, have no Plain adequate or complete remedy at law to redress the wrongs described herein. The Plaintiff and all similarly situated prisoners at Stillwater Correctional facility has and will continue to be irreparably injured by the conduct of the defendants unless this court grants the Requested Remedies As a Class both declaratory and injunctive Relief and also Class Punitive Damages. As well as Granting The Plaintiff Individual Awards of $500 Million in Compensatory damages and Individual $1.5 Million Awards against each defendant in punitive damages. The Need for relief is critical because the rights at issue are paramount under the United States Constitution and laws of the United States.

**A.** The Plaintiff is ignorant of the true names and capacities of Defendants sued in this complaint and therefore sues these Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believe, and thereon allege, that each of the fictitiously named Defendants is personally responsible in some manner for the occurrences alleged in this complaint.

**B.** At all times mentioned in this complaint, each Defendant was the agent of the other and was acting within the course and scope of this agency, and all acts alleged to have been committed by any one of them was committed on behalf of every other Defendant.

507. State briefly exactly what you want the Court to do for you. Do not make any legal arguments or cite any cases or statutes.

1. Declare that the suite is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

2. Adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, as described herein, are in violation of the rights of Plaintiffs under the Eighth Amendment, Fourteenth Amendment, Thirteenth Amendment, the Americans with Disabilities Act, the Rehabilitation Act and Religious Freedom Act;

3. Preliminary and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting Plaintiff to illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above;

4. A declaration that all acts and omissions described herein violated both the Plaintiff & All similarly situated prisoners Constitutional Rights at Stillwater Correctional Facility & Rush City Correctional Facility.

5. A declaration that both Prison Reform & Criminal Justice Reform is Needed to Abolish Toxic Mass Incarceration In the State of Minnesota Therefore The Adoption of the First Step & Second Chance Act Law signed by President Donald Trump Must be Applied to the State of Minnesota State Prisons and State Criminal Justice System.

6. A Declaratory Judgment that State –Wide Prison Population Limits, Policies and Procedures for population management so that the number of prisoners and Technical Parole Violators is kept at a level that can be safely managed which is necessary to remedy the violation of Plaintiffs Constitutional Rights before any narrowly tailored Consent Decree that would be least intrusive can be implemented.

7. A Declaratory Judgement that the Defendants have subjected the Plaintiff to Extended Incarceration beyond the Presumptive term of imprisonment without Due Process, Exploitation, Financial Extortion, Slavery, Racial Injustices, and Discrimination for Profit Due to the Plaintiffs Criminal Status as a Convicted Person and Also Due to the Plaintiffs Race and Gender where the Plaintiff is an African American Male.

8. A Declaratory Judgement that the Fourteenth Amendment Due Process Clause is Violated where the Plaintiff remains incarcerated after the legal authority to hold him has expire and the Plaintiffs due process rights extend to State Supreme Court Review of Aggravated Sentencing Enhancement Factors imposed by the District Court where the State Supreme Court has provided Mandatory Right to Such Review but refuse to do so.

9. A Declaratory Judgement that The AFSCME COUNSEL #5 CORRECTIONS GUARD UNIT EMPLOYEE ORGANIZATION AND REPRESENTITIVES, are an hostile Entity within the Minnesota Correctional Facilities State Wide, its activities became overtly subversive to the functioning of the Departments, mission, values, vision, strategic direction, and operational goals into prioritizing and providing effective correctional services in its facilities, community supervision, and its daily operations to Reduce recidivism by promoting offender change through proven strategies during safe and secure incarceration and effective community supervision and therefore has subjected the Plaintiff to Cruel and Unusual Punishment Prohibited by the Eighth Amendment.

10. A Declaratory Judgement that requires the Minnesota Department of Corrections to Hire Professional Employee Staff, Special Education Staff, Education Staff and Case Managers for Academic and Vocational training programs in tandem with the rise in the number of prisoners.

11. A declaration that Stillwater Correctional Facility must be required to create a Racial Task Force Employee hiring committee committed to recruiting and hiring Minorities & other ethnic groups as potential Prison staff members, Education Staff Members & Prison Administrators for Stillwater Correctional Facility & Rush City Correctional Facility.

12. A Declaratory Judgment that the Thirteenth Amendments exception made applicable to the Plaintiff requiring slavery & involuntary servitude as punishment for crime whereof the plaintiff shall have been convicted is an abomination that cannot be reconciled with the Eighth Amendment's Ban Against Cruel & Unusual Punishment which is unconstitutional and does not serve the Cause of Evolving Standard of decency of an Maturing Society and has caused mass Incarceration and Toxic overcrowding conditions for Profit Where the Minnesota Department of Corrections and Minnesota Department of Administration and MINNCOR Industries & Private Contractors continue to use the Thirteenth Amendment as a shield as justification to Abuse the Plaintiff for Financial Gain based upon Racketeering Influenced and Corrupt Organizations Act.

13. A Declaratory Judgement that the Plaintiff is entitled to a broader Due Process Right to appropriate or Effective or Reasonable Treatment of Illness or disability that triggered the Plaintiffs Involuntary confinement under Reasonable safe custodial conditions where the Plaintiffs Life, Liberty and Property Interest are also attached to the Minnesota Department of Corrections Facilities Mandatory Requirement thru State Statute to provide the Plaintiff with Rehabilitation & Sex Offender Treatment Beyond the Plaintiffs Presumptive Sentences.

14. The Plaintiff Seeks Prospective and Permanent Injunction Court Order Relief for Continued violations of Federal Law Barring the Illegal Organizing or Forming of Labor Unions or Employee organizations within the Minnesota Department of Corrections for Contracted Employees and Corrections Security Guards that are in reality Independent Contractors.

15. The Plaintiff Seeks Prospective Injunction Court Order Relief for Continued violations of Federal Law mandating State-Wide Prison Population limit necessary to remedy the violation of prisoners' constitutional rights such as extended incarceration beyond the prisoners presumptive terms of imprisonment without Due Process and is authorized by the Prisoner Litigation Reform Act & The Eighth Amendment of the United States Constitution.

16. The Plaintiff Seeks Prospective Injunction Court Order Relief for Continued violations of Federal Law mandating State-Wide Prison Reform & Criminal Justice Reform by Extending Jurisdiction of the First

Step Act for State Criminal Actions necessary for Implementing The First Step & Second Chance Act Laws signed by President Donald Trump making the Act Applicable to Inmates Convicted of State Crimes.

17. The Plaintiff Seeks Prospective Injunctive Relief for continued violation of Federal Law Barring the MNDOC Defendants and JPay Defendants from preventing the Plaintiff from engaging in legitimate exercises of his First Amendment rights to Freedom of Speech by Broadly Limiting & Completely Denying the Plaintiff Access to the Internet such as Cyberspace, Social Media, Through JPay-Kiosk, Withholding WIFI From Plaintiff for JPay Communication & Messaging Devices, Internet Cellphones, Books, Magazine Publications, Photos, Packages through the Mailroom & Property Control Department, In Violation of The First Amendments Right to Freedom of Speech.

18. The Plaintiff also Seeks Prospective Injunctive Relief for continuing violation of Federal law barring the Plaintiff's and All Similarly situated prisoner's housed at Stillwater Correctional Facility, & All Similarly Situated Minnesota Correctional Facilities or Confinement Facilities from both present and future confinement in overcrowded and double bunking prison conditions because such conditions has and will continue to jeopardize the Plaintiff & All Similarly situated Prisoners Health & Safety or Eminent Death because of the Rise of Aggravated Violence and Prisoner Rape that these overcrowded & double bunking conditions has caused within all Minnesota Correctional Facilities.

19. The Plaintiff also Seeks Prospective Injunctive Relief for continuing violation of Federal Law & the Fair Labor Standard Act barring the Defendants For MINNCOR & the Defendants for Minnesota Department of Corrections & the Defendants for Stillwater Correctional Facility &The Defendants From Rush City Correctional Facility & The Defendants For the Minnesota Department of Administration from Labor Abuses regarding the Plaintiffs Labor, wages and unsafe and Hazardous Working Conditions.

**20.** Individual Compensatory damages in the Amount of $500 Million Dollars Assessed to the Following Defendants Jointly: State Defendants or Actors and its Contractors, MINNCOR Industries and its Contractors, and AFSCME Counsel Number#5 and its Contractors.

**21.** Class Action Punitive Damages against each defendant In an Amount Assed by the Court.

22. Individual Punitive Damages in the amount of $1.5 Million, against each defendant Individually.

23. Award Plaintiff the cost of this suit, and reasonable fees and litigation expenses and other applicable relief under law.

24. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction.

25. Designate this Action as a Class Action and Subclasses and Appoint the Plaintiff in his Capacity as Jail House Lawyer as Class Counsel or Appoint Class Counsel .

26. Award such other and further relief as the court deems just and proper.

**508. Fed R. Civ. P.23(a): Adequacy of Representation**

The Claims of the Plaintiff are typical of those of the MDOC Class, as their claims arise from the same policies, practices, and course of conduct and their claims are based on the same theory of law as the Plaintiffs claims. The Plaintiff in his Capacity as Jail House Lawyer will fairly and adequately represent the interest of the MNDOC Class and will diligently serve as a Class representative under the Management of the Court.

I (We) hereby certify under penalty of perjury that the above Amended First Amended Complaint is true to the best of my (our) information, knowledge, and belief.

Signed this day of September 23rd 2019, 2019

Signature(s) of Plaintiff(s) Tony D. Jackson

**BY: TONY DEJUAN JACKSON**
**JAIL HOUSE LAWYER***
**PRISONER #197562**